1
2
3
4

William E. Kennedy California Bar No. 158214
CONSUMER LAW OFFICE OF WILLIAM E. KENNEDY
2797 Park Avenue, Suite 201
Santa Clara, California 95050
Telephone: (408) 241-1000
Facsimile:  (408) 241-1500
Email: wkennedy@kennedyconsumerlaw.com

5
6
7
8

Ben Dupre California Bar No. 231191
DUPRE LAW FIRM PROF. CORP.
3567 Benton St. # 171
Santa Clara, CA 95051
Telephone: (408) 874-5300
Facsimile: 408) 727-5310
bendupre@gmail.com

9

Attorneys for Plaintiff PHYLLIS SANDIGO

10

11 **UNITED STATES DISTRICT COURT**

12 **NORTHERN DISTRICT OF CALIFORNIA**

13

14

Phyllis Sandigo,

15              Plaintiff,

16      v.

17 Ocwen Loan Servicing, LLC and U.S. Bank
National Association, as Trustee for GSAA
18 Home Equity Trust 2007-3, Asset Backed
Certificates, Series 2007-3,
19
              Defendants.
20

21

22

23

24

25

26

27

28

**5:17-cv-02727**

**FIRST AMENDED COMPLAINT**

1. Homeowner's Bill of Rights, Civil Code § 2920 *et seq.*
2. Violation of the Rosenthal Act, Civil Code § 1788 *et seq.*;
3. Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605 *et seq.*;
4. Conversion;
5. Violation of the Consumer Credit Reporting Agencies Act, Civil Code § 1785.1 *et seq.*;
6. Violation of the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*
7. Violation of the Federal Fair Credit Reporting Act 15 U.S.C § 1681s-2(b)

**DEMAND FOR JURY TRIAL**

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## I. __INTRODUCTION__

1.     Ms. Sandigo is a senior and a widow, living on a fixed income. She has owned and lived in her home for over 40 years.  In June 2016, Ocwen sprung on Ms. Sandigo a letter falsely stating that she was past due over $6,000 on her mortgage loan, when in fact Ms. Sandigo was current on her loan and had been for years.  Ocwen then commenced a relentless and unlawful collection campaign -- harassing her with constant collection calls (ignoring her repeated requests to cease), sending collection letters, falsely reporting damaging information on her credit report, and threatening to foreclose on her home.  Despite Ms. Sandigo's repeated telephone calls to resolve the problem, Ocwen robotically rejected her disputes, continued to demand payment, and falsely stated she was past due.  In response to Ms. Sandigo's numerous dispute letters, Ocwen responded with confusing non-responses, and inaccurate information concerning the reasons Ocwen contended Ms. Sandigo was in default.  In March 2017, Ocwen followed through on its threats of foreclosure by recording a Notice of Default with Santa Clara County (starting the foreclosure clock running on when Ocwen can sell Ms. Sandigo's home at auction).  That same month, Ocwen sent Ms. Sandigo, in just one day alone, over fifty (50) foreclosure notices; when stacked on a table, the foreclosure notices are almost six inches thick. Ocwen's campaign continues to the current date, as it still claims that Ms. Sandigo is months behind on her mortgage, threatens foreclosure, refuses her access to information about her account, and refuses to allow her to make any payments whatsoever. Ocwen has now even gone so far to unlawfully possess Ms. Sandigo's checks totaling over $15,000 (issued by her homeowner's insurance company to repair significant flood damage to her home bathrooms). Ocwen is listed as a co-payee on the check.  In early August 2017, Ms. Sandigo sent in both checks for Ocwen to sign, along with a letter explaining she experienced flood damage.  Instead of signing and returning the check, Ocwen refused and has unlawfully possessed the checks ever since.  For months, one of Ms. Sandigo's bathrooms remains completely unusable and the other partially unusable (flooring and paneling removed, etc.).

2.     As a result of Defendants' unlawful acts and omissions, Ms. Sandigo has suffered and continues to suffer significant emotional distress including bouts of crying, physical

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

shaking, nausea, nervousness, sleep problems (requiring valium and trazadone), stress, loss of appetite, weight loss, paranoid, humiliation, loss of enjoyment in life, anger, loss of concentration at home, fear of losing her home, hopelessness, frustration, anxiety, among other negative emotions. The telephone conversations with Ocwen personnel were disturbing to the point that Ms. Sandigo was often left physically shaking, and at times crying after they were over.

3.      Ms. Sandigo is a senior citizen, as that term is defined by Civil Code § 1761. Ocwen knew that their conduct was directed at a senior citizen.  A widow and a senior citizen, Ms. Sandigo is substantially more vulnerable than other members of the public to Ocwen's conduct because of her status, and actually suffered substantial emotional and economic damages from Defendants.

4.      Defendants have a history, business plan, or practice of unlawfully servicing mortgage loans and unlawful collection practices similar to herein.

5.      Defendants' conduct is reckless and with a conscious disregard for the rights of Ms. Sandigo, particularly after receiving repeated pleas from Ms. Sandigo to cease the collection campaign because she was current on her payments.

## II.  PARTIES

6.      Plaintiff, Phyllis Sandigo is an individual and at all relevant times herein was a resident of Santa Clara County, California.   Ms. Sandigo is a senior citizen as that term is defined by Civil Code §1761.

7.      Defendant Ocwen Loan Servicing, LLC ("Ocwen"), the current servicer of Ms. Sandigo's mortgage loan, is primarily engaged in the business of mortgage servicing.

8.      Defendant U.S. Bank U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 2007-3, Asset-Backed Certificates, Series 2007-3 ("U.S. Bank") is the trustee for the investor on the loan and owner of the note secured by Ms. Sandigo's home, and is a national banking association organized under the laws of the United States.

9.      Ms. Sandigo alleges that at all times herein mentioned, each of the Defendants was, and is now, the agent, servant, employee and/or other representative of the other

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1  Defendants.  In doing the things herein alleged, Defendants were acting in the scope, purpose

2  and authority of such agency, service of employment, and/or other representative capacity with

3  the permission, knowledge, consent, and ratification of the other Defendants.

4       10.    Upon information and belief, throughout this entire time (including all relevant

5  events listed in this lawsuit, Ocwen was the mortgage servicer of Ms. Sandigo's loan on behalf

6  of Defendant, U.S. Bank.  As U.S. Bank's mortgage servicer, Ocwen acted as U.S. Bank's agent,

7  thus created a principal-agency relationship between these two Defendants.

8       11.    Upon information and belief, Defendants authorized, approved, and/or ratified the

9  acts herein.

10  **III.  <u>VENUE AND JURISDICTION</u>**

11       12.    Defendants, and each of them, are subject to the jurisdiction of Santa Clara

12  County Superior Court of the State of California by virtue of their business dealings and

13  transactions in California, and by causing injurious effects in California by their acts or

14  omissions.

15       13.    Venue is proper in this Court because the property and transactions at issue

16  occurred in Santa Clara County.

17  **IV.  <u>FACTUAL SUMMARY</u>**

18       14.    Plaintiff incorporates and realleges all of the preceding allegations as though fully

19  set forth here.

20       15.    The fundamental reason why Ms. Sandigo has found herself victim of Ocwen's

21  unlawful and abusive debt collection practices (including its ongoing attempt to foreclose on her

22  home) is that Ocwen is wrongfully attempting to collect money for escrow regarding property

23  tax payments for a three-year period despite the fact that Ocwen paid no property tax, and Ms.

24  Sandigo and her late husband made such property tax payments directly to Santa Clara County.

25       16.    From 2013 to 2016, Ocwen never requested Ms. Sandigo to make monthly

26  payments in an amount which included escrow for property tax payments.  But in 2016, Ocwen

27  suddenly, and without any explanation, falsely claimed that such higher payments should have

28  been made.  Ms. Sandigo spent hours disputing the matter with Ocwen during numerous

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

telephone conversations, as well as in written correspondence.  Ocwen repeatedly rejected Ms. Sandigo's pleas and didn't appear to listen to anything Ms. Sandigo said.

17.     Instead of fixing the problem, Ocwen continues to engage in a relentless campaign of unlawful collection harassment in an attempt to collect more than $6,000.  This collection campaign consists of constant collection calls, collection letters, false reporting of past due balances and delinquencies to national credit reporting agencies, and initiating a foreclosure to sell Ms. Sandigo's home, and blocking Ms. Sandigo from cashing insurance check proceeds (totaling over $15,000) to repair flooding damage to her bathroom, and unlawfully maintains possession of the checks.

## V.  FACTUAL ALLEGATIONS

18.     Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

19.     Plaintiff, Phyllis Sandigo lives at 3577 Lynx Drive in San Jose, California.

20.     Ms. Sandigo and her late husband Joseph Sandigo purchased their home, at the time in a newly developed neighborhood, in 1976 and raised their children there.

21.     In September 2011, the Sandigos filed a Chapter 13 bankruptcy, which Ms. Sandigo successfully completed in November 2016.  In 2014, Mr. Sandigo passed away.  The mortgage was current, and it was not included in the bankruptcy.  The Sandigos continued to make timely monthly payments directly to Ocwen during the bankruptcy.

22.     In January 2012, the Sandigo's loan was modified.  The modification calls for a fixed principal and interest payment of $1,325.79 for the duration of the loan.  At the end of the loan, a balloon payment is due.

23.     The crux of this matter concerns the escrow portion of the monthly payment on Ms. Sandigo's loan. There are two escrow items, which at times, have been added to the principal and interest portion of the payment ($1,325.79) to raise the total monthly payment due. The first is for the payment of hazard insurance (i.e. homeowner's insurance).  The cost of the escrow payment for hazard insurance has varied somewhat, but has remained approximately

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

$89.42 per month.  The Sandigos have at all times made payments which included the hazard insurance escrow amount, and there is no known dispute concerning these amounts.  Thus, the regular monthly payment due to Ocwen has always been at least $1,415.21 ($1,325.79 + $89.42).

24.     The second escrow item is for property tax.  This is the escrow item which is at the center of Ocwen's cascade of errors and wrongful collections.  The cost of the escrow payment for property tax has been approximately $182.35.  When Ocwen included this escrow item in the payment, it brought the payment to approximately $1,597.56. ($1,325.79 + $89.42 + $182.35).

25.     In early 2012, when the loan was modified, it was agreed that their account would be escrowed for property tax, as well as hazard insurance for one year.  Accordingly, in 2012 and early 2013, Ocwen required payment of approximately $1,597.56, which the Sandigos paid without dispute.

26.     In early 2013, the Sandigos requested that their account be de-escrowed for property tax.  Ocwen did so.  Accordingly, beginning in June 2013, Ocwen began sending the Sandigos billing statements for a lower monthly payment of approximately $1,415.21, thus reflecting the fact that the account had been de-escrowed for property tax.

27.     Ocwen made no payment of property tax after March 22, 2013.  The Sandigos have made all property tax payments due directly to Santa Clara County after March 2013.  The Sandigos continued to make the de-escrowed payment of approximately $1,415.21 from June 2013 through June 2016.

**Ocwen Unlawfully Attempts to Collect $6,266.55, Falsely Stating Ms. Sandigo is Delinquent and Past Due**

28.     On May 24, 2016, after Ms. Sandigo had been making payments of approximately $1,415.21 for three years, which Ocwen accepted without issue, defendant U.S. Bank (trustee for the loan's investor) filed a document in bankruptcy court stating that Ms. Sandigo was $6,266.55 past due on her mortgage.  U.S. Bank attached a payment history which indicated that U.S. Bank contended that the Sandigos had been required to make a payment of

$1,597.56 (not $1,415.21) from June 1, 2013 to April 2016.

29.     Ms. Sandigo regularly made her monthly payments through Ocwen's online system.  In July 2016, following U.S. Bank's actions, Ocwen suddenly and without explanation, began requiring Ms. Sandigo to make payments of $1,597.56 instead of the $1,415.21, which she had been paying up until that point.  Ocwen's system no longer would accept payments of $1,415.21.  Ms. Sandigo called Ocwen to dispute the higher payment required.  Ocwen insisted that she make the $1,597.56 payment.  Ms. Sandigo had no choice but to pay.  Ms. Sandigo was charged $19.50 to make the payment, as a result of Ocwen's surcharge on such telephonic payments, which it refers to as "Speedpay."

**Ocwen Rejects Ms. Sandigo's Oral Pleas, and Unlawfully Attempts to Collect Over $6,000 Not Owed**

30.     After these events, Ms. Sandigo began a long series of communications with Ocwen to dispute Ocwen's handling of her account.

31.     Ms. Sandigo spoke to numerous individuals.  None of these individuals fixed the problem.  Ms. Sandigo was forced to explain the problem over and over to each of the different individuals.  Ms. Sandigo felt Ocwen was never really listening to her when she would try to explain and get Ocwen to fix the problem.  Despite her explanations, Ocwen continued to falsely state she was behind on payments and demanded that she pay.  At various times, Ocwen falsely stated that Ms. Sandigo missed payments, or that her payments in the past had not been in a sufficient amount.  These conversations were emotionally upsetting to Ms. Sandigo and often left her physically shaking.

32.     During other phone calls with Ocwen, Ms. Sandigo was often put on hold for long periods of time.  Other times, she was told that someone would call her back, but no one called.

**Ocwen's Representative Presanth Gives Conflicting Explanations and Does Not Fix the Problem**

33.     Ms. Sandigo was eventually put in touch with a representative named Presanth who offered a variety of explanations for Ocwen's conduct. All of these conversations described

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

below occurred after the Spring of 2016.

34.     In one conversation with Ms. Sandigo, Presanth falsely stated that Ocwen had paid Ms. Sandigo's property taxes, which was the reason her payment had increased.  In fact, as alleged above, Ms. Sandigo paid all property taxes due on the property after March 22, 2013.

35.     In another conversation, Presanth stated that Ocwen had not received a number of her monthly payments.  Specifically, Presanth falsely stated that Ocwen had not received payments in April 2013, May 2014, September 2014, and November 2015.

36.     Ms. Sandigo located her Wells Fargo bank statements, which showed that she in fact had made payments during those months.  Ms. Sandigo sent the bank statements to Presanth.  Even this was an ordeal, Ms. Sandigo emailed the statements to the email address Presanth had provided.  Ocwen's email system acknowledged receipt of the email, but directed Ms. Sandigo to email it to other email addresses. These addresses did not work, as Presanth said that he did not receive such emails.  Ultimately, he told Ms. Sandigo to "efax" the documents, which required the opening of an efax account.  By this means, Ms. Sandigo was finally able to get the documents to Presanth.

37.     During subsequent conversations with Presanth, he admitted that Ocwen had in fact received all payments.  However, Presanth would still not acknowledge that Ms. Sandigo had wrongly been placed in default, stating that he still needed to check with Ocwen's bankruptcy department.

38.     In Ms. Sandigo's last telephone call with Presanth, he told Ms. Sandigo that her monthly payment had been increased during her bankruptcy, but that Ocwen had not been allowed to notify her that this had occurred.  Presanth reiterated that Ms. Sandigo was in default and that there was nothing more that he would do.

**Ocwen Dismisses Ms. Sandigo's Written Dispute Letters, and Continues to Unlawfully Collect Over $6,000 and Rejects Ms. Sandigo's Payments**

39.     Ms. Sandigo also submitted written disputes to Ocwen.

40.     For example, on July 26, 2016, Ms. Sandigo faxed a letter to Ocwen's Research

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Department at fax number 407-737-6375.  Ms. Sandigo's July 26, 2016 letter disputed Ocwen's increase of her monthly payment to $1,597.56, and also submitted proof that she made two payments, which an Ocwen representative had falsely claimed that she had not made.

41.     The Research Department is the department at Ocwen, which handles Qualified Written Requests/Notices of Error pursuant to the Real Estate Settlement Procedures Act ("RESPA").

42.     On August 4, 2016, Ocwen sent a response to the July 26, 2016 letter.  The response letter acknowledged that the two payments for which Ms. Sandigo had submitted proof had been received and applied, but otherwise took no action to resolve the problem, or explain why Ms. Sandigo's dispute concerning the increase in her payment amount was not valid. Ocwen incorrectly interpreted the dispute letter to include a complaint about the due date on the loan, which was not even addressed in Ms. Sandigo's July 26 letter.  Ocwen would continue its unlawful collection campaign.

43.     On November 2, 2016, Ms. Sandigo faxed another dispute letter to Ocwen's Research Department at 407-737-6375.  The letter responded to false statements made by Ocwen personnel over the telephone that Ocwen had raised her monthly payment because Ocwen had paid Ms. Sandigo's property taxes on her behalf.  Ms. Sandigo provided proof that she had made the property tax payments herself for the last few years.  Ms. Sandigo again asked Ocwen to reduce her payment to $1,415.21.

44.     On November 28, 2016, Ocwen sent Ms. Sandigo a letter in which it stated that it had de-escrowed Ms. Sandigo's account for property taxes prospectively, and stated that Ms. Sandigo's payment would be reduced to $1,416.37 starting in February 2017.  However, Ocwen continued its unlawful collection campaign unabated.

45.     On December 8, 2016, Ocwen sent correspondence to Ms. Sandigo which admitted that "we have not disbursed any funds toward the county tax since 03/22/2013."

46.     Neither Ocwen's November 28, 2016 letter nor its December 8, 2016 letter addressed the larger issue, i.e. Ocwen retroactively charging $1,597.56 per month during time periods when Ocwen paid no property tax, resulting in Ms. Sandigo's account being placed in

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

default, and triggering the abusive and harassing collection campaign.

47.     Then, things got even worse. Beginning in December 2016, Ocwen refused to allow Ms. Sandigo to make her monthly payments.  Ms. Sandigo mailed payments to Ocwen but Ocwen rejected them, and returned them to Ms. Sandigo.

48.     On December 26, 2016, Ms. Sandigo also sent a letter to Ocwen at the address designated by Ocwen to receive Notices of Errors (sometimes known as Qualified Written Requests) under RESPA.  In response to Ocwen's representative, Presanth's earlier statement (that the reason Ocwen considered her to be in default was that it contended that she had not made several payments), she provided her Wells Fargo bank statements for four years, (from January 2013 through November 2016), and made notations on the Wells Fargo statements showing each payment during that time period.  Ms. Sandigo received no written acknowledgement or response to the December 26, 2016 letter, despite that fact that RESPA required Ocwen to respond.

**Ocwen Continues Making Collection Calls (Despite Ms. Sandigo's Repeated Requests to Cease)**

49.     Ms. Sandigo also received a large number of collection calls from Ocwen demanding payment.  These calls would range from morning until the afternoon, multiple times per week, in the latter half of 2016.

50.     She would attempt to explain that she was making payments each month as required and that she paid her own property taxes, yet Ocwen's collectors would nonetheless demand payment.  Ms. Sandigo repeatedly told Ocwen to fix the problem, and to stop calling and harassing her, yet the phone calls persisted.  Many collectors seemed to have no knowledge of the previous calls or even that Ms. Sandigo disputed the default status of the loan.

**Ocwen Continues Sending Collection Letters, Assessing Fees and Conducting Home Inspections**

51.     Ocwen also sent a number of collection letters to Ms. Sandigo falsely stating that she was in serious default.  The letters did not address or acknowledge Ms. Sandigo's many disputes.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

52.     Some collection letters falsely and confusingly stated that Ms. Sandigo had not made payments in months when she clearly had made payments.  For example, a December 1, 2016 letter stated, "We have not received your 08/01/2016 through 12/01/2016 mortgage payment(s). . ."  In fact, Ms. Sandigo made payments in August, September, October, and November 2016.  (Ocwen would not allow Ms. Sandigo to make a payment in December 2016.).

53.     In February 2017, Ocwen's monthly statement listed a total amount due of $355,635.91.

54.     Ocwen sent a "Delinquency Notice" dated March 2, 2017 falsely stating that Ms. Sandigo was 213 days delinquent on her mortgage loan and stating "Failure to bring your loan current may result in fees and foreclosure – the loss of your home."

55.     During its collection campaign, Ocwen conducted inspections of Ms. Sandigo's home on a regular basis and assessed an illegal fee for each inspection.  Ocwen also assessed a number of late charges based on the incorrect position that Ms. Sandigo was behind on her payments.

**Ocwen Continues to Report False, Incomplete and Damaging Information on Ms. Sandigo's Credit Report to National Credit Reporting Agencies**

56.     Ms. Sandigo's December 2016 Equifax credit report shows that she owed "amounts past due" in 2015 and 2016, when she was current on her mortgage.  For example, in June and July 2016, Ocwen reported an amount past due of $6,111.00.  Ms. Sandigo also sent a copy of the December 26, 2017 letter to Equifax, to dispute the credit reporting, but received no response.

57.     Ocwen never even bothered to report to the credit reporting agencies that Ms. Sandigo was disputing that she was past due or delinquent.

**Ocwen Follows Through on its Unlawful Threats and Initiates a Foreclosure**

58.     On March 3, 2017, the Santa Clara County District Attorney's office sent a letter to Ms. Sandigo advising her that a Notice of Default had been recorded against her home, and that her home was now in foreclosure.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

59.     On or about March 13, 2017, fifty-four (54) copies of a Notice of Default were delivered to Ms. Sandigo's home, indicating that Ocwen commenced the foreclosure process.

**Ocwen Continues Its Refusal to Fix the Problem and Continues Harassing Ms. Sandigo**

60.     On April 11, 2017, Ms. Sandigo filed this lawsuit.

61.     Despite being served with the lawsuit (which has been pending for over nine months), Ocwen has refused to fix its errors concerning Ms. Sandigo's account.  Instead, Ocwen has continued its unlawful collection campaign. Nor has Ocwen, throughout this entire time of over nine months since this lawsuit has been pending, ever offered Ms. Sandigo any justification or explanation whatsoever for its actions, despite repeated requests.

62.     Ocwen has continued to falsely report derogatory credit information concerning Ms. Sandigo's account, and has falsely verified that the derogatory credit information reported is accurate to the credit reporting agencies.

63.     Ocwen continues to refuse to allow Ms. Sandigo to make monthly payments on her account.

64.     Ocwen has continued to block Ms. Sandigo's access to her account information online, and refuses to provide monthly account statements.

65.     Ocwen refuses to rescind the Notice of Default that it recorded against Ms. Sandigo, thus allowing to remain a public record of Ms. Sandigo's claimed delinquency, and keeping Ms. Sandigo under the threat of a foreclosure sale which could be commenced on only 20 days notice under California foreclosure law.

66.     On October 24, 2017, despite this pending lawsuit (filed six months earlier), Ocwen sent Ms. Sandigo a letter claiming that she had not made the August 2016 payment or any payments since then.  The letter claimed that Ocwen had the right to foreclose on her house and suggested that she engage in alternatives such as a loan modification, refinance, short sale, or deed-in-lieu of foreclosure.  Meanwhile Ocwen rejected and sent back any payments Ms. Sandigo attempted to make, and blocked her out of accessing her account.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**Ocwen Continues to Unlawfully Possesses Ms. Sandigo's Insurance Checks Issued to Repair Significant Flood Damage to Her Home**

67.     In the spring of 2017, Ms. Sandigo sustained significant flood damage to her home bathrooms causing serious damage and rendering one bathroom completely unusable and the other partially unusable, and in disrepair.  Flooring and side paneling had to be removed immediately.  Ms. Sandigo notified her homeowner's insurance company (State Farm), which promptly issued two checks (totaling over $15,000).  The payee information on the checks included Ms. Sandigo, Ocwen, and the mortgage servicer on her 2nd loan.

68.     Ms. Sandigo sent the checks to the servicer of her 2nd mortgage which promptly signed the checks and sent them back to Ms. Sandigo.  On August 7, 2017, Ms. Sandigo, sent the two checks to Ocwen, explained that she had suffered water damage to her home, and asked Ocwen to sign and return the checks.

69.     Ocwen did not not sign and return the checks, but instead sent Ms. Sandigo a letter dated August 14, 2017 requiring her to submit several documents as a prerequisite to receiving any insurance funds, including a Contractor's Waiver of Lien, Contractor's signed Contract, Insurance Adjustment Worksheet, IRS w-9, and a copy of the contractor's license  as a prerequisite to receiving any funds.  The letter said that even if Ms. Sandigo met all of these requirements, she would only receive the funds in increments of as little as 25%.  In order to receive additional increments, Ms. Sandigo would be required to arrange for an inspection conducted by Ocwen of the repairs.

70.     Ocwen's insistence that the contractor sign a waiver of lien, and receive funds in increments, contingent on Ocwen's willingness to provide the funds, complicated the process of finding a contractor.  Nonetheless, Ms. Sandigo complied with Ocwen's requirements.  On November 7, 2017, she submitted all of the required documents to Ocwen.  Yet, Ocwen did not provide the funds.  Ocwen's sole response was on November 14, 2017, when it sent a nonsensical letter stating that Ms. Sandigo had failed to update Ocwen on the status of the repairs.  Any such repairs were impossible since Ocwen had failed to return any of the insurance

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1    funds.

2

3        71.     On August 21, 2017, Ms. Sandigo's attorney contacted Ocwen's attorney to

4    advise him of the situation and request resolution of the problem.  Ocwen took no action in

5    response to this letter. On November 18, 2017, Ms. Sandigo again sent Ocwen the materials

6    required by the August 14, 2017 letter.  Ocwen never provided Ms. Sandigo a response to this

7    letter, apart from acknowledging its receipt.

8

9        72.     Ms. Sandigo's family has no use of one of its bathrooms and only partial use of

10   the other.  Ms. Sandigo has spent significant amounts of time trying to jump through all the

11   hoops that Ocwen required with the hope the flood damage to her home could be repaired

12   without delays. To this day, Ocwen continues to unlawfully possess Ms. Sandigo's insurance

13   check proceeds of over $15,000, and has failed to communicate with Ms. Sandigo about this

14   issue.

15

16       73.     This entire episode, including the prospect of losing her home of over forty years,

17   has caused and continues to cause Ms. Sandigo significant emotional stress and physical

18   symptoms, as described above.

19

20                              **VI.  <u>LEGAL CLAIMS</u>**

21

22                          <u>**FIRST CAUSE OF ACTION**</u>
                     **Violation of the California Homeowner Bill of Rights**
23               **California Civil Code § 2924.11 – Against Ocwen and U.S. Bank**
                      **California Civil Code § 2924.17 – Against Ocwen**
24

25       74.     Plaintiff incorporates and realleges all of the preceding allegations as though fully

26   set forth here.

27       75.     The loan at issue is secured by a first lien deed of trust against Ms. Sandigo's

28   principal residence, which is a single-family house and used only for personal, family, and

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1  household purposes.

2      76.    Defendant Ocwen is a "mortgage servicer" as defined by Cal. Civil Code §

3  2920.5.

4      77.    On information and belief, Ocwen is not an entity described in Cal. Civil Code §

5  2924.18(b) because, among other reasons, it foreclosed on more than 175 residential real

6  properties during the immediately preceding annual reporting period.

7      78.    Ms. Sandigo is a "borrower" as defined by Cal. Civil Code § 2920.5.

8      79.    As of March 2017, Ms. Sandigo was in compliance with the loan modification.

9      80.    Civil Code § 2924.11(c)(1) provides that if a foreclosure prevention alternative,

10  such as a modification, is approved in writing and the borrower is in compliance with the loan

11  modification, the servicer "shall not record a notice of default."

12      81.    Ocwen and U.S. Bank violated § 2924.11(c)(1) by recording a Notice of Default

13  even though Ms. Sandigo was fully in compliance with the permanent loan modification.

14      82.    Civil Code § 2924.17 requires that foreclosure documents, including a Notice of

15  Default, recorded by or on behalf of a mortgage servicer be accurate, complete, and supported by

16  competent and reliable evidence.   The servicer must ensure that it has competent and reliable

17  evidence to substantiate the borrower's default and right to foreclose, including the borrower's

18  loan status and loan information, before recording foreclosure documents.

19      83.    Defendants violated Civil Code § 2924.17 when Ocwen recorded, or had its agent

20  record, the March 2017 Notice of Default, despite being on notice multiple times that Ms.

21  Sandigo fully complied with the loan modification.

22      84.    Pursuant to Civil Code § 2924.12, Ms. Sandigo is entitled to an injunction to

23  address material violations of sections 2924.11 and 2924.17.   She seeks an injunction which

24  prevents the sale of her home, and requires Ocwen and U.S. Bank to rescind the Notice of

25  Default and comply with the loan modification. Ms. Sandigo also seeks attorney's fees and

26  costs.

27

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## SECOND CAUSE OF ACTION
### Violation of the Rosenthal Act, Cal. Civil Code §§ 1788, *et seq*
### Against Ocwen

85.     Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

86.     Ocwen is a "debt collector" within the meaning of Civil Code§ 1788.2(c).

87.     The monies allegedly owed by Plaintiff is a "debt" within the meaning of Civil Code § 1788.2(d), and a "consumer debt" within the meaning of Civil Code § 1788.2(f).

88.     Ocwen's acts and omissions, and its entire course of conduct, as more fully described above, constitute numerous violations of the Rosenthal Fair Debt Collection Practice Act ("RFDCPA"), Civil Code § 1788 et seq., including, but not limited to, the violations of §§ 1788 et seq., 1788.11, and 1788.17.

89.     Ocwen violated California Civil Code § 1788.11 by communicating by telephone, with the debtor with such frequency as to be unreasonable and to constitute a harassment under the circumstances.

90.     Ocwen violated California Civil Code § 1788.17 by demanding payments in excess of those required or allowed by the modification agreement, rejecting Ms. Sandigo's payments, assessing fees without justification, refusing to accept Ms. Sandigo's payments, refusing to provide a coherent reason for its contention that Ms. Sandigo was in default, failing to respond substantively to disputes submitted by Ms. Sandigo, unlawfully possessing Ms. Sandigo's insurance check proceeds and blocking her from cashing these checks, and unlawfully threatening foreclosure, and initiating an illegal foreclosure.

91.     Ocwen violated Civil Code § 1788.13(e) by representing to Plaintiff that her loan could be increased by fees and charges, and including property inspection fees when no such fees and charges could be assessed.

92.     Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. § 1692e) by making false, deceptive, and misleading representations in an attempt to collect a debt, and taking action it could not legally take.

93.     Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. § 1692c)

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

by failing to cease communicating.

94.      Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. § 1692d), by engaging in conduct which had the natural consequence to harass, oppress, and abuse Ms. Sandigo, and causing a telephone to ring or engaging Ms. Sandigo in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass her, and unlawfully possessing Ms. Sandigo's insurance check proceeds and blocking her from cashing these checks,.

95.      Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. §1692e(2)(A)) which prohibits misrepresentation of the character, amount, or legal status of the debt.

96.      Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. §1692f), which prohibits any unfair or unconscionable means to collect or attempt to collect any debt, including but not limited to, unlawfully possessing Ms. Sandigo's insurance check proceeds and blocking her from cashing these checks.

97.       Ocwen violated Civil Code § 1788.17 (via incorporation of 15 U.S.C. §1692f(1)),  which prohibits attempts to collect any amount unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

98.      Ocwen's violations were willful and knowing.

99.      As a result of these violations, Ms. Sandigo has suffered damages, including emotional distress, in an amount to be proven at trial.

100.     Plaintiff is entitled to statutory damages, actual damages, reasonable attorney's fees, and costs under Cal. Civil Code §§ 1788.17 and 1788.30, and 15 U.S.C. § 1692k(a)(2)(A).

101.     Plaintiff is entitled to treble statutory damages.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## THIRD CAUSE OF ACTION
### Real Estate Settlement Procedures Act 12 U.S. C. § 2605
### Against Ocwen

102.    Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

103.    Ocwen is a servicer of a federally related mortgage loan and therefore is subject to the RESPA pursuant to 12 U.S.C.§ 2605(e) and Regulation X, 12 C.F.R. Part 1024.

104.    As alleged above, Ms. Sandigo submitted letters to Ocwen dated July 26, 2016, November 2, 2016, December 26, 2016, August 21, 2017, and November 18, 2017.  Each of the letters met all requirements for a "Notice of Error" under RESPA.  The letters included, or otherwise enabled Ocwen to identify the Plaintiff's name and account, and included a statement of the reasons for the Plaintiff's belief that the account was in error.

105.    Pursuant to 12 U.S.C. § 2605(e)(1)(A) and 12 C.F.R. § 1024.35(d), Ocwen was required to acknowledge receipt of the dispute letters within 5 days (excluding legal public holidays, Saturdays, and Sundays).

106.    Pursuant to 12 U.S.C. § 2605e(2), and 12 C.F.R. § 1024.35(e), within 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt of the letters, Ocwen was required to:

- make appropriate corrections in Plaintiff's account, including any late charges or penalties, **and**

- transmit to Plaintiff a written notification of such correction, which included the name and telephone number of a representative of Ocwen who can provide assistance.

107.    Alternatively, if Ocwen determined to not make corrections to Plaintiff's account, it was required to:

- conduct a reasonable investigation;

- provide Plaintiff with a written explanation or clarification that included a statement of the reasons for which Ocwen believed that no error occurred; **and**

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

• provide the name and telephone number of an individual employed by, or the   office or department of Ocwen who could provide assistance to the borrower.

108.     Ocwen violated these provisions in multiple ways.

109.     With respect to the July 26, 2016, November 2, 2016, December 26, 2016, August 21, 2017, and November 18, 2017 letters, Ocwen failed to promptly make appropriate corrections to Ms. Sandigo's account, or explain the reasons why Ocwen believed that no error occurred.  Ms. Sandigo is informed and believes that Ocwen also failed to conduct a reasonable investigation.

110.     With respect to the December 26, 2016, August 21, 2017, and the November 18, 2017 letters, Ocwen failed to acknowledge these letters within 5 business days.

111.     With respect to the December 26, 2016 letter, Ocwen failed to make any response to this letter whatsoever.

112.     Ocwen's many and repeated violations of RESPA constitute a "pattern and practice" of violation of the Act.  Pursuant to 12 U.S.C. §2605(f)(1), Ocwen is liable for $2,000.00.

113.     Plaintiff suffered actual damages as a result of Ocwen's willful violations of RESPA, including but not limited to emotional distress damages.

114.     Ocwen is liable for a trebling of RESPA statutory damages.

115.     Defendants are liable for attorney fees and costs under 12 USC 2605(f)(3) and other applicable statutes.

**FOURTH CAUSE OF ACTION**
**Conversion**
**Against Ocwen**

116.     Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

**Conversion of Ms. Sandigo's Mortgage Payments**

117.     Ms. Sandigo made payments of $1,597.56 from July 2016 to November 2016 because Ocwen demanded such payment amount, and refused to accept a lesser amount.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

118.     The $1,597.56 payment unlawfully includes approximately $182.35 in escrow charges related to property taxes, which are illegal because Ocwen did not pay Ms. Sandigo's property taxes.  This totals $911.75 that Ocwen received and deposited, and continues to wrongfully maintain possession and control over.

119.     Ms. Sandigo had a possessory and ownership interest in the monies she paid to Ocwen (under the false representations and coercive statements that she had to pay Ocwen a higher monthly payment than she actually owed and was legally required to pay).

120.     Through its false representations and coercive statements to Ms. Sandigo (that she was required to pay a higher amount than she truly was required) Ocwen intentionally took a possessory interest in the money Ms. Sandigo paid Ocwen, and refused to give her money back, depriving Ms. Sandigo of her personal property.

**Conversion of Ms. Sandigo's Insurance Checks**

121.     Ms. Sandigo's insurance company issued two checks ($13,071.10 and $2,158.69) to Ms. Sandigo to cover costs of repairs to her home.

122.     Ms. Sandigo had a possessory and ownership interest in these checks.

123.     On or around August 2017, Ms. Sandigo sent these checks to Ocwen requesting that it sign (since it was listed as a co-payee).  Ocwen refused to sign the checks and instead intentionally took a possessory interest in the checks and unlawfully maintains possession of the checks, depriving Ms. Sandigo of her money.  Even when Ms. Sandigo complied with Ocwen's several requirements to obtain the funds, Ocwen refused to return the funds, or even to respond.

**Plaintiff's Damages Due to Conversion**

124.     Ms. Sandigo suffered monetary, out-of-pocket damages, physical harm, and emotional distress and mental anguish as a result of Ocwen's actions.   Ocwen's conduct was a substantial factor in causing this harm to Ms. Sandigo.

125.     Ocwen acted with oppression, and/or malice, thereby entitling Ms. Sandigo to punitive damages in an amount to be determined at trial. Ocwen acted in a despicable manner and acted with a conscious disregard to the rights of Ms. Sandigo.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### FIFTH CAUSE OF ACTION
### Consumer Credit Reporting Agencies Act, Civil Code § 1785.1 et seq.
### Against Defendants

126.    Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

127.    Ocwen, either directly or through their agents, in the ordinary course of business, regularly and on a routine basis furnishes information to one or more "consumer credit reporting agencies", as that term is defined by Cal. Civil Code section § 1785.3(d).

128.    Ocwen is a "person" as defined by Cal. Civil Code § 1785.3(j).

129.    California's Civil Code § 1785.25(a) states that a "person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

130.    Ms. Sandigo is informed and believes that Ocwen reported inaccurate and/or incomplete information to Equifax, Experian, and Trans Union on a monthly basis.

131.    On numerous occasions, (through many telephone conversations and dispute letters (including, but not limited to, dispute letters: July 26, 2016, November 2, 2016, December 26, 2016, and March 9, 2017), Ocwen was informed that its accounting with respect to Plaintiff's loan was erroneous and thus knew, or should have known that the information it was reporting about Ms. Sandigo to the national credit reporting agencies was inaccurate and incomplete.

132.    In other words, Ocwen knew or should have known that it had not made any property taxes payments on Ms. Sandigo's behalf and that Ms. Sandigo had made timely payments of her property taxes directly to the County.  Thus, Ocwen knew or should have known it had no lawful or factual basis to attempt to collect monies not owed, refusing to accept her monthly mortgage payments beginning in December 2016, and wrongfully reporting her to the national credit bureaus as delinquent.

133.    Ms. Sandigo also sought the assistance of the national credit bureaus to assist her in trying to fix her credit reporting problems regarding Ocwen.  For example, on March 9, 2017, Ms. Sandigo sent Equifax a dispute letter. Equifax then contacted Ocwen requesting Ocwen to

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

investigate.  Again, on June 20, 2017, Ms. Sandigo disputed with Experian and Trans Union regarding her problem with Ocwen.  These national credit bureaus again advised Ocwen of Ms. Sandigo's credit reporting disputes, and requested Ocwen to investigate.

134.     Despite Ms. Sandigo and the national credit reporting agencies' efforts, Ocwen failed to report accurate information to the national credit reporting agencies.  Ocwen continued to report inaccurate information (essentially derogatory information), and failed to conduct a reasonable investigation of Ms. Sandigo's dispute of the derogatory information.

135.     Ocwen's acts and omissions violated Civil Code § 1785.25(a) including, but not limited to the below.

**Equifax Credit Report**

136.     In December 2016, Ocwen inaccurately reported that Ms. Sandigo was past due in January 2016 in the amount of $546.00, was past due in February 2016 in the amount of $728, was past due in March 2016 in the amount of $910.00, was past due in the month of April 2016 in the amount of $5,753.00, was past due in June 2016 in the amount of $6,111.00, and was past due in the month of July 2016 in the amount of $6,111.00, among others.  (12/14/2016 Equifax credit report).

137.     In June 2017, Ocwen inaccurately reported to Equifax that Plaintiff was past due $8,421.00.  In addition, Ocwen inaccurately and incompletely reported that Plaintiff was delinquent from November 2016 through April 2017.  (06/19/17 Equifax credit report)

**Experian Credit Report**

138.     Around July 2017, Ocwen reported inaccurately that Plaintiff was "past due" in the amount of "$16,126".  In addition, Ocwen inaccurately reported to Experian that Plaintiff was 180 or more days delinquent from January 2017 to March 2017, and also 180 or more days delinquent in June 2017 and July 2017.  Ocwen also reported inflated and inaccurate account balances for many months.  In July 2017, Ocwen also did not report the complete account status.

**Trans Union Credit Report**

139.     In December 2016, Ocwen inaccurately reported to Trans Union that Plaintiff had a $0 balance.  In addition, Ocwen also did not accurately report the account status as disputed.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

(December 9, 2016 Trans Union credit report).

140.    Around June 2017, and other prior months, Ocwen inaccurately reported to Trans Union that Plaintiff was 120 days late for the months November 2016 to March 2017. In addition, Ocwen also falsely reported to Trans Union Plaintiff's "account 120 days past due date".  And falsely reported that Plaintiff was "past due $8,421".  (July 4, 2017 Trans Union credit report).

141.    In addition, around July 2017 and other prior months, Ocwen inaccurately reported to Trans Union that Plaintiff was 120 days or more late for November and December 2016.  (06/19/17 3-Bureau credit report).

**Ocwen's Acts and Omissions Violate §1785.25(a)**

142.    Ocwen knew or should have known the above information was inaccurate or incomplete.

143.    Ocwen should have known, or discovered, through its investigation, that the reported information of Ms. Sandigo's account was inaccurate or incomplete.

144.    Ocwen failed to conduct a reasonable investigation with respect to the disputed information.

145.    Ocwen did not and still does not maintain reasonable procedures to comply with its duties, as identified in Cal. Civil Code section 1785.25(a) et seq.

146.    Ocwen acted with a conscious disregard of Plaintiff's rights and safety.

147.    As a direct and proximate result of Ocwen's willful, negligent and inaccurate and incomplete credit reporting, Ms. Sandigo has suffered harm, as described above, and including credit denial damages.

148.    Ms. Sandigo is entitled to recover actual damages pursuant to Cal. Civil Code section 1785.31 *et seq.*

149.    Ms. Sandigo is entitled to attorney's fees and costs pursuant to Cal. Civil Code

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

section 1785.31.

150.    Ms. Sandigo is entitled to punitive damages (to be determined by a trier of fact) and injunctive relief, pursuant to Cal. Civ. Code section 1785.31, as a result of Ocwen's willful conduct.

**SIXTH CAUSE OF ACTION**
**Unfair Business Practices (Violation of Cal. Bus. & Prof. Code §§ 17200, *et. seq.*)**
**Against Defendants**

151.    Plaintiff incorporates and realleges all of the preceding allegations as though fully set forth here.

152.    Business & Professions Code §17200, et seq., the "Unfair Competition Law" ("UCL") defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice.   The UCL authorizes this Court to issue whatever orders or judgments may be necessary to prevent such practices, or to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." *Id.* § 17203.

153.    Defendants committed "unlawful" business acts or practices by, among other things, recording a Notice of Default even though Ms. Sandigo was current on her payments, in violation of the California Homeowner Bill of Rights, Cal. Civil Code § 2924.11(c)(1); filing inaccurate and incomplete foreclosure documents, in violation of the Homeowner Bill of Rights, Cal. Civil Code § 2924.17; failing to appropriately and timely respond to disputes submitted under RESPA; engaging in unlawful collection practices in violation of the Rosenthal Act; converting Ms. Sandigo's funds by insisting on excessive payments; and furnishing inaccurate and incomplete information on her credit reports in violation of California Civil Code § 1785.25(a) as alleged in this Complaint.

154.    Ocwen committed "unfair" business acts and practices, including but not limited to, demanding and accepting payments in excess of those required, assessing various fees without justification, refusing to accept Ms. Sandigo's payments, failing to respond substantively to disputes submitted by Ms. Sandigo, failing to even respond to some of the

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1   disputes, and ultimately threatening and commencing foreclosure proceedings.

2      155.    U. S. Bank, through its agent and servicer Ocwen, committed unlawful and unfair

3   business practices by recording a Notice of Default even though Ms. Sandigo was current on her

4   payments, in violation of the California Homeowner Bill of Rights, Cal. Civil Code §

5   2924.11(c)(1); filing inaccurate and incomplete foreclosure documents, in violation of the

6   Homeowner Bill of Rights, Cal. Civil Code § 2924.17, demanding and accepting payments in

7   excess of those required, assessing various fees without justification, refusing to accept Ms.

8   Sandigo's payments, and ultimately threating and commencing foreclosure proceedings.

9      156.    The Court's intervention is necessary to halt and remedy Defendants' unlawful

10  and unfair acts and practices.

11     157.    Ms. Sandigo is entitled to restitution, declaratory relief, and injunctive relief

12  pursuant to Bus. and Prof. Code § 17203.

13

14                         **SEVENTH CLAIM FOR RELIEF – FCRA**

15                                **15 U.S.C. § 1681s-2(b)**
                                   **(Against Defendants)**
16

17     158.    Plaintiff incorporates and realleges all of the preceding allegations as though fully

18  set forth here.

19
        159.    Ocwen, in the course of regular business, reports information to consumer
20
    reporting agencies, as that term is defined by title 15 U.S.C. § 1681a(f).
21

22     160.    Ocwen knew that Ms. Sandigo was not required to make property taxes as part of

23  her escrow beginning in June 2013, and instead Plaintiff would pay these taxes directly to the

24  County.  Which Plaintiff did.

25     161.    Yet, despite Plaintiff paying her full amount of property taxes timely, Ocwen acted

26  unlawfully by claiming that Plaintiff was delinquent, and refusing to accept monthly payments

27  unless she paid thousands of dollars which she did not owe.

28

    FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

162.    Ocwen also reported derogatory information to the credit reporting agencies based on its false claim that Plaintiff was delinquent. (See Fifth Cause of Action detailing months of inaccurate and incomplete reporting.)

163.    Unable to resolve the issue after months and months of disputes with Ocwen over the telephone and with dispute letters, Ms. Sandigo sought the help of the national credit bureaus.  For example, on December 26, 2016, Ms. Sandigo sent a dispute letter to Equifax. Then again, on March 9, 2017, Ms. Sandigo sent a dispute letter to Equifax.  Then again, on June 20, 2017, Ms. Sandigo sent a dispute letter regarding Ocwen's credit reporting problems to Trans Union and to Experian.  That's four (4) dispute letters from December 2016 to June 2017, over an eight-month time frame.

164.    Ms. Sandigo's certified dispute letters dated March 9, 2017 and June 20, 2017 to Equifax, Trans Union and Experian constitute disputes regarding the completeness and accuracy of Ocwen's credit reporting concerning pursuant to section 1681i(a)(2) of Title 15 U.S. Code.

165.    Plaintiff is informed and believes that Equifax, Trans Union, and Experian sent notice of Plaintiff's dispute letter dated March 9, 2017, and June 20, 2017 to Ocwen, pursuant to section 1681i(a)(2) of 15 U.S. Code.

166.    Ocwen was thereafter under a duty to conduct a reasonable investigation and to correct all inaccurate and misleading consumer credit information after receiving Ms. Sandigo's disputes, pursuant to section 15 U.S.C. 1681s-2(b).  See *Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057 (9th Cir. 2002).

167.    Instead of correcting the inaccurate and incomplete credit reporting, and conducting a reasonable investigation, Ocwen willfully and negligently verified its derogatory information as accurate.

168.    Ms. Sandigo is informed that Ocwen's investigation of Ms. Sandigo's dispute

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

regarding the debt was unreasonable, in violation of 15 U.S.C. § 1681s-2(b).

169.    Ocwen knew or should have known that Plaintiff never was required to make property tax payments as part of her escrow after the beginning of June 2013 and that Ocwen had not made such payments for Ms. Sandigo.  Thus, Ocwen knew or should have known it was unlawful to attempt to collect money for these property taxes, as well as report Plaintiff delinquent, past due, and refusing to accept her mortgage payments.

170.    Ocwen should have corrected the credit reports, thus only providing accurate and complete information.

171.    Ocwen further violated 15 U.S.C. § 1681s-2(b) by failing to fully and properly investigate Plaintiff's dispute.

172.    Ocwen further violated 15 U.S.C. § 1681s-2(b) by failing to review all relevant information regarding the same (pursuant to section 1681i(a)(2), thus violating section 1681s-2(b)(1)(B);

173.    Ocwen further violated 15 U.S.C. § 1681s-2(b) by continuing the representations within Ms. Sandigo's credit file with Equifax, Trans Union and Experian without also including a notation that the derogatory information was disputed;

174.    Ocwen's failure to correct the previously disclosed inaccuracies on Ms. Sandigo's credit report was willful and in reckless disregard of Plaintiff's rights and her safety.

175.    Ocwen willfully and negligently failed to correct the erroneous and inaccurate credit information in direct violation of the Federal Fair Credit Reporting Act.

176.    As a result of this conduct, action and inaction of Ocwen, Ms. Sandigo suffered harm, as described above, and including credit denial damages.  .

177.    Ocwen willfully and negligently failed to comply with its duty to investigate Ms. Sandigo's disputes under 15 U.S.C. § 1681(n) & (o).

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

178.    Ocwen's conduct, action and inaction was willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by a trier of fact, pursuant to 15 U.S.C. § 1681n.  In the alternative, it was negligent entitling Ms. Sandigo to recover actual damages under 15 U.S.C. § 1681o.

179.    Ms. Sandigo is also entitled to recover costs and attorney's fees from Ocwen in an amount to be determined by the Court pursuant to 15 U.S.C. §§1681n and 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Sandigo prays for judgment against Defendants as follows:

**Against Ocwen**

1.    For equitable and injunctive relief, including a) an Order enjoining defendants from proceeding with foreclosure, b) an Order requiring rescission of the Notice of Default and any Notice of Trustee's Sale subsequently filed, c) an accounting, d) an Order requiring Defendants to revoke all demands for property tax based escrow payments and other fees and charges arising out of defendants unjustified demand for such escrow payments, e) an Order requiring Ocwen to correct Plaintiff's credit report, and f) further relief as the Court may deem just;

2.    For restitution of excess payments;

3.    For actual damages, including damages for emotional distress under all applicable law, including 15 U.S.C. § 1692k(a)(1); Cal. Civil Code; 12 U.S.C. § 2605(f)(1)(A); Cal. Civil Code §1785.31(a)(2)(A), and Cal. Civil Code § 1788.30(a);

4.    For statutory, and punitive damages pursuant to all applicable law, including Cal. Civil Code § 3294 *et seq*., 15 U.S.C. § 1692k(a)(2)(A), 12 U.S.C. § 2605(f)(1)(B), Cal. Civil Code § 1785.31(a)(2)(B) and Cal. Civil Code § 1788.30(b);

5.    For an award of punitive damages to deter further unlawful conduct pursuant to Cal. Civil Code section 1785.31(a)(2)(B) of up to $5,000 per violation;

6.    For an award of punitive damages, pursuant to Cal. Civil Code section §3294;

7.    $16,141.54 ($911.75 + $15,229.79 in converted funds, with interest from the time

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

of conversion;

8.      For an award of attorney's fees, costs and expenses;

9.      Fair compensation for the time and money properly expended in pursuit of the converted funds;

10.     Treble damages pursuant to Civil Code section §3345;

11.     Pre-judgment and post judgment interest at the legal rate;

12.      For actual, statutory, and punitive damages per 15 U.S.C. §§ 1681s-2(b); 1681n, and 1681o;

13.      For attorney fees and costs per 15 U.S.C. §§ 1681n and 1681o; Civil Code 1788.31; and Cal. Civil Code sections 1785.31(d); 1788.30 and 1692(k); and 12 U.S.C. §§ 2605[f][3], and other provisions under RESPA, and other applicable statutes.

14.     For such other and further relief as the court may deem proper.

**<u>Against U.S. Bank</u>**

1.      For equitable and injunctive relief, including a) an Order enjoining defendants from proceeding with foreclosure, b) an Order requiring rescission of the Notice of Default and any Notice of Trustee's Sale subsequently filed, c) an accounting, d) an Order requiring Defendants to revoke all demands for property tax based escrow payments and other fees and charges arising out of defendants unjustified demand for such escrow payments, and e) further relief as the Court may deem just;

2.      For restitution of excess payments;

3.      For actual damages, including damages for emotional distress under all applicable law, including Cal. Civil Code §1785.31(a)(2)(A);

4.      For statutory, and punitive damages pursuant to all applicable law, including Cal, Cal. Civil Code § 1785.31(a)(2)(B);

5.      For an award of punitive damages to deter further unlawful conduct pursuant to Cal. Civil Code section 1785.31(a)(2)(B) of up to $5,000 per violation;

7.      For an award of attorney's fees, costs and expenses;

9.      Treble damages pursuant to Civil Code section §3345;

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

1    10.    Pre-judgment and post judgment interest at the legal rate;

2    11.    For actual, statutory, and punitive damages per 15 U.S.C. §§ 1681s-2(b); 1681n,

3    and 1681o;

4    12.    For attorney fees and costs per 15 U.S.C. §§ 1681n and 1681o; Civil Code

5    1788.31; and Cal. Civil Code sections 1785.31(d); and other applicable statutes.

6    13.    For such other and further relief as the court may deem proper.

7

8    DATED:  January 18, 2018          CONSUMER LAW OFFICE OF WILLIAM E.
                                       KENNEDY
9                                      DUPRE LAW FIRM, P.C.

10

11                              By      /s/ Ben E. Dupre
                                        Ben E. Dupre
12                                      Attorneys for Phyllis Sandigo

13

14                      **DEMAND FOR JURY TRIAL**

15    Plaintiff demands a trial by jury of all the claims asserted in this Complaint so triable.

16

17    DATED:  January 18, 2018          CONSUMER LAW OFFICE OF WILLIAM E.
                                       KENNEDY
18                                      DUPRE LAW FIRM, P.C.

19

20                              By      /s/ Ben E. Dupre
                                        Ben E. Dupre
21                                      Attorneys for Phyllis Sandigo

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL