MARY KATE SULLIVAN (State Bar No. 180203)
mks@severson.com
ALISA A. GIVENTAL (State Bar No. 273551)
aag@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant
OCWEN LOAN SERVICING, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA — SAN JOSE DIVISION**

| | |
|---|---|
| PHYLLIS SANDIGO,<br><br>Plaintiff,<br><br>vs.<br><br>OCWEN LOAN SERVICING, LLC and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR GSAA HOME EQUITY TRUST 2007-3, ASSET BACKED CERTIFICATES, SERIES 2007-3 and DOES 1-100,<br><br>Defendants. | Case No. 5:17-cv-02727-BLF<br>Hon. Beth Labson Freeman<br>Ctrm. 3<br><br>**DECLARATION OF KEVIN FLANNIGAN IN SUPPORT OF OCWEN LOAN SERVICING, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: March 28, 2019<br>Time: 9:00 a.m.<br><br>Action Filed: April 11, 2017<br>Removal Date: May 11, 2017<br>Trial Date: August 19, 2019 |

I, Kevin Flannigan, declare as follows:

1. I am employed as a Senior Loan Analyst for Ocwen Loan Servicing, LLC ("Ocwen"), and am authorized to sign this declaration on behalf of Ocwen. This declaration is provided in support of Ocwen's Opposition to Plaintiff's Motion for Partial Summary Judgment.

2. As part of my job responsibilities for Ocwen, I have personal knowledge of and am familiar with the types of records maintained by Ocwen and the procedures for creating and maintaining those records, including the procedures for integrating records from prior loan servicers and/or lenders.

3. In the course of my employment responsibilities, I have access to the business records of Ocwen, including Ocwen's file concerning the loan that is the subject matter of this litigation (Loan number ending in 5841) ("the loan"), which Ocwen services.

4. The records of Ocwen relating to the subject loan are made in the ordinary course of business by persons whose job it is to make such records, and/or are received by Ocwen in the ordinary course of its business. The records were made at or near the time of the occurrence of the events which they record. I have personally reviewed Ocwen's records pertaining to the subject loan, including the loan origination, servicing, and foreclosure files. If called as a witness, I could and would testify truthfully with respect to the matters stated herein.

5. Ocwen began servicing Sandigo's loan in September 1, 2011. It became aware on September 19, 2011 that on September 15, 2011, Sandigo filed for Chapter 13 bankruptcy protection, and placed the account in bankruptcy status. A true and correct copy of the section of Ocwen's Detailed Transaction History reflecting this information is attached hereto as **Exhibit 1.**

6. Ocwen's general policy is not to collect on accounts in bankruptcy. Ocwen does not place collection calls or send collection letters on past due accounts in bankruptcy status. Upon contact received from a borrower whose account is in a bankruptcy status, Ocwen will relay factual information regarding the status of the account, the next payment due, and the amount, but will not seek out payment. Ocwen does accept a payment voluntary offered by a borrower in bankruptcy.

7. For most loans, including Sandigo's loan, payments are due on the first of the month. For such loans, for a payment to be posted during a particular month, Ocwen must receive the full contractual payment owed on the first of the month no later than the last day of the month.

8. For accounts in bankruptcy status, if a short payment is received from a customer – i.e. a payment that is insufficient to cover the contractual principal, interest, and escrow (if any) amount due – the payment is placed into a "suspense" account associated with the customer, the due date on the account does not advance to the following month, and – if no additional funds are received during that month – the payment for that month is deemed not received. If, during the month that a short payment is made, additional funds are received from the customer and those

funds together with funds held in suspense are sufficient to complete the next contractual payment due on the account, then the payment is applied and the payment is deemed received for whichever monthly payment the account is then due. If a short payment is made and no additional funds are received during that month, then the short payment remains in suspense until such a time when the customer makes a payment sufficient to complete the next contractual payment due on the account.

9. As a general practice, for accounts that are not in bankruptcy, Ocwen stops accepting partial payments and holding the funds in suspense pending receipt of additional funds once an account becomes more than 89 days past due. Once this status is reached, Ocwen will only accept a payment that brings the account fully current.

10. This is not the case for accounts in a bankruptcy status, particularly Chapter 13 bankruptcy. For accounts in Chapter 13 bankruptcy, Ocwen continues to accept partial payments, holding them in suspense, and applying payments to the next due date upon receipt of additional funds sufficient to constitute a full payment, so long as a bankruptcy status is on the account.

11. During Sandigo's bankruptcy, in January 2012, Ocwen agreed to modify Sandigo's loan by lowering the interest rate from 6.875 percent to 2.875 and monthly payments from $2,114.06 to $1,597.56. Specifically, the modification required Sandigo to make an initial payment of $1,597.56, after which Sandigo was required to make monthly principal and interest payments in the amount of $1,325.79 until all amounts owed under the note and modification were paid in full. However, the modification warned that if the loan was "currently escrowed, Ocwen will continue to collect the escrow amounts with [Sandigo's] monthly principal and interest payment." At the time Sandigo's loan was modified, her loan was escrowed for both taxes and insurance. The modification went into effect in April 2012, after Sandigo obtained approval to modify the loan from the bankruptcy Court. As a consequence of the timing of the modification going into effect, Sandigo's March 2012 payment was placed into the suspense account. After the modification was processed, and the suspense funds and the April 2012 payment were applied, the loan became due for the June 2012 payment. Consequently, no payment became due or was received in May 2012. A true and correct copy of the loan modification agreement is attached

hereto as **Exhibit 2**; *see also:* **Exhibit 3** attached hereto for a transaction history sent to Sandigo in August 2016, which reflecting the application of payments in connection with the processing of the loan modification in April 2012.

12. In April 2013, Sandigo asked Ocwen's escrow department if she could de-escrow the property tax portion of her monthly payment and the insurance portion of her monthly payment. Initially, Ocwen's escrow department attempted to accommodate Sandigo by de-escrowing her monthly payment for property taxes, resulting in two initial payments of $1,430.85, and then monthly payments of $1,415.21. A true and correct copy of the section of Ocwen's Detailed Transaction History reflecting communications about de-escrowing the account is attached hereto as **Exhibit 4**; *see also:* **Exhibit 3** for a transaction history reflecting Sandigo's payments in the above-referenced amounts.

13. In fact, because of the pending bankruptcy, the escrow department had no authority to allow a change in payment inconsistent with bankruptcy filings that reflected the monthly payment of $1,597.56. There was no meaningful contact between Ocwen and Sandigo from May 2014 until December 14, 2015. Although Ocwen had adjusted the account to reflect a monthly payment consistent with bankruptcy records, it could not have reached out to Sandigo to tell her that the payments she had been making were short because of the pending bankruptcy.

14. No funds were received from Sandigo in November 2015. On December 14, 2015, Sandigo sought to make a double payment by phone to cover November and December 2015, Ocwen informed her that the monthly payment amount was $1,597.56 and had been since March 2012. When she said that was wrong and insisted on paying a lower monthly amount, consistent with its non-collection policy for accounts in bankruptcy, Ocwen accepted the payment Sandigo wanted to make. *See* Declaration of Phyllis Sandigo in Support of Motion for Partial Summary Judgment Declaration ("Sandigo Declaration"), Exhibit 22.

15. Thereafter, Sandigo called Ocwen several times regarding the payment amount. In a conversation with Sandigo on February 2, 2016, although Ocwen's system correctly reflected the payment as $1,597.56, the representative concluded that this was wrong when he went all the way back to June 2013 in the servicing records and saw the notation indicating that the escrow

department agreed to a partial de-escrow of the account. *See* Sandigo Declaration, Exhibit 23. As a result of the representative's efforts to address what he perceived to be a mistake, the account was temporarily de-escrowed for taxes beginning May 2016. The new payment would have been $1,415.62. For this reason, on April 6, 2016, Sandigo was told that $1,415.62 would be her payment beginning May 2016. *See* Sandigo Declaration, Exhibit 24. The attempt to de-escrow the account for taxes was overridden because of the ongoing bankruptcy and the new payment never went into effect. A true and correct copy of the section of Ocwen's Detailed Transaction History reflecting the reversal of the escrow analysis and notating that the account had to be escrowed for taxes and insurance is attached hereto as **Exhibit 5.**

16. In all subsequent communications, Sandigo was consistently told that the monthly payment was $1,597.56. In a June 28, 2016 call Sandigo placed to Ocwen, she discussed with a representative that bankruptcy records reflect that she was over $6,000 past due. She went over the payments she made in detail and the representative told her that she was potentially behind because the payment she had been making was less than the amount owed under the terms of the modification agreement. *See* Sandigo Declaration, Exhibit 25.

17. Beginning in July 2016, Ocwen received $1,597.56 from Sandigo each month. However, Ocwen performed an escrow analysis in July 2016 which resulted in the monthly payment going up to $1,636.20 beginning in September 2016. A notice of payment change was filed in the bankruptcy action advising Sandigo of this change. *See* RJN Exhibit 13. Ocwen continued to receive $1,597.56 from Sandigo each month.

18. Sandigo's bankruptcy petition was discharged in October 2016. Ocwen performed a bankruptcy reconciliation to ensure that all payments received during bankruptcy were correctly applied. No longer precluded from collecting on past due amounts by the bankruptcy stay, on November 29, 2016, Ocwen sent Sandigo a statement accounting for all payments received through November 15, 2016 and the amount due on December 1, 2016 to cure the full past due balance owed of $7,275.37.[1] A true and correct copy of this Statement is attached hereto as

---

[1] This amount breaks down as follows:

**Exhibit 6**. Additionally, Ocwen was now able to de-escrow Sandigo's account for taxes. It informed her on November 28, 2016 that pursuant to a new escrow analysis, beginning with the February 1, 2017 payment, her payment would be $1,416.37. A true and correct copy of this written communication is attached hereto as **Exhibit 7**.

19. In December 2016 and January 2017, Sandigo attempted to make partial payments toward the past due balance, each in the amount of $1,597.56. Because the account was over 89 days past due, these were insufficient to cure the above-referenced delinquency, and Ocwen was no longer obliged by the bankruptcy to accept partial payments, these payments were returned. A true and correct copy of the section of Ocwen's Detailed Transaction History reflecting this is attached hereto as **Exhibit 8**. No further payments were received from Ms. Sandigo until November 2018. A true and correct copy of a portion of Ocwen's Detailed Transaction History is attached hereto as **Exhibit 9.**

20. Sandigo had several conversations with Ocwen employees about the default. Each time she insisted that she cannot be past due because she made all of her payments. As a consequence of the timing of Sandigo's payments and the majority of those payments being short payments, Ocwen's records reflected some of the payments as not having been received because payments only posted to the account when additional funds were received and applied to suspense funds. Thus, Sandigo was accurately told that payments that had not posted to her account were not received, and that this and her short payments were the reason for her default.

21. The calculations demonstrating the application of payments beginning with June 2013, when Sandigo first started making short payments, are described in the following paragraphs (a) through (f). The information is based on the transaction history and monthly statement attached hereto as **Exhibits 3, 6**.

---

| | | |
|---|---|---|
| * Aug. – Dec. 2016 P&I pmts. ($1325.79 x 5) | = | $6,628.95 |
| * Aug. 2016 escrow pmt. ($271.77 x 1) | = | $271.77 |
| * Sept. – Dec. 2016 escrow pmts. ($310.41 x 4) | = | $1,513.41 |
| Total | = | $8,142.36 |
| Less Suspense Balance | | - $866.99 |
| TOTAL AFTER SUSPENSE REDUCTION | = | $7,275.37 |

a. Ocwen received $1,430.85 (a shortage of $166.71 each time) on June 13, 2013 and July 12, 2013, and $1,415.21 (a shortage of $182.35) on August 12, 2013. Because there was $595.51 in the suspense account after Sandigo's May 2013 payment was applied, the funds in the suspense account were sufficient to supplement each of these short payments, such that Sandigo's June, July, and August 2013 payments were applied and posted to the account as if received in full. After the application of the August 2013 payment, there was $79.74 in the suspense account. When Ocwen received $1,415.21 on September 9, 2013, the suspense balance was insufficient to cover the payment owed, so the payment went into the suspense account, which now had a balance of $1,494.95. However, a second payment of $1,415.21 was received on September 30, 2013. Together with the funds in suspense, this was sufficient to cover the payment due in September 2013. The suspense balance after the application of this payment was $1,312.60. Ocwen received no other funds until November 5, 2013. Because no funds were received in October 2013 and the funds in suspense during that month were insufficient to cover the October 2013 payment, no payment posted to Sandigo's account during that month and Ocwen's records reflected that no payment was received in October 2013.

b. Although Ocwen received short payments of $1,415.21 (each short $182.35) on November 5, 2013, December 9, 2013, January 15, 2014, February 3, 2014, February 27, 2014, and April 1, 2014, the large amount in the suspense account was sufficient to supplement each of these payments so that all of them could be applied. Because no payment had been received for October 2013, each payment was applied to the previous month. After the payment received on April 1, 2014 was applied to the payment due in March 2014, the balance in the suspense account was $218.50. However, Ocwen received another payment of $1,415.21 (a shortage of $182.35) on April 25, 2014. Together with the funds in the suspense account, this was sufficient to apply to the payment due for April

2014. After the application of this payment the balance in the suspense account was $36.15. Ocwen received no other funds until June 9, 2014. Because no funds were received in May 2014 and the funds in suspense during that month were insufficient to cover the May 2014 payment, no payment posted to Sandigo's account during that month and Ocwen's records reflected that no payment was received in May 2014.

c. The $1,415.21 (a shortage of $182.35) Ocwen received on June 9, 2014 together with the funds in the suspense account, was insufficient to cover the May 2014 payment, so the funds went into the suspense account, which now had a balance of $1,451.36. Ocwen received another short payment of $1,415.21 on June 26, 2014. This amount, together with the funds in suspense, was sufficient to cover the May 2014 payment. This also meant that Ocwen's records reflected a payment posting during the month of June 2014. After the application of this payment, there was $1,269.01 left in the suspense account. Ocwen received short payments of $1,415.21 (each a shortage of $182.35) on July 31, 2014 and August 29, 2014, which – together with the funds in suspense – was sufficient to cover the payments due in June and July 2014, which is why payments posted to Sandigo's account during those months. After the application of the August 29, 2014 payment to July 2014, there was $904.31 left in the suspense account. No further funds were received by Ocwen until October 13, 2014. Because no funds were received in September 2014 and the funds in suspense during that month were insufficient to cover the next payment due (which was for August 2014), no payment posted to Sandigo's account during that month and Ocwen's records reflected that no payment was received in September 2014.

d. Ocwen received payments of $1,415.21 (each short $182.35) on October 13, 2014, November 13, 2014, December 8, 2014, and January 12, 2015. The funds in suspense were sufficient for each of these payments to be applied. Because at

the time the October 13, 2014 payment was received the loan was due for August 2014, each payment was applied for the payment due two months earlier. After the funds received on January 12, 2015 were applied, the loan was due for December 2014 and there was $174.91 left in the suspense account. The $1,415.21 (a shortage of $182.35) payment Ocwen received on February 11, 2015, even with the funds in suspense, was not enough to cover a full payment due, so the payment also went into the suspense account, which now had a balance of $1,590.12. Because no other funds were received in February 2015 and the funds in suspense during that month were insufficient to cover the next payment due (which was for December 2014), no payment posted to Sandigo's account during that month and Ocwen's records reflected that no payment was received in February 2015.

e. Ocwen received payments of $1,415.21 on March 12, 2015, April 13, 2015, May 12, 2015, June 11, 2015, July 13, 2015, August 12, 2015, September 11, 2015, and October 13, 2015. Although each of these payments was short by $182.35, the funds in suspense were sufficient to supplement each short payment such that a full payment was applied to the account during each of these months. Because when the March 12, 2015 funds were received, the account was due for December 2014, each payment was applied to the one due three months earlier. After the funds received on October 13, 2015 were applied, the account was due for August 2015 and there was $131.32 left in the suspense account. Because no funds were received in November 2015 and the funds in suspense during that month were insufficient to cover the next payment due (which was for August 2015), no payment posted to Sandigo's account during that month and Ocwen's records reflected that no payment was received in November 2015.

f. Ocwen received $2,831.24 on December 14, 2015, which was sufficient to cover the August 2015 payment, with $1,365 left in the suspense account.

Ocwen received payments of $1,415.21 on January 13, 2016, February 12, 2016, March 14, 2016, April 15, 2016 May 13, 2016, and June 15, 2016. Although each of these payments was short by $182.35, the funds in suspense were sufficient to supplement each short payment such that a full payment was applied to the account during each of these months. Because when the January 13, 2016 funds were received, the account was due for September 2014, each payment was applied to the one due four months earlier. After the funds received on June 15, 2016 were applied, the account was due for March 2016. Thereafter Sandigo began paying $1597.56 each month from July through November 2016. All of these payments posted to the account and were applied to the payment due four months earlier. After the November 2016 payment was applied July 2016, the account was due for August 2016.

22. As a consequence of Sandigo's default, a Notice of Default was recorded in March 2017. A true and correct copy of the Notice of Default is attached hereto as **Exhibit 10.** After Ocwen received notice of the present lawsuit and raised a litigation flag on the account, no further mortgage statements were sent pursuant to Ocwen's policy not to initiate communications with customers known to be represented by counsel.

23. For various reasons, including customer courtesy, availability of funds in the escrow account, and being unhampered by bankruptcy proceedings, Ocwen made the decision to abandon the foreclosure proceedings, and to reverse and reapply payments made by Sandigo during her bankruptcy consistently with Sandigo's request to be de-escrowed for taxes as of June 2013. This process was completed on June 21, 2018. All late charges and foreclosure fees were also waived. *See* transaction history reflecting these changes attached hereto as **Exhibit 9**.

24. In November 2018 Sandigo reinstated the loan, and as of today, she is presently due for the March 2019 payment.

25. Paragraphs 14 through 16 of this declaration reference exhibits to Sandigo's declaration in support of her motion for partial summary judgment. The exhibits referenced are

transcripts of four recorded calls between Ocwen and Sandigo. I compared the recordings to the transcripts and confirmed that the transcripts accurately reflect the contents of the recordings.

I declare under penalty of perjury that the foregoing is true and correct. Executed March 6, 2019, at Port Richey, Florida.

Kevin Flannigan