William E. Kennedy California Bar No. 158214
CONSUMER LAW OFFICE OF WILLIAM E. KENNEDY
2797 Park Avenue, Suite 201
Santa Clara, California 95050
Telephone: (408) 241-1000
Facsimile:  (408) 241-1500
Email: wkennedy@kennedyconsumerlaw.com

Ben Dupré California Bar No. 231191
DUPRÉ LAW FIRM PROF. CORP.
3567 Benton St. # 171
Santa Clara, CA 95051
Telephone: (408) 874-5300
Facsimile: 408) 727-5310
bendupre@gmail.com

Attorneys for Plaintiff, PHYLLIS SANDIGO

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Phyllis Sandigo,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Ocwen Loan Servicing, LLC and U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 2007-3, Asset Backed Certificates, Series 2007-3 and Does 1-100,<br><br>　　　　　Defendants. | **DECLARATION OF EVAN HENDRICKS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT, OCWEN'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 5:17-cv-2727-BLF, NC<br><br>Action filed: April 11, 2017<br>Trial Date: August 19, 2019 |

I, Evan Hendricks, declare:

**Retained as Expert Witness regarding Credit Reporting**

1. This declaration is provided in support of Plaintiff's Opposition to Ocwen's Motion for Summary Judgment or alternatively, Partial Summary Judgment.

2. I have been retained by Plaintiff as an expert witness regarding subject matter, including, but not limited to, Defendant Ocwen's credit reporting of Plaintiff's account, the quality and

1

adequacy of Ocwen's so-called "investigations" in Plaintiff's credit reporting disputes, the adverse impact Ocwen's credit reporting had on Plaintiff.  Due in part to the specialized knowledge I have accumulated over the past 40+ years, I have also been retained and testified as an expert witness regarding credit report subject matter, as further identified in the Background & Qualifications and in my Curriculum Vitae - see section "Testimony & Expert Reports".  See **Attachment "A"** to this Declaration.

3. This declaration is based on my expertise and review of this case, including Ocwen's deposition testimony, Plaintiff's deposition testimony, documents produced in discovery, among others.  My opinions in this case are also based on my 40-year profession of following privacy developments including those relating to the consumer reporting and information broker industry as an author a journalist, editor, publisher and privacy expert. My experience includes listening to and participating in dozens of hours of Congressional testimony, hearings before the Federal Trade Commission, media coverage, studies by independent groups, my own personal observations and numerous contacts, and my previous work preparing to be an expert witness in other FCRA cases.

**4th Circuit Court Upheld Jury Verdict Against Ocwen for Willful Violations**

4. In May 2016, I testified at a federal jury trial in West Virginia against Ocwen regarding the same types of subjects, as I have been retained in this case.  <u>David M. Daugherty v. Equifax Information Services, Ocwen Loan Servicing, et al.</u>: U.S. District Court for the Southern District of West Virginia (Beckley Div.); No.: 5:14-cv-24506.  The federal jury returned a verdict in favor of Plaintiff finding that Ocwen willfully violated the Federal Fair Credit Reporting Act, specifically violations of 15 U.S.C. 1681s-2(b), the same credit reporting violations alleged by Plaintiff. On May 11, 2017, the 4th Circuit Court of Appeals upheld the jury's verdict.  *Daugherty v. Ocwen Loan Servicing, LLC*, 2017 U.S. App. LEXIS 13521 (4th Cir. May 11, 2017)

5. As discussed further below, I am attaching portions of the 4th Circuit's opinion in *Daugherty v. Ocwen* regarding my testimony, as it serves, in part, as a basis, for my opinion regarding the quality of Ocwen's so-called "investigations" herein, and that it served as another example of the robust notice Ocwen had regarding the standards for conducting a reasonable investigation.

6. In rejecting Ocwen's Daubert motion to exclude me from testifying, Judge Irene C. Berger ruled:

> I find that he has experience, related experience, counsel, and that he should be allowed to give expert testimony … I find that that testimony could be helpful to the jury …
>
> I specifically find that in order for him to have specialized knowledge that's useful to the jury, it is not necessary that he have first-hand experience with working with one of the credit reporting agencies.

7. In rejecting Ocwen's motion to overturn the jury's $2.5 million punitive damages verdict against Ocwen, the U.S. Court of Appeals for the Fourth Circuit wrote:

> "Ocwen next argues that the district court should have excluded the testimony of Daugherty's expert witness, Evan Hendricks, on two bases. Ocwen contends that Hendricks' expert witness report was too vague to provide the basis for, or the substance of, his expert opinion. Additionally, Ocwen argues that the district court improperly permitted Hendricks to testify about the legal standard to which furnishers of credit information are held under the FCRA. We disagree with Ocwen's arguments.
>
> First, we conclude that Hendricks' expert witness report provided adequate notice to Ocwen concerning the substance of his anticipated testimony. His report disclosed that he relied on "Bates-Stamped documents produced by Defendant Equifax" in forming his expert opinion. His examination of these documents led him to conclude in his report that "Ocwen did nothing more than engage in the superficial [exchange of dispute verification requests], reflecting its disregard of the history and context that clearly put it on notice" that its investigation was not reasonable for a dispute of this nature. Thus, Hendricks' expert report provided sufficient notice that he was prepared to testify about Ocwen's inadequate responses to particular dispute verification requests. Additionally, Hendricks' report placed Ocwen on notice that the content of the dispute verification requests would be central to Hendricks' opinion that comprehensive investigation procedures were required under the circumstances but were not undertaken by Ocwen.
>
> We also are not persuaded by Ocwen's argument that Hendricks improperly provided legal conclusions during his testimony. We recognize the general rule that expert witnesses are not permitted to "state[ ] a legal standard or draw [ ] a legal conclusion." United States v. Offill, 666 F.3d 168, 175 (4th Cir. 2011) (quoting United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006)). However, Hendricks'

testimony did not violate this general rule. Reasonableness is a subject on which experts routinely testify. See United States v. Barile, 286 F.3d 749, 761 (4th Cir. 2002) (holding that an expert could properly give his opinion whether certain actions by the defendant were "reasonable" in light of the defendant's legal obligations under section 510(k) of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k)). Here, Hendricks' testimony addressed the reasonableness of Ocwen's conduct in light of the regulatory framework of the FCRA. This testimony did not draw legal conclusions but was offered as an explanation why Ocwen's cursory investigation in response to the dispute verification requests was deficient. Therefore, we conclude that the district court did not abuse its discretion in permitting Hendricks to testify regarding the reasonableness of Ocwen's investigations."

**Past Experience Testifying to US Congress re Credit Reporting**

8.  In addition to testifying in the *Daugherty v. Ocwen* matter, I have been invited and testified before the U.S. Congress on at least ten different occasions, as shown below.

**Testimony Before Congress & The FTC**

"Keeping Score on Credit Scores: An Overview of Credit Scores, Credit Reports and their Impact on Consumers," House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit Hearing, March 24, 2010.

"What Borrowers Need to Know About Credit Scoring Models and Credit Scores," House Financial Services Subcommittee on Oversight, July 29, 2008.

"Credit Reports: Consumers' Ability to Dispute and Change Information," House Financial Services Committee, June 19, 2007.

"Privacy in the Commercial World II," House Energy & Commerce Subcommittee On Commerce, Trade, and Consumer Protection, June 20, 2006.

"Financial Data Protection Act of 2005," House Financial Services Subcommittee on Financial Institutions and Consumer Credit, November 9, 2005.

"Credit Card Data Processing: How Secure Is It?" House Financial Services Subcommittee on Oversight and Investigations, July 21, 2005.

"Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information," Senate Banking Committee, March 15, 2005.

"The Accuracy of Credit Report Information and the Fair Credit Reporting Act;" Senate Banking Committee, July 10, 2003.

"The Role of FCRA in the Credit Granting Process," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, June 12, 2003.

"Database Security: Finding Out When Your Information Has Been Compromised," Senate Judiciary Subcommittee on Technology, Terrorism and Government Information, Nov. 4, 2003.

"Fighting Fraud: Improving Information Security," House Financial Services Subcommittee on Financial Institutions & Consumer Credit, and Oversight, April 3, 2003.

"Information Flows: The Costs and Benefits to Consumers and Businesses of The Collection and Use of Consumer Information," Federal Trade Commission, National Workshop, June 18, 2003

**From 2016 to 2018 Ocwen furnished inaccurate and incomplete account information regarding Ms. Sandigo**

9. At the heart of Plaintiff's case are her disputes (numerous telephone calls, numerous dispute letters to Ocwen and the national credit reporting agencies, including July 26, 2016, November 2, 2016, December 13, 2016, December 26, 2016, March 9, 2017, November 18, 2017, and May 17, 2018) that Ocwen was wrong to claim that her account was delinquent by over $6,000 when she had made all of the payments to Ocwen in the amounts she had been told to pay by Ocwen. Plaintiff submitted multiple direct disputes to Ocwen in 2016 and 2017. For example, on December 26, 2016, she submitted a dispute, including bank statements (51 pages) to Ocwen showing she had made all payments for the past several years, contrary to what she had been told by Ocwen personnel, who said that her "delinquency" was the result of her skipping several payments. She also complained that Ocwen was reporting her as delinquent and some $6,000 past due to Equifax.

10. Upon receiving Plaintiff's direct disputes, Defendant should have investigated whether it was furnishing inaccurate information to CRAs.  But Defendant failed to do this.

11. Another example of this is Defendant's failure to provide accurate and complete information in response to Plaintiff's March 9, 2017 direct dispute, which provided the explanation that Ocwen ultimately adopted for Plaintiff's $6,000-plus delinquency – that the payments of approximately $1,415.21, which she had been making since the loan was de-escrowed for property taxes in June 2013, was the correct payment amount. Ocwen's adoption of this explanation directly contradicted claims made by Ocwen in other instances, which were based on Ocwen's erroneous accounting, that despite the de-escrow, the payment remained at $1,597.56. In turn, Ocwen's erroneous accounting resulted in Ocwen's erroneous conclusion that Plaintiff's $1,415.21 payments were

insufficient. Again, Plaintiff provided documentation supporting her position, i.e., several monthly statements which Ocwen had sent her in 2013 instructing her to pay the $1,415.21 amount. [See Gollaher depo., part 2, pages 179-181, "As a standard practice, Ocwen's credit reporting department would not receive a copy of the letter or review it."]

12. These repeated errors were particularly egregious, as there was abundant information within Ocwen's records which showed that Plaintiff was not delinquent. First, Ocwen's own records of Plaintiff's payments, plus those which Plaintiff provided, showed that she had made all payments, i.e., that she had not skipped any months (except for one missed payment when her husband died, which she paid the next month). Ocwen later acknowledged these payments in Interrogatory Response No. 2. Second, multiple documents showed that Ocwen had in fact de-escrowed the loan for property taxes in mid-2013 and lowered Plaintiff's monthly payment from approximately $1,597.56 to approximately $1,415.21. These documents included Ocwen's monthly billing statements, [Sandigo 333, 355, 358, 360, 372], its escrow statements, [Sandigo 278-281, 338-343, 390-397], its servicing records, which showed the payment due was approximately $1,415.21 after June 2013, [OWC 3194-3433, E.G. 3295, 3300, 3303, 3313] and its monthly furnishing to CRAs. [Exhibit 5 of Gollaher depo.] In addition, Ocwen had no records showing that it paid the property taxes after the June 2013 de-escrow.

13. Yet, Ocwen submitted an AUD to the CRAs in April 2017 [OCW 003562-3564] instructing them to keep the derogatory status of 180-days past due and increase the past-due balance to $8,421.

14. Month after month, Defendant furnished information to four CRAs that it knew or should have known was inaccurate and/or incomplete, including, but possibly not limited to, the derogatory account status, the past-due amount/balance, the balance, month-by-month delinquent payment history, last date of payment and that the tradeline was discharged through bankruptcy chapter 13, and with a zero balance. These inaccuracies continued even when Ocwen had admitted through discovery responses that it had made errors in how Ms. Sandigo's account was handled that resulted in errors regarding the credit reporting.

**<u>Ocwen Should Have Notated the Account as Disputed when responding to the ACDVs</u>**

15. As I have testified in the past and also address in my expert report produced to Ocwen herein, possibly the most important standard in consumer credit reporting is accuracy. If consumer report information is inaccurate, then it can harm consumers, financial institutions, users of credit reports, and even the economy as a whole.

16. Another important standard in credit reporting coinciding with accuracy is completeness. Thus, in order to achieve credit reporting accuracy and completeness, it would be necessary for a creditor-furnisher to portray the tradeline in its proper context.

17. Each time Ocwen received an ACDV from any of the credit reporting agencies (such as Equifax and Experian), in responding back, Ocwen should have notated the account as disputed, by entering the "XB" code. I understand that Ocwen's expert witness, Mr. John Ulzheimer merely reiterates what the 2018 CDIA Manual states. However, this is contrary to the superseding standards articulated by important oversight authorities which oversee the credit reporting industry. Furthermore, as the 2017-2018 CDIA manual disclaimers state, "Neither CDIA nor the CRRG offers any legal or other professional advice. CDIA also makes no representations or warranties about the suitability, completeness, timeliness, reliability, legality, or accuracy of the CRRG for any purpose" [T]he entire risk as to the quality of and results from the use of the CRRG is with you…" Ocwen could have certainly inputted the "XB" code to notate Ms. Sandigo's disputes if it chose to by simply inputting it as part of its response to an ACDV or AUD or through its monthly furnishing of account information to the credit bureaus.

18. Notating the disputed tradeline "disputed by consumer" with the "XB" code is important because it ensures that the derogatory aspects of the tradeline do not lower the consumer's credit score and thus mitigates damage to that consumer's credit worthiness.

**Failure to Notate Ms. Sandigo's account as disputed harmed her - Harm to Plaintiff's Creditworthiness**

19. Defendant's furnishing of inaccurate data to CRAs damaged Plaintiff's creditworthiness in at least two ways.

20. First, by reporting a current "status" of "180-days past due," and with a past-due balance, Ocwen, for all practical purposes, rendered Plaintiff ineligible for nearly all forms of major credit (i.e., mortgage, refinance, etc.) because these types of creditors typically will not extend credit to consumers until they remove all past-due balances from their credit reports.

21. Second, the "status" of "180-days late," and with a past-due balance, constituted a major derogatory under the FICO scoring model, and consequently, significantly lowered her FICO scores. In fact, the inaccurate Ocwen tradeline, was the only recent, major derogatory tradeline on Plaintiff's credit reports.

22. It is important to note that under the FICO scoring model, consumers like Plaintiff who have a bankruptcy on their credit reports are analyzed more critically than other consumers who do not have a bankruptcy. Thus, the appearance of a seriously derogatory tradeline subsequent to a bankruptcy, as occurred on Plaintiff's credit reports, constitutes a type of "double whammy," which interfered with the "fresh start" to which Plaintiff was entitled.

23. Thus, when Plaintiff in November 2017 applied for pre-qualified loan options through Lending Tree®, she was rejected because she had a dismal 609 credit score, caused by the Ocwen tradeline, as the primary reason cited was a "Serious delinquency and public record or collection filed." [Sandigo 001654.]

24. Also, in November 2017, LoanMe rejected Plaintiff's application for a consolidation loan due to her 644 credit score. Again the primary reason cited was a "Serious delinquency and public record or collection filed." [Sandigo 001680.]

25. In April 2018, in denying her application for a personal loan, Wells Fargo informed Plaintiff

that she had a 579 credit score. Again the primary reason cited was a "Serious delinquency and public record or collection filed." [Sandigo 001711.]

26. I have reviewed Ocwen's expert witness report and Declaration and disagree with several of his opinions. First, Mr. Ulzheimer opines that, "Plaintiff, to this point, has produced no evidence suggesting she suffered any damages as a result of information furnished by Defendant." Aside from this possibly being an inappropriate opinion for an expert in this sort of case, Mr. Ulzheimer is disregarding some of the profound problems Ocwen caused Plaintiff, as described in her deposition, which Mr. Ulzheimer said he reviewed. (See deposition of Phyllis Sandigo.) In my experience, the kinds of problems to which Plaintiff testified have been found by juries and courts in FCRA cases to constitute damages. Thus, I strongly disagree with his opinion that she "…has produced no evidence suggesting she suffered any damages as a result of information furnished by Defendant."

27. Second, I disagree with Mr. Ulzheimer's attempts to downplay the negative impact that Ocwen's furnishing had on Plaintiff's creditworthiness by stating or implying that the Ocwen tradeline was not a substantial factor in some of Plaintiff's credit-denial letters stating as the primary reason, "Serious delinquency and public record or collection filed." In my opinion, when this "Reason Code" was the first one listed, the Ocwen tradeline was at a minimum a substantial factor causing it.

**Ocwen's Investigations regarding Plaintiff's Credit Reporting Disputes (ACDVs).**

28. I understand my testimony will be provided regarding the quality of Ocwen's investigations and the reasonableness. As the 4th Circuit held in *Daugherty v. Ocwen*, my testimony was directly relevant to evaluating Ocwen's conduct and the jury finding willful violations.

29.     **Defendant & the 'ACDV Exchange'**

It is important that the trier of fact understand that participants in the credit reporting industry rely on the ACDV-exchange, operated through an industry-created system known as "e-OSCAR," as the principal means of responding to a consumer's dispute. When relied on exclusively and

operated defectively, as Defendant did in Plaintiff's case, the ACDV-exchange has been widely criticized for being inadequate to reasonably investigate disputes such as Plaintiff's that require careful consideration and the goal of determining the underlying truth regarding disputed facts.

30. The ACDV-exchange essentially consists of an exchange of messages known as "Automated Consumer Dispute Verifications" (ACDVs). When consumers send their disputes to CRAs, the CRA populates the ACDV form with their identifying information (name, address, city-state-zip, SSN, sometimes previous address), and a two-or three-digit, or alpha-numeric code that cryptically describes the dispute (e.g., "not liable," or "not mine," or "never late," or "fraud" "inaccurate information", "present/previous account status").

31. Upon receipt of the ACDVs for Plaintiff's disputes, the Defendant essentially restricted its review to portions of the internal systems housing its customer information which were the sources of the inaccuracies Defendant furnished to CRAs. (See deposition of Mariana Gollaher, pages 316-317.)

32. In the case of Plaintiff, this process can be better described as a ***comparison*** of the Defendant and the CRA's existing data on the consumer, rather than an independent evaluation, careful examination, searching inquiry, or investigation of the accuracy of the disputed data.

33. As this case illustrates, there can be several problems with Defendant's operation of the ACDV-exchange serving as the Defendant's principal means for responding to consumer disputes.

34. First, a cursory comparison of existing data does not amount to an investigation under any normal sense of the word. The Webster's New Collegiate Dictionary defines "investigate" as, "v. To observe or study by close examination and systematic inquiry. Systematic—adj. Marked by thoroughness and regularity." The kind of superficial check of its customer information system that Defendant performed in Plaintiff's case was a superficial exercise, as it was neither a "study by close examination" nor "marked by thoroughness and regularity," in my opinion.

35. Second, Defendant's operation of the ACDV-exchange occurred in a conveyor-belt like atmosphere. This conveyor-belt styled atmosphere is conducive to a dispute operator overlooking, missing or just "whiffing" on important information due to volume, speed or attention issues. This

meant that in Plaintiff's case, Defendant failed to review or adequately review quite relevant information, including that which was in its possession or which was readily available to it, which clearly supported Plaintiff's disputes.

36. A glaring example of this in Plaintiff's case was Defendant's failure to give due regard to Plaintiff's disputes and the important details they provided or which Defendant already had in its possession.

37. As mentioned above, such details included:

1. A detailed letter explaining that she made all the payments per her mortgage modification agreement (except for one missed payment when her husband died, which she paid the next month).

2. A previous letter in which she explained that Ocwen had the monthly payment wrong because she was paying her property taxes directly and Ocwen was improperly escrowing money for taxes.

3. Bank statements confirming she had made the payments.

4. A plethora of telephone calls in which Plaintiff disputed and explained these issues.

38. As a result of Defendant's failure to give due regard to Plaintiff's disputes and adequately review quite relevant information, including that which was in its possession, did not even investigate the core of her June 2017 dispute, i.e., after receiving a mortgage modification, she had paid timely her monthly mortgage payments to Ocwen, and that the correct payment amount was approximately $1,415.21 since June 2013, when the mortgage was de-escrowed for property taxes, and that she paid the property taxes directly to the county government. [Sandigo 001210-1223; also see Gollaher depo., pages 220-231.]

39. The June 2017 ACDV from Experian used the dispute code, "106," meaning Plaintiff "Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status, Payment Rating and Account History." The "106" code is a very broad one, and indicates that most of the significant data Ocwen was furnishing was disputed as inaccurate and/or incomplete.

40. In addition, attached to this ACDV was Plaintiff's dispute letter, along with her March 2017 dispute letter, which set forth all of the details about how and why Ocwen's furnishing was inaccurate and/or incomplete.

41. Nonetheless, Defendant engaged in the superficial exercise of conducting a narrow comparison of data from the very internal system which was the source of the inaccuracies, and then wrongly instructed Experian to maintain the disputed derogatory data in Plaintiff's credit file, in my opinion. Defendant wrongly "verified" disputed information regarding the erroneous monthly payment that was not verifiable, given the information Ocwen possessed, in my opinion. It failed to include the XB Code. In fact, Defendant's response also made Plaintiff's file even more derogatory by increasing the past due amount from $8,421 to $16,126. Moreover, even though Plaintiff did not dispute anything about bankruptcy, Defendant responded by "replacing the H [code] with Q, which, "Removes previously reported bankruptcy indicator." Even Defendant admitted that bankruptcy was not at the core of Plaintiff's dispute. [Gollaher depo., pages 220-231; OCW 4098-4100.] And, Defendant stated that reviewing any of Plaintiff's past correspondence would not have aided its "investigation." [Gollaher depo., pages 244-245.] Ocwen also stated that reviewing any of its own account notes would not have been helpful. [Gollaher depo., pages 247-248.] In my opinion, information in the account notes were relevant to Plaintiff's disputes.

42. Defendant repeated its failure to investigate adequately in response to Plaintiff's March 2018 disputes, in my opinion. A highlight of Plaintiff's March 2018 dispute was that it referred Ocwen back to its own interrogatory answers, which Ocwen made in response to Plaintiff's original March 2017 lawsuit. In fact, the interrogatories were attached to the second March 20, 2018 Experian ACDV and were forwarded to Defendant, which stated:

> Describe any errors that you made regarding the handling of Ms. Sandigo's loan, including escrow analysis, billing statements sent to Ms. Sandigo, attempts to foreclose on Ms. Sandigo's home, inaccurate and incomplete credit reporting, including the dates you discovered you made the errors.

> While Ocwen agreed to de-escrow Ms. Sandigo's loan for taxes in April of 2013, Ocwen did not adjust its escrow accounting to reflect that the loan had been de-escrowed. As a result of the foregoing, Ocwen's accounting records reflected that the monthly payments owed by Ms. Sandigo was $1,597.56 as opposed to $1,415.21. As a result of the accounting discrepancy, Ocwen's accounting records reflected that Ms. Sandigo was delinquent on her loan payments which was inaccurate. Ocwen discovered this error on or about January 5, 2018. Based on this error, Ocwen also discovered on or about January 5, 2018, that its notice of default is based on inaccurate accounting information and that its credit reporting was also inaccurate.

43. In my opinion, this information was not only highly relevant to Plaintiff's dispute, it was compelling. Regardless of Ocwen's admission that Ocwen's records regarding Plaintiff were inaccurate, Ocwen wrongly "verified" the most derogatory disputed information, and then even made it more derogatory by increasing the past-due balance from $16,126 to $27,920. [OCW 004305-4307.]

44. Moreover, Ocwen characterized Plaintiff's dispute as, "Invalid inaccurate credit dispute received," [OCW 004306] meaning that "based on the investigation by Avinash, he found no information to be inaccurate, so there was nothing to change." [Gollaher depo., pages 291.]

45. Furthermore, Ocwen responded on the very same day it received this dispute from Experian, and Ocwen did not even consider Plaintiff's pending lawsuit and what it said about the inaccuracy of Ocwen's records:

> Q. Where would we look in Ocwen's notes – where would we look if this credit report associate who was investigating this confirmed or even looked into whether Ms. Sandigo actually did have a pending case filed against Ocwen?
> **A. There are no notes that state that.** [Gollaher depo., page 287.]

46. This showed that at a minimum, Ocwen failed to adequately consider this relevant, even compelling information. In my opinion, it means that Ocwen disregarded or essentially disregarded this information.

47. In a second March ACDV, the dispute code was: "Code 112: Dispute present/previous account status, payment rating, account history. Verify account status, payment rating, and account history.") The "FCRA Relevant Information" stated, "I DISPUTE ALL NEGATIVE CREDIT REPORTING IN AND AFTER 2016. IN RECENT RESPONSES OCWEN ADMITTED THAT I WAS NOT IN DEFAULT AND THAT THEIR CREDIT REPORTING WAS WRONG." [OCW 004308-4310.]

48. Nonetheless, Ocwen just wrongly "verified" the derogatory status and worsened the past-due balance from $16,126 to $27,920.

49. One action that Ocwen must be able to take if it instructs CRAs to maintain disputed data in a consumer's file is to verify the accuracy and/or completeness of the disputed data. In my opinion, in Plaintiff's case, Ocwen did not verify because it never adequately considered – or essentially disregarded – information that was relevant to Plaintiff's disputes.

50. In fact, Ocwen itself does not know what its dispute operators actually did in response to Plaintiff's disputes:

> Q. But I want to know what he investigated and I want -- and I would imagine the jury needs to know that, too. In fact, I know they want to know that. So what exactly besides the comment notes and this ACDV that we're looking at would a jury want to see that would show what all Mr. Manjunath Umesh did in investigating this ACDV that was received on March 13, 2018, Exhibit 27?
> MS. GIVENTAL: Objection. Calls for speculation. Lacks foundation. Outside of the scope of designated topics.
> **A. There is nothing else that you could look at to see the specific items investigated.**
> Q. And are there any other notes to look at to see what Mr. Manjunath Umesh did regarding this ACDV, March 13, 2018, Exhibit 27?
> **A. No.** [Gollaher depo., page 284.]

51. Not only does Ocwen not know whether its ACDV dispute operators ever looked at Plaintiff's pre-ACDV, direct disputes from July 2016 to December 2016, Ocwen does not believe that examining the information in those earlier disputes, or contacting the research department, would have aided Ocwen's ACDV investigations. [Gollaher depo., page 246-248.] In my opinion, this demonstrated that Ocwen's de facto PPP was to disregard information that was relevant to Plaintiff's disputes.

52. Defendant's ACDV operators do not even confirm in Ocwen's internal notes that they actually reviewed Plaintiff's dispute letters that were attached to the ACDVs. In Plaintiff's case, there also was no indication that Defendant's ACDV operators ever reviewed previous dispute correspondence sent by Plaintiff. Moreover, it is Defendant's PPP not to contact consumer's whose dispute caused a CRA to send Ocwen an ACDV – even though that consumer could answer important questions or provide additional documentation.

53. For Plaintiff's final, May 2018 dispute, the dispute code indicated she was disputing all derogatory aspects of the tradeline. ("Code 106: Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status. Payment Rating. Account History." "Code 118: Disputes Current Balance and/or Amount Past Due. Verify Current Balance and/or Amount Past Due." [OCW 004311-4313.]

54. The attached letter again explained in detail what was wrong with Ocwen's furnishing and why, and included the title and case number of her pending lawsuit, the names of her two attorneys, and even the name of Ocwen's attorney.

55. In response to this, Ocwen merely confirmed the derogatory status, and again made more derogatory the amount past due. There is no indication they ever contacted Ocwen's litigation department or otherwise escalated it to supervisors. [Gollaher depo., page 304.]

56. This showed that Ocwen essentially disregarded the compelling information it received in connection with Plaintiff's dispute, and also essentially disregarded information in its own possession that supported Plaintiff's dispute, in my opinion. Defendant's PPP of handling each of Plaintiff's ACDV disputes on a case-by-case basis, while disregarding information relating to her previous disputes, and disregarding the context in which they were being made, doomed Defendant's responses to inadequacy.

57. Thus, in my opinion, in connection with the five ACDVs that Ocwen sent to CRAs (one in June 2017, one in July 2017, two in March 2018, and one in May 2018), Ocwen never conducted an adequate investigation.

58. Defendant's failures actually should not be surprising, given the paucity of significant guidance to employees in its FCRA policies.

59. █████████ █████████████████████████████████████████████████
    █████████████████████████████████████
    ████████████████████████████████████████████████████
    ████████████
    █████████████████████████████████████████████████████
    ██████████████████





68. In terms of credit report accuracy, completeness and fairness, what is disconcerting about Defendant is that despite, robust notice it received that its practices, policies and procedures for responding to consumers' disputes were not only seriously defective, but also violated the Fair Credit Reporting Act ("FCRA ") – notice which came in the form of FCRA punitive damages verdicts against it by federal juries (*Jeffers v. Ocwen and Daugherty v. Ocwen*) , a federal appeals court *Per Curiam* opinion affirming a jury's finding of a willful violation of the FCRA, Defendant has not recently made significant changes in its practices/policies/ and procedures ("PPPs") for responding to consumers' disputes regarding data which it furnishes to CRAs. [Gollaher depo., page 317-326.]

Dated:   March 6, 2019            /s/ Evan Hendricks
                                  Evan Hendricks