MARY KATE SULLIVAN (State Bar No. 180203)
mks@severson.com
ALISA A. GIVENTAL (State Bar No. 273551)
aag@severson.com
SEVERSON & WERSON
A Professional Corporation
One Embarcadero Center, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

KRISTIN WALKER-PROBST (State Bar No. 206389)
Kristin.Walker-Probst-us@wbd-us.com
WOMBLE BOND DICKINSON (US) LLP
3200 Park Center Drive, Suite 700
Costa Mesa, California 92626
Telephone: (714) 557-3800
Facsimile: (714) 557-3347

Attorneys for Defendant
OCWEN LOAN SERVICING, LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA — SAN JOSE DIVISION

| | |
|---|---|
| PHYLLIS SANDIGO,<br><br>    Plaintiff,<br><br>vs.<br><br>OCWEN LOAN SERVICING, LLC and U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR GSAA HOME EQUITY TRUST 2007-3, ASSET BACKED CERTIFICATES, SERIES 2007-3 and DOES 1-100,<br><br>    Defendants. | Case No. 5:17-cv-02727-BLF<br>Hon. Beth Labson Freeman<br>Ctrm. 3<br><br>**DECLARATION OF JOHN ULZHEIMER IN SUPPORT OF OCWEN LOAN SERVICING, LLC'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:     March 28, 2019<br>Time:     9:00 a.m.<br><br>Action Filed:     April 11, 2017<br>Removal Date:     May 11, 2017<br>Trial Date:     August 19, 2019 |

I, John Ulzheimer, declare as follows:

1. I have been retained by defendant Ocwen Loan Servicing, LLC ("Ocwen") as an expert witness with regard to plaintiff Phyllis Sandigo's ("Plaintiff") allegations of harm from information allegedly furnished by Ocwen about her account to Credit Reporting Agencies ("CRAs") such as Equifax, Experian, and Trans Union. My experience testifying as an expert and

summary of qualifications are provided in **Attachment A** to the declaration filed in support of Ocwen's Motion for Summary Judgment, or alternatively, Partial Summary Judgment (the "MSJ"). This declaration is being provided in support of Ocwen's Reply in support of the MSJ.

2. The declaration is based on the expert knowledge I acquired by working in the industry, as detailed in **Attachment A** discussed above, and my review and analysis of documents I reviewed in connection with this action. If called as a witness, I could and would testify truthfully with respect to the matters stated herein.

3. In my declaration in support of Ocwen's MSJ, I explained that based on my review of documents produced by Ocwen and Plaintiff, as well as Plaintiff's deposition testimony about credit denials she attributes to the manner in which the Ocwen trade line on her account was reported by the CRAs, I found no evidence that an indirect credit reporting dispute was made to Ocwen at any time that could have resulted in an XB code being furnished at or near the time any of the credit applications identified by Plaintiff were under consideration. Since Plaintiff's expert challenges this finding, I am providing the details of my analysis.

4. As explained in my original declaration in support of Ocwen's MSJ, an XB dispute code would not be furnished in response to an indirect dispute – a dispute received by a furnisher from a CRA -- pursuant to the definition and directive of use for this code in the CRRG. A true and correct copy of the relevant Exhibits from the 2017 and 2018 CRRG that provide a summary of Compliance Condition Codes and definitions is attached hereto as Exhibits 1 and 2 respectively.

5. Notably, this was not the case prior to 2017. For example, the 2016 version of the CRRG did not define Compliance Condition Codes as applicable only to direct disputes. A true and correct copy of the relevant Exhibit from the 2016 CRRG that provides a summary of Compliance Condition Codes, definitions, and directives of use is attached hereto as Exhibit 3. In 2016, a furnisher could have supplied a Compliance Condition Code in response to a notice of dispute received from a CRA. However, even before 2017, per definition and industry guidelines, the XB code was not an appropriate code in response to an indirect dispute.

6. The reason for this comes from the fact that a response to an indirect dispute is

provide after a furnisher's investigation has been completed, and the XB code has been defined in all three versions of the CRRG discussed herein as applicable only while an investigation of a dispute is currently in progress by the furnisher.

7. The process of handling indirect disputes makes this evidence. When a dispute is received by a CRA, a code is assigned to the specific dispute. These dispute codes, which are different from Compliance Condition Codes, allow the credit bureaus to communicate the nature of the dispute to the furnisher and guide (or limit) the investigative actions of the furnisher. For example, the dispute code "107" refers to the situation where the consumer "[d]isputes Special Comment/Compliance Condition Code/ narrative remarks." These codes and other consumer information are then pre-populated on a form called an Automated Consumer Dispute Verification (ACDV) and sent to the furnisher via a web-based system called Online Solution for Complete and Accurate Reporting or "e-OSCAR." The data furnisher usually has 30 to 45 days to determine if the consumer's dispute requires a modification to his or her credit report or if the challenged item is accurate. Either way, the data furnisher will fill out the "response" portion of the ACDV form with directions to modify the item, delete the item, or leave the item unchanged. The data furnisher's response is sent back the credit bureaus via e-OSCAR. Once the credit bureaus receive the data furnisher's response, they will modify, delete, or do nothing to the entry.

8. Because a response to an ACDV is a response communicating the results of a furnisher's investigation, the response would not contain the XB code, which is furnished only while an investigation is ongoing. For example, a CRA might code an account with an XB code while it waits for a furnisher's response to an ACDV and conducts its own investigation. Or, a furnisher might furnish an XB code while it is investigating a direct dispute. Once the investigation is completed, the code must be removed. Like the 2017 and 2018 versions, the 2016 CRRG highlighted this fact, stating that "**[w]hen a dispute investigation is completed, it is important to update the Compliance Condition Code to show that the investigation has been completed or to delete the previously-reported Compliance Condition Code.**"

9. The reason that it is critical that the XB code be removed upon completion of an

1  investigation is because, as explained in my earlier declaration, the XB code results in the
2  tradeline marked with this code being excluded from any credit score characteristics that measure
3  payment history or debt. To the extent that Plaintiff's expert contends that the XB code must
4  remain on an account in perpetuity, even after the furnisher's investigation is completed, he is
5  wrong as it would permanently exclude the account from any meaningful consideration by credit
6  scoring systems, would incorrectly suggest that the account is being investigated in perpetuity, and
7  runs counter to the clear instructions in the credit reporting standards manual, the CRRG. Such an
8  obligation would mean that any consumer who is dissatisfied with negative but accurate reporting
9  of his or her account obligation need only submit a dispute to the CRAs to have the negative
10 information forever suppressed from consideration in her credit scores. No such obligation exists
11 and the CRRG explicitly explains that this should not be done.

12      10.    In sum, even if after 2016 a furnisher wished to disregard the CRRG definitions of
13 the Compliance Condition Codes as being reserved for direct disputes only, it would still not be
14 appropriate to respond to an ACDV with an XB code as it would result in incorrect information.
15 And, as explained in my prior declaration, no other Compliance Condition Code has any effect on
16 the calculation of credit scores.

17      11.    Moreover, my review of documents produced by Plaintiff and discussed in her
18 deposition testimony does not evidence any credit denials that took place while an ACDV
19 investigation by Ocwen was taking place. And my review of the ACDVs establishes that none of
20 Plaintiff's disputes were coded with a dispute code indicating that Plaintiff was disputing the lack
21 of a dispute notation on her trade line.

22      12.    Specifically, Ocwen's records indicate that it investigated five indirect disputes
23 from the CRAs as follows:

24      (a) Dispute received from Experian on June 29, 2017 to which Ocwen responded
25      on July 13, 2017. The dispute code identified by Experian was 106, which refers to a
26      dispute regarding "present/previous Account Status/Payment History Profile/ Payment
27      Rating." Additional text stated "CURR ACCT |||||ACT. DT: 06/28/17|||||||||||||||||."

(b) Dispute received from Equifax on July 10, 2017, to which Ocwen responded to on July 31, 2017. The dispute code identified by Equifax was 102, which means the dispute is that the "[a]ccount reaffirmed or not included in bankruptcy. Verify Consumer Information Indicator and Account Status." Additional text stated: "CONSUMER STATES THAT THIS ACCOUNT IS NOT INCLUDED IN BANKRUPTCY AND SHE NOT LATE PAYING IN THIS ACCOUNT."

(c) Dispute received from Experian on March 13, 2018 to which Ocwen responded to on March 20, 2018. The dispute code was 112, which means "[c]onsumer states inaccurate information. Provide or confirm complete ID and verify all Account Information." Additionally, there was text stating: "THIS MATTER IS IN LITIGATION. I DISPUTE ALL NEGATIVE CREDIT REPORTING IN AND AFTER 2016. IN RECENT INTERROGATORY RESPONSES OCWEN ADMITTED THAT I WAS NOT IN DEFAULT AND THAT THEIR CREDIT REPORTING WAS WRONG.||||||||||||||||||||."

(d) A dispute from Experian received on March 20, 2018 to which Ocwen responded to on the same date. The dispute code was 112, which means "Consumer states inaccurate information. Provide or confirm complete ID and verify all Account Information."

(e) A dispute received from Equifax on May 8, 2018, to which Ocwen responded to on May 9, 2018. The dispute code was 106, which means the customer "Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status, Payment Rating and Account History." A secondary dispute code listed was 118, which means "Disputes Current Balance and/or Amount Past Due. Verify Current Balance or Amount Past Due."

13. None of the above-referenced disputes identified the dispute code associated with the Compliance Condition Code. Also, based on the above-referenced credit disputes, even if XB were furnished while the ACDVs were being investigated, the code could have only been appropriately placed on the account for the limited time periods of June 29, 2017 to July 13, 2017,

July 10, 2017 to July 31, 2017, March 13 to March 20, 2018, and May 8, 2018 to May 9, 2018. I have reviewed all of Plaintiff's document productions and located no credit denials during these periods. Thus, even if an XB were required, furnished, and reported in conjunction with Plaintiff's indirect disputes, no XB code would have been placed on the Ocwen trade line at any time that could have made a difference to the Plaintiff's credit score.

14. Plaintiff's expert declaration identifies three credit denials that Plaintiff attributes to Ocwen's failure to furnish the XB notation: (a) November 14, 2017: LendingTree (Marcus Goldman Sachs); (b) November 16, 2017: LoanMe; and (c) April 4, 2018: Wells Fargo. None of the three occurred during the above-referenced periods when a dispute investigation was pending. Additionally, the denial letters and documents produced by Plaintiff or the CRAs in this case demonstrate no causal connection between the denial and the reporting of Ocwen's trade line.

### (a) LendingTree (Marcus Goldman Sachs

15. As to the Marcus by Goldman Sachs denial, a copy of which is attached hereto as **Exhibit 4**, it appears the Plaintiff requested pre-qualified loan options through LendingTree on November 14th 2017, after the Plaintiff sued Ocwen. LendingTree sent the Plaintiff's request to Marcus by Goldman Sachs, one of its personal loan lending partners, which declined to provide loan options based on the Plaintiff's Trans Union credit report, a copy of which for the relevant time period was not produced in discovery.

16. The reasons given by Marcus Goldman Sachs for the decision were: (1) Serious Delinquency and Public Record or Collection Filed; (2) Too Many Accounts With Balances; and (3) Length of Time Revolving Accounts Have Been Established. Factors 2 and 3 have nothing to do with Ocwen or with derogatory credit reporting. Factor 2 refers to the Plaintiff having too many accounts with a balance greater than zero dollars. Factor 3 refers to the lack of time since the Plaintiff's revolving accounts have been established.

17. Score factor 1 does refer to derogatory credit reporting but this factor would have been present even in the absence of Ocwen's trade line because the conditions that caused this score factor would have also been represented by another trade line. Score factor 1 refers to

"Serious Delinquency and Public Record." At the time of the Plaintiff's application she did, in fact, have a Chapter 13 bankruptcy on her credit report and, according to the Plaintiff's TransUnion credit report from December 2017, she did have at least one unrelated account (Wells Fargo) appearing that was seriously delinquent because it showed as being included in her bankruptcy. There is therefore no basis for concluding that it was the Ocwen trade line that resulted in Factor 1 being listed as a denial reason.

**(b) LoanMe**

18.    As to the LoanMe denial, a copy of the denial letter is attached hereto as **Exhibit 5**, it appears that on or about November 16th 2017, months after the Plaintiff sued Ocwen, the Plaintiff applied for credit with LoanMe and was denied.

19.    According to LoanMe's documents the Plaintiff was denied because of information on her Experian credit report, a copy of which for the relevant period was not produced in discovery. LoanMe does not identify the specific reasons for the denial of credit – only the required notice that it will provide those reasons upon request. Thus, the denial letter does not establish the denial reason.

20.    LoanMe did disclose the credit score, suggesting the credit score could have been used in the denial decision, and, the reasons given for the lower credit score. Specifically, the reasons given for the lower credit score were, (1) Serious Delinquency and Public Record or Collection Filed; (2) Proportion of Balance to High Credit on Bank Revolving or All Revolving Accounts; (3) No Recent Installment Loan Information; and (4) Length of Time (or Unknown Time) Since Account Delinquent.

21.    Score factors 2 and 3 have nothing to do with information furnished by Ocwen. Factor 2 refers to the Plaintiff's credit card balances being too close to her credit limits. Factor 3 refers to a lack of recent installment loan information. The Plaintiff's credit reports are almost entirely void of installment information.

22.    Score factors 1 and 4 do refer to derogatory credit reporting but it appears these factors would have been present even in the absence of the Ocwen trade line because conditions

that caused these score factors would have also been present whether or not the Ocwen trade line was reported. Score factor 1 refers to "Serious Delinquency and Public Record." At the time of the Plaintiff's application she did, in fact, have a bankruptcy as a public record. While we do not have an Experian credit report from November 2017, the Plaintiff did have at least one unrelated account (Wells Fargo) appearing on the Plaintiff's credit reports that was seriously delinquent because it showed as being included in her bankruptcy.

**(c) Wells Fargo**

23. According to an email dated April 4th 2018, it appears the Plaintiff applied for credit with Wells Fargo. Shortly after, the Plaintiff received an emailed message that appears to be from Wells Fargo in response to her April 4th application indicating that it/Wells Fargo cannot approve her application for an account at that time. Wells Fargo based its decision on the Plaintiff's Experian credit report, a copy of which for the relevant time period was not produced in discovery. The above referenced email was accompanied by a letter from Wells Fargo dated April 8th, 2018.14. A copy of the email and the letter are attached hereto as **Exhibit 6**.

24. This letter more fully communicates Wells Fargo's decision to deny the Plaintiff's application and provides reasons for the denial. Specifically, the factors were, (1) Bankruptcy on credit report; (2) Legal or other action taken against your accounts; (3) Wells Fargo or affiliate credit account charged off and uncollectable; and (4) Late payments on past or present credit accounts. As with the previously listed credit denials, it appears the conditions for the Plaintiff's denial were present regardless of whether or not the Ocwen trade line was being reported or how.

25. The first reason listed indicates Wells Fargo did, in fact, consider the Plaintiff's bankruptcy from her credit report. The second factor indicates Wells Fargo became aware of some sort of legal or "other" action taken against her accounts. There is no record of a legal action furnished to any of the credit reporting agencies by Ocwen at any point before this credit denial. The third factor indicates Wells Fargo became aware that one of its prior accounts was either charged off or uncollectable. The Plaintiff does have a record of a discharged Wells Fargo account

on several of the credit reports that are part of the discovery records. The fourth factor indicates late payments present on past or present credit accounts. Because we do not have the accompanying credit report from the Wells Fargo application there is no way to know to which account this factor refers.

26. Plaintiff's expert declaration attributes the Wells Fargo denial not to the denial factors identified above, but to the reasons separately listed in the denial letter that may have negatively affected the credit score. Because the credit score is not listed as a denial reason by Wells Fargo, the credit score reason disclosure is not relevant to the reasons for the denial. Even if it were, Plaintiff's expert incorrectly interprets the reasons in the credit score disclosure as causally attributable to information furnished by Ocwen.

27. There are four factors listed as negatively affecting Plaintiff's credit score: (1) Serious delinquency and public record or collections filed; (2) Too many accounts with balances; (3) Time since delinquency too recent or unknown; and (4) Too many inquiries last 12 months.

28. Score factors 2 and 4 have nothing to do with information furnished by Ocwen. Factor 2 refers to the Plaintiff having too many accounts with a balance greater than zero dollars. Factor 4 refers to impact that credit inquiries have on credit scores.

29. Score factors 1 and 3 do refer to derogatory credit reporting but it appears these factors would have been present even in the absence of the Ocwen trade line because conditions that caused these score factors would have also been present whether or not the Ocwen trade line was reported. Score factor 1 refers to "Serious delinquency and public record or collections filed." At the time of the Plaintiff's application she did, in fact, have a bankruptcy as a public record. While we do not have an Experian credit report from April 2018, the Plaintiff did have at least one unrelated account (Wells Fargo) appearing on the Plaintiff's credit reports that was seriously delinquent because it showed as being included in her bankruptcy.

30. Additionally, Plaintiff's expert contends that information furnished by Ocwen rendered Plaintiff ineligible for nearly all forms of major credit. The examples provided are mortgage and refinance. I am aware of no application within these categories for which Plaintiff

was denied based on my review of all documents pertaining to credit reporting that Plaintiff produced in this action. The statement appears to be a supposition.

31.  It is worth pointing out the Plaintiff has been able to procure significant credit both fairly recently in 2018 and during the 2016-2017 timeframe, when she contends Ocwen was causing credit damages. *See* Sandigo 4058, 4047, 1561-1572. According to Plaintiff's September 2018 credit report, prior to 2016 the Plaintiff had only opened two credit accounts. Since 2016 the Plaintiff has opened six new credit accounts and steadily raised credit limits on the revolving accounts. *See id*. Not only does this contradict the notion that Plaintiff was somehow unable to get new credit as a result of Ocwen's credit reporting, but it also indicates a healthy credit trajectory, especially for someone coming out of bankruptcy.

I declare under penalty of perjury that the foregoing is true and correct. Executed March __14__, 2019, in ____Atlanta____, ____Georgia____.



John Ulzheimer