**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| PHYLLIS SANDIGO,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>OCWEN LOAN SERVICING, LLC, et al.,<br><br>　　　　　　Defendants. | Case No.  17-cv-02727-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF 100, 104] |

Paying a mortgage can be complicated, even for homeowners who try hard.  Add to that mix a bankruptcy proceeding, and even sophisticated loan servicers struggle to understand what to do.  Such is the circumstance that prompted Plaintiff Phyllis Sandigo to sue Defendant Ocwen Loan Servicing, LLC ("Ocwen") for Rosenthal Act, Real Estate Settlement Procedures Act, federal and state fair credit reporting acts, and other statutory and common law violations.  Now the parties bring cross motions for summary judgment.

Ocwen is the mortgage servicer on a loan for Ms. Sandigo's home.  From September 2011 through November 2016, Ms. Sandigo was in Chapter 13 bankruptcy proceedings, but she still made monthly payments to Ocwen on her loan.  In early 2012, Ocwen and Ms. Sandigo modified the loan.  This modification required Ms. Sandigo to pay $1,597.56 per month, consisting of the principal, interest, and two escrow payments—one for homeowner's insurance and one for property taxes.  Ms. Sandigo alleges that in early 2013, Ocwen agreed to de-escrow the loan for property taxes, reducing Ms. Sandigo's monthly payment obligation to Ocwen to $1,415.21.  Indeed, since March 2013, Ms. Sandigo has paid her own property taxes to Santa Clara County.  Ocwen claims that the loan was never de-escrowed because certain events occurring in Ms.

1    Sandigo's bankruptcy barred Ocwen from de-escrowing the account.

2        Nevertheless, for several years after early 2013, Ocwen billed Ms. Sandigo for the lower

3    $1,415.21 amount, which Ms. Sandigo timely paid (with one exception which she promptly

4    remedied).  It was not until at least April 2016 that Ocwen began to consistently inform Ms.

5    Sandigo that she had owed and would continue to owe the higher $1,597.56 amount.  Ocwen relies

6    on the automatic stay in Ms. Sandigo's bankruptcy action to justify its failure to inform Ms.

7    Sandigo until April 2016 that she was underpaying.  In June 2016, Ocwen began demanding

8    higher payments from Ms. Sandigo, and once the bankruptcy action ended in November 2016,

9    Ocwen informed Ms. Sandigo that she was several thousand dollars behind on her payments.  Ms.

10   Sandigo consistently disputed this position.  In March 2017, Ocwen recorded a Notice of Default

11   as to Ms. Sandigo's loan.  At certain times throughout this period, Ocwen also reported to several

12   consumer reporting agencies that Ms. Sandigo was delinquent in her payments.  At the same time,

13   Ocwen allegedly held hostage certain insurance payments Ms. Sandigo had received for repairs

14   after her home flooded.

15       In this suit, Ms. Sandigo claims that these actions by Ocwen violated various federal and

16   state laws.  Ms. Sandigo's chief theory of liability is that she only owed Ocwen the lower payment

17   amount and that Ocwen violated the law by demanding the higher amount.  Ocwen disputes this

18   contention.

19       Now before the Court is Ocwen's and Ms. Sandigo's motions for summary judgment.  For

20   the reasons discussed below, and because many of the material facts in this case are disputed, the

21   Court DENIES Ms. Sandigo's motion for summary judgment (Pl. Mot, ECF 100) and GRANTS

22   IN PART AND DENIES IN PART Ocwen's motion for summary judgment (Def. Mot., ECF

23   104).  The Court grants Ocwen's motion on Ms. Sandigo's conversion claim only.  Moreover, the

24   Court holds that res judicata does not bar Ms. Sandigo from asserting that she owed Ocwen only

25   the lower payment amount, but it also holds that the amount Ms. Sandigo owed is a disputed issue

26   of material fact.

27   **I.    PROCEDURAL BACKGROUND**

28       Ms. Sandigo filed this action in Santa Clara County Superior Court on April 11, 2017

United States District Court
Northern District of California

against Ocwen and U.S. Bank National Association, as Trustee for GSAA Home Equity Trust 2007-3, Asset Backed Certificates, Series 2007-3 ("U.S. Bank") (collectively, "Defendants"). ECF 1-1.  On May 11, 2017, Defendants removed the action to federal court.  ECF 1.  On January 19, 2018, upon stipulation with Defendants, Ms. Sandigo filed her First Amended Complaint ("FAC", ECF 38).

In her FAC, she asserted seven causes of action for violations of the following laws: (1) California's Homeowner's Bill of Rights, Cal. Civil Code § 2920, *et seq.* (against Ocwen and U.S. Bank); (2) California's Rosenthal Act, Cal. Civil Code § 1788, *et seq.* (against Ocwen); (3) Real Estate Settlement Procedures Act, 12 U.S.C. § 2605, *et seq.* (against Ocwen); (4) Conversion (against Ocwen); (5) California's Consumer Credit Reporting Agencies Act, Cal. Civil Code § 1785.1, *et seq.* (against Ocwen and U.S. Bank); (6) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (against Ocwen and U.S. Bank); and (7) the Federal Fair Credit Reporting Act, 15 U.S.C § 1681s–2(b) (against Ocwen and U.S. Bank).  *See generally* FAC.  Defendants answered on February 2, 2018 (ECF 39) and amended their answer on February 28, 2018 (ECF 59).

On October 27, 2018, Ms. Sandigo dismissed by stipulation claim 1 under the California's Homeowner's Bill of Rights against both Defendants.  ECF 88.  She also dismissed claims five and seven under California's Consumer Credit Reporting Agencies Act and the Federal Fair Credit Reporting Act, respectively, against U.S. Bank only.  ECF 88.  On November 1, 2018, Ms. Sandigo dismissed by stipulation claim 6 under California's Unfair Competition Law against U.S. Bank only.  ECF 89.  The Court granted both stipulations on November 1, 2018.  ECF 90, 91.

The claims remaining against Ocwen are as follows: : (1) California's Rosenthal Act, Cal. Civil Code § 1788, *et seq.*; (2) Real Estate Settlement Procedures Act, 12 U.S.C. § 2605, *et seq.*; (3) Conversion; (4) California's Consumer Credit Reporting Agencies Act, Cal. Civil Code § 1785.1, *et seq.*; (5) California's Unfair Competition Law, Cal. Bus & Prof. Code § 17200, *et seq.*; and (6) the Federal Fair Credit Reporting Act. 15 U.S.C § 1681s–2(b).

On February 21, 2019, both Ms. Sandigo and Ocwen moved for summary judgment.  Ms. Sandigo moved for summary judgment on her Rosenthal Act claim, *see generally* Pl. Mot., and

*United States District Court*
*Northern District of California*

3

Ocwen moved for summary judgment on all of Ms. Sandigo's claims, as well as her request for punitive damages, *see generally* Def. Mot.  The Court held a hearing on the motions on March 28, 2019.

## II.    EVIDENTIARY OBJECTIONS

Under Federal Rule of Civil Procedure 56(c), a party can object to an opposing party's declarations and evidentiary material if it is not in a form that "would be admissible in evidence."  Ocwen objects to certain portions of Ms. Sandigo's declaration in support of her motion ("Sandigo Mot. Decl.," ECF 101).[1]  *See* Def. Opp. at 25, ECF 113.  The Court discusses each objection in turn.

### 1.    Sandigo Mot. Decl. ¶ 4

In her declaration, Ms. Sandigo states the following:

> I made all payments on the modification in the amounts requested by Ocwen. This continued until Ocwen refused to allow me to make further payments in December 2016 as described below. In the first year after the modification, the payments were approximately $1,597.56. I was told that this amount included property tax and insurance escrow amounts.

Ocwen objects that this statement "[m]isstates the evidence" and that her statement "I made all payments on the modification in the amounts requested by Ocwen" is "vague/ambiguous."  Def. Opp. at 25.  Ocwen objects on the basis of Federal Rules of Evidence ("FRE") 601 and 602.

Ruling:  OVERRULED.  Ms. Sandigo has personal knowledge of the payments requested by Ocwen and the amounts she paid.  She also has personal knowledge of what Ocwen told her with respect to why her payments were $1,596.56.  Her statement that she made all of her payments through December 2016 is neither vague nor ambiguous.

### 2.    Sandigo Mot. Decl. ¶ 6

---

[1] Ocwen also objects to some of Ms. Sandigo's evidence cited in her opposition to Ocwen's motion.  *See* Def. Reply at 15, ECF 124.  However, Ocwen's objections in its reply contain no reasoning.  Instead, Ocwen merely lists numerous paragraphs of various declarations and follows each list with a string cite of evidentiary rules.  *See, e.g., id.* (objecting to "Plaintiff's Declaration ¶¶ 12, 13, 15, 22, 23, 25, 31, 33 and 34 under the FRE 401, 403, 601, 602, 701, 702, 802 and 901").  Such objections are wholly inadequate, so those objections are overruled without prejudice to Ocwen's reasserting them at trial if relevant.

United States District Court
Northern District of California

1    In her declaration, Ms. Sandigo states that "Ocwen de-escrowed the loan for property

2  taxes, but not for insurance."

3    Ocwen objects that this statement "[l]acks foundation, calls for speculation, [and] misstates

4  the evidence."  Def. Opp. at 25.  Ocwen objects on the basis of FRE 601 and 602.

5    Ruling: SUSTAINED in part.  Ms. Sandigo does not have personal knowledge of what

6  Ocwen did, but she may testify as to what she believes Ocwen did, based on its representations to

7  her.

8    **3.    Sandigo Mot. Decl. ¶ 15**

9    In her declaration, Ms. Sandigo states that "[i]n 2014 and 2015, I would often make my

10  payments online. When I did this, Ocwen's system would prompt me to pay $1,415.21."

11    Ocwen objects that this statement "[l]acks foundation, calls for speculation, [and is]

12  hearsay regarding what Ocwen's system would say/do."  Def. Opp. at 25.  Ocwen objects on the

13  basis of FRE 601, 602, and 802.

14    Ruling: OVERRULED.  Ms. Sandigo has personal knowledge of what Ocwen's system

15  prompted her to do.  Ocwen has not sufficiently argued why it's system's prompt would be a

16  "statement" for hearsay purposes, or why, even if it were a statement, it is not a party admission

17  and thus not hearsay under FRE 801.

18    **4.    Sandigo Mot. Decl. ¶ 17**

19    In her declaration, Ms. Sandigo states the following:

20    I made all payments due to Ocwen under the modification, with one exception.  I
21    forgot to make the payment due on November 1, 2015, as I was commemorating the
       one-year anniversary of my husband's death on October 14, 2014.  I made that
22    payment up by making a double payment of $2,831.24 on December 14, 2015.

23    Ocwen objects that this statement "[m]isstates the evidence, [is] vague/ambiguous, calls

24  for a legal conclusion regarding 'I made all payments due to Ocwen under the modification, with

25  one exception'; [and is] [v]ague [and] ambiguous as to 'double payment.'"  Ocwen objects on the

26  basis of FRE 601, 602, 701, and 702.

27    Ruling: OVERRULED in part.  Ms. Sandigo has personal knowledge as to whether she

28  made all of her payments and what amount she paid.  Her reference to making a double payment is

United States District Court
Northern District of California

5

neither vague nor ambiguous.  However, to the extent her testimony can be read to require her

interpretation of the loan modification contract, she has not demonstrated that she has the expertise

to present legal conclusions about the contract.  Thus, the Court sustains the objection as to "all

payments due."

     **5.**       **Sandigo Mot. Decl. ¶ 21**

In her declaration, Ms. Sandigo states the following:

> As of late 2015, I wasn't aware of any problem with my mortgage loan.  I made the
> payments Ocwen asked me to pay, and I paid my own property tax directly to Santa
> Clara County.  I relied on all of the above-described representations that the payment
> amount was approximately $1,415.21, and paid that amount because Ocwen told me
> to.  It made sense to me that the payment amount was lower than the previous
> payment of approximately $1,597.56 because the loan had been de-escrowed for
> property taxes and I had been paying my own property taxes directly to the County
> since March 2013.

Ocwen objects that this statement "[m]isstates the evidence, [and is] [v]ague [and]

ambiguous as to 'I made the payments Ocwen asked me to pay.'"  Ocwen objects on the basis of

FRE 601, 602, 701, and 702.

     <u>Ruling</u>: OVERRULED in part.  Ms. Sandigo has personal knowledge of her own beliefs,

as well as how much Ocwen asked her to pay.  However, to the extent her testimony can be read

as a legal conclusion as to whether the loan was de-escrowed, she has not demonstrated that she

has the expertise to draw such a conclusion or the personal knowledge to say what Ocwen did.

     **6.**       **Sandigo Mot. Decl. ¶ 28**

In her declaration, Ms. Sandigo states the following:

> My disputes, which had up until then concerned the prospective payment increase
> imposed by Ocwen, expanded to include Ocwen's claim that I was thousands of
> dollars in default.  The process of disputing the default was made extremely
> exasperating due to erroneous and inconsistent information provided by Ocwen. One
> significant example of Ocwen's misdirection was its explanation to me as to the
> reason I was in default. Ocwen claimed on several occasions that I was in default
> because it had not received a number of payments over the last 3–4 years. The Ocwen
> representatives claimed the payments for certain listed months were not made. The
> information provided to me as to how many, and which payments were missing
> varied depending on who I was talking to.

Ocwen objects that this statement is "[i]mproper opinion, calls for a legal conclusion, [and]

lacks foundation [and] calls for speculation as to 'due to erroneous and inconsistent information

provided by Ocwen.'"  Ocwen objects on the basis of FRE 601, 602, 701, and 702.

Ruling: OVERRULED.  Ms. Sandigo has personal knowledge of what Ocwen told her and whether that information was inconsistent.  This statement does not include legal conclusions.

### 7.    Sandigo Mot. Decl. ¶ 40

In her declaration, Ms. Sandigo states the following: "On or about March 13, 2017, fifty-four (54) copies of a Notice of Default were delivered to my home.  After April 2017, Ocwen ceased sending monthly statements, and cut off my online access to my account."

Ocwen objects that this statement "[l]acks foundation [and] calls for speculation as to what Ocwen did."  Ocwen objects on the basis of FRE 601 and 602.

Ruling: OVERRULED.  Ms. Sandigo has personal knowledge of the mail she received and whether she had access to Ocwen's site.

### 8.    Sandigo Mot. Decl. ¶ 46

In her declaration, Ms. Sandigo states the following: "As a result of Ocwen's actions, I have suffered significant emotional distress.  The telephone conversations with Ocwen personnel were disturbing to the point that I was often left physically shaking, and at times crying after they were over."

Ocwen objects that this statement "[l]acks foundation [and] calls for expert opinion [and] legal conclusion[s] as to 'as a result of Ocwen's actions, I have suffered significant emotional distress.'"  Ocwen objects on the basis of FRE 601, 602, 701, and 702.

Ruling: OVERRULED.  Ms. Sandigo has personal knowledge of her emotional state and physical condition following telephone conversations with Ocwen.

## III.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).

The moving party seeking summary judgment bears the burden of showing there is no

material factual dispute.  Once the moving party has satisfied this initial burden, the non-moving party must then "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Schneider v. TRW, Inc.*, 938 F.3d 986, 991 (9th Cir. 1990).  It is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact."  *Keenan*, 91 F.3d at 1279 (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)).  Moreover, the court makes no credibility determinations and does not weigh the evidence.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 254; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]."  *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).  If the non-moving party fails to make this showing, the moving party is entitled to summary judgment.  *Celotex*, 477 U.S. at 323.

The filing of cross-motions for summary judgment or partial summary judgment does not mean that the material facts are undisputed, and the denial of one motion does not necessarily require the granting of the other.  *See, e.g., Regents of Univ. of Calif. v. Micro Therapeutics, Inc.*, 507 F. Supp. 2d 1074, 1077–78 (N.D. Cal. 2007) (citing *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1147 (10th Cir. 2000).  The cross-motions are to be evaluated in accordance with the requisite burden of proof facing each party.  *Id.* at 1078.

## IV.   DISCUSSION

Ocwen seeks summary judgment on each of Ms. Sandigo's claims and on her request for punitive damages.  *See* Def. Mot. at 1.  Ms. Sandigo seeks summary judgment on her Rosenthal Act claim.  *See* Pl. Mot. at 1.  Two questions apply broadly to multiple claims:  (1) Does res judicata, based on orders in her Bankruptcy Action, bar Ms. Sandigo from arguing that she owed Ocwen only $1,415.21 each month; and (2) if not, how much did Ms. Sandigo owe Ocwen?  The Court first addresses these questions and then turns to the arguments with respect to each of Ms. Sandigo's claims and her request for punitive damages.

United States District Court
Northern District of California

### A. The Amount Ms. Sandigo Owed in Escrow Payments

#### 1. Res Judicata

Ocwen seeks summary judgment based on res judicata to bar most of Ms. Sandigo's claims. As mentioned previously, Ms. Sandigo was in Chapter 13 bankruptcy proceedings for a large portion of the relevant time period here. One of Ocwen's primary arguments is that certain orders of the bankruptcy court memorialized the amount of monthly payments Ms. Sandigo owed Ocwen. As such, Ocwen claims that under the doctrine of res judicata these orders bar Ms. Sandigo from arguing that she owed Ocwen less. The Court first discusses the relevant facts, then res judicata law, and then the parties' arguments.

#### a. Facts[2]

The relevant facts of the res judicata dispute date back to September 2011 when Ms. Sandigo and her late husband Joseph Sandigo (referred to collectively in this section as "Ms. Sandigo") filed for bankruptcy. On September 15, 2011, Ms. Sandigo filed a Chapter 13 Voluntary Petition and a Chapter 13 Plan in the U.S. Bankruptcy Court for the Northern District of California, Case No. 11-58639 ("Bankruptcy Action"). Def. Mot. RJN, Exs. 1, 2, ECF 105-1.[3] The Bankruptcy Court confirmed the Chapter 13 Plan on November 22, 2011. *Id.*, Exs. 2, 3, ECF 105-1. Ocwen is the mortgage servicer on a loan for Ms. Sandigo's home. Flannigan Decl. ISO Def. Mot. ¶ 3, ECF 110; FAC ¶ 7; Sandigo Decl. ISO Opp. ¶ 3, ECF 101. The confirmed Plan required Ms. Sandigo to make monthly payments of $2,114.06 to Ocwen. Def. Mot. RJN, Ex. 2. On February 15, 2012, Ms. Sandigo moved the Bankruptcy Court to modify the loan with Ocwen such that Ms. Sandigo would make monthly principal and interest payments of $1,325.79 and monthly escrow payments of $271.77, for total monthly payments of $1597.56 (referred to in this

---

[2] The facts set forth in this section are undisputed unless otherwise noted.

[3] Ocwen asks the Court to take judicial notice of several filings in the Bankruptcy Court and several public filings with Santa Clara County Clerk Recorder's Office. *See* Def. Mot. RJN, ECF 105; Def. Opp. RJN, ECF 115; Def. Reply RJN, ECF 126. Ms. Sandigo does not oppose this request. Courts "may take judicial notice of court filings and other matters of public record." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006); *see* Fed. R. Evid. 201(b). As such, the Court GRANTS Ocwen's request for judicial notice as to these documents. The Court also takes judicial notice of the declaration of Mr. Hendricks from a previous case because it is a matter of public record not subject to dispute, and because Ms. Sandigo does not object.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

opinion as the "full escrow amount"). *Id.*, Ex 4 ¶¶ 4, 8, ECF 105-1.

The bankruptcy court motion was made pursuant to a loan modification agreement between Ms. Sandigo and Ocwen, in which Ms. Sandigo agreed to pay the monthly principal and interest payments and "[i]f the loan is currently escrowed, . . . the escrow amounts." *Id.*, Ex. 4, Ex. A. At that time, Ocwen escrowed the loan for both property taxes ($182.35/month) and homeowner's insurance ($89.42/month) in the combined amount of $271.77. Flannigan Mot. Decl. ¶ 5; FAC ¶¶ 23–25; Sandigo Opp. Decl., Exs. 2, 3, 4 ECF 117-2, 117-3, 117-4. On March 9, 2012, the Bankruptcy Court granted the motion, stating that Ms. Sandigo "will start making the initial monthly escrow payment in the amount of $271.77, which may be adjusted periodically." Def. Mot. RJN, Ex. 5, ECF 105-1. Subsequently, Ms. Sandigo twice moved to modify her Chapter 13 Plan, once in October 2013 and once in September 2015. Def. Mot. RJN, Exs. 6, 8, ECF 105-1. In these motions, Ms. Sandigo did not request to modify the monthly payments due. *Id.* The Bankruptcy Court granted both motions. *Id.*, Exs. 7, 9, ECF 105-1.

The parties agree that in April or May 2013, Ms. Sandigo asked Ocwen to de-escrow the property tax portion of her monthly payment. Sandigo Opp. Decl. ¶ 6 & Ex. 5, ECF 117-5; Flannigan Mot. Decl. ¶ 6 & Ex. 2. However, they disagree as to what happened next.

Ms. Sandigo claims that Ocwen de-escrowed the property tax portion of the loan escrow to make her monthly payment obligation $1,415.21 ("the de-escrowed amount"). She submits her billing statements showing that she paid the de-escrowed amount on the 13th of June, August, September, and December 2013. Sandigo Opp. Decl., Ex. 6, ECF 117-6. She submits several escrow statements from May 5, 2013 and June 5, 2013 showing the de-escrowed amount. *Id.*, Exs. 7, 8, ECF 117-7, ECF 117-8. She also submits transcripts from calls with Ocwen employees in which Ocwen employees told her to make payments of the de-escrowed amount. These calls took place on July 23, 2013, February 3, 2014, and April 1, 2014. Sandigo Opp. Decl. Exs. 19 (2:11–13), 20 (2:19–20), 21 (3:7–10), ECF 117-19–21. And she submits deposition testimony by Ocwen's 30(b)(6) witness that the loan was de-escrowed in April 2013 and remained de-escrowed through the end of 2015. Kennedy Decl. ISO Opp., Ex. 1 at 140: 2–141:1, ECF 118-1; *see also* Sandigo Opp. Decl., Ex. 11 at 55 (letter from Ocwen stating loan was de-escrowed on April 12,

United States District Court
Northern District of California

1  2013).

2        Moreover, Ms. Sandigo avers that when she made online payments to Ocwen in 2014,

3  2015, and early 2016, Ocwen's system prompted her to pay the de-escrowed amount.  *Id.* ¶ 11.

4  And Ocwen sent her certain statements as late as June 4, 2015 and June 12, 2015 reflecting that

5  her account was not escrowed for property taxes.  Sandigo Opp. Decl., Exs. 9, 36, ECF 117-9,

6  117-36.  Through October 2015, Ocwen's system showed Ms. Sandigo's monthly payment

7  obligation as the de-escrowed amount and Ms. Sandigo's account as having a $0 balance.

8  Kennedy Opp. Decl., Ex. 3, ECF 118-3.  Ocwen admitted that from December 2013 through

9  September 2015, it had not found any written confirmation that it told Ms. Sandigo that her

10  monthly payment obligation exceeded the de-escrowed amount.  *Id.*, Ex. 4 at 6, ECF 118-4.

11        After March 22, 2013, Ms. Sandigo made all property tax payments directly to Santa Clara

12  County, Sandigo Opp. Decl ¶ 12; Ocwen never paid property taxes to the County on behalf of Ms.

13  Sandigo after this date, Kennedy Opp. Decl., Ex. 2 at 7, ECF 118-2.  Also, from this date through

14  June 2016, Ms. Sandigo promptly made all regular monthly payments to Ocwen in the de-

15  escrowed amount, except when she missed a payment in November 2015, which she promptly

16  paid in December 2015.  Sandigo Opp. Decl. ¶ 13.

17        Ocwen counters this narrative with its own.  Ocwen submits a "detailed transaction

18  history" showing that it attempted to de-escrow the loan per Ms. Sandigo's request, such that as of

19  July 15, 2013, the monthly payment obligation was the de-escrowed amount.  Flannigan Mot.

20  Decl. ¶ 6 & Ex. 3.  However, it claims that it then "reconciled Sandigo's monthly payment with

21  the bankruptcy court's order . . . and realized that it needed to collect the monthly escrowed

22  payment for taxes of $1,597.56," so it "re-escrowed the account and advised Sandigo that she

23  owed the higher amount."  *Id.* ¶ 6 & Ex. 4.  Ocwen's documents show that at least as of November

24  16, 2015, Ocwen realized that Ms. Sandigo's monthly payment obligation needed to include the

25  escrow for property taxes.  *Id.*, Ex. 4.

26        Indeed, on October 22, 2015, Ocwen filed an Amended Proof of Claim ("APOC") in the

27  Bankruptcy Court, which included an attachment ("escrow attachment") showing that Ms.

28  Sandigo owed $1,597.56 per month, including a total escrow of $271.77 (which includes the

United States District Court
Northern District of California

11

property tax escrow).  Def. Mot. RJN, Ex. 10 at 6, ECF 105-2.  The escrow attachment states that the "monthly payment amount may change due to an escrow requirement and/or interest rate adjustment" and lists the $1,597.56 amount due as the "first post-petition payment amount."  *Id.* The APOC also attached and incorporated the January 2012 loan modification agreement between Ms. Sandigo and Ocwen.  *Id.*  Ms. Sandigo did not object to the APOC.  *Id.*, Ex. 1.  Ocwen then claims that though it "had adjusted the account to reflect a monthly payment consistent with bankruptcy records," "it could not have reached out to Sandigo to tell her the payments she had been making were short because of the pending bankruptcy['s]" stay on debt collection practices. Flannigan Decl. ISO Opp. ¶ 13, ECF 114.

On December 14, 2015, Ms. Sandigo called Ocwen to make a double payment because she had missed her November payment due to the anniversary of her husband's passing.  Flannigan Mot. Decl. ¶ 7 & Ex. 5.  Ocwen's agent told Ms. Sandigo she owed the full escrow amount for each month.  *Id.*  But Ms. Sandigo told them she owed only the de-escrowed amount.  *Id.*  The agent allowed Ms. Sandigo to pay the lower amount.  *Id.*, Ex. 5; Sandigo Opp. Decl., Ex. 22 at 1:23–4:19, ECF 117-22.  Ms. Sandigo admits that in late 2015, Ocwen contended that her monthly payment obligation was the full escrow amount of $1,597.56, Pl. Opp. at 3, ECF 116, but submits evidence that after this phone call, Ocwen told her on at least two occasions, on February 2, 2016 and April 6, 2016, that her monthly payment obligation was in fact the de-escrowed amount of $1,415.21, Sandigo Opp. Decl., Ex. 23 at 13:13–16:25, Ex. 24 at 2:18–21, ECF 117-23, 24.

Ocwen admits that in February 2016 and April 2016, Ms. Sandigo was informed that she owed only the de-escrowed amount.  Flannigan Opp. Decl. ¶ 15 & Ex. 5, ECF 114-1.  However, Ocwen states that these attempts to de-escrow were overridden because of the ongoing bankruptcy.  *Id.*  Ocwen contends that Plaintiff was consistently told after April 2016 that she owed the full escrow amount.  *Id.* ¶ 16.

On May 12, 2016, the Chapter 13 Trustee filed a Notice of Final Cure Payment.  Def. Mot. RJN, Ex. 11.  On May 24, 2016, U.S. Bank, trustee for the loan's investor, then filed a response indicating that Ms. Sandigo had an outstanding balance of $6,266.55 on her mortgage.  *Id.*, Ex. 12; FAC ¶ 28.  This response included a payment history indicating that Ms. Sandigo's monthly

United States District Court
Northern District of California

payment obligation had been $1,597.46 (the full escrow amount) from May 1, 2012 through May 1, 2016.  Def. Mot. RJN, Ex. 12; FAC ¶ 28.  $6,266.55 represents the difference in the amounts of the full escrow payments and the de-escrowed payments over that same time period.  Through June 2016, Ms. Sandigo made payments in the de-escrowed amount of $1,415.62.  Kennedy Decl., Ex. 5 at 5–7.  In July 2016, Ms. Sandigo began paying the full escrow amount of $1,597.56 monthly at Ocwen's demand, though she disputed the increased amount.  Sandigo Opp. Decl. ¶ 17.  In August 2016, Ocwen filed a Notice of Mortgage Payment Change in the Bankruptcy Action, stating it was raising the amount of escrow due from the full escrow amount to a higher amount.  Def. Mot. RJN, Ex. 13.  Ms. Sandigo did not object.  *Id.*, Ex. 1.

On October 14, 2016, the bankruptcy petition was discharged, and on November 23, 2016, the Bankruptcy Action was closed.  Def. Mot. RJN, Ex. 1; Sandigo Opp. Decl. ¶ 3.

### b.  Res Judicata Law

The "doctrine of res judicata bars a party from bringing a claim if a court of competent jurisdiction has rendered a final judgment on the merits of a claim in a previous action involving the same parties or their privies." *Robertson v. Isomedix, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994).  "[T]he allowance or disallowance of a claim in bankruptcy is binding and conclusive on all parties or their privies, and being in the nature of a final judgment, furnishes a basis for a plea of res judicata."  *Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 529 (9th Cir. 1998) (internal quotation marks and citation omitted).

To establish the defense of res judicata, a party must prove three elements: "(1) an identity of claims, (2) a final judgment on the merits, and (3) [identity or] privity between parties." *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003).  "Res judicata bars all grounds for recovery that could have been asserted, whether they were or not, in a prior suit between the same parties on the same cause of action."  *Siegel*, 143 at 528–29 (9th Cir. 1998) (alteration in original) (citation omitted).  To determine whether the same cause of action is involved in both suits, courts look to the following four factors: "(1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions;

1    (3) whether the two suits involve infringement of the same right; and (4) whether the two suits

2    arise out of the same transactional nucleus of facts." *Id.*

3          Because both parties rely on the Ninth Circuit's decision in *Siegel*, the Court briefly

4    describes that case here.  In *Siegel*, the Ninth Circuit affirmed the district court's holding that res

5    judicata barred the plaintiff-debtor Siegel's tort and contract action relating to the creditor-

6    defendant Freddie Mac's foreclosures of two of Siegel's properties.  143 F.3d at 529.  The court so

7    held because Siegel did not object to Freddie Mac's proof of claim to the properties in a previous

8    bankruptcy action.  *Id.*  In the district court action, "[t]he gravamen [of the complaint] [wa]s that

9    Freddie Mac violated its duties under the notes and deeds of trust and, among other things, should

10   not have been able to proceed against Siegel due to its own defaults and wrongdoing."  143 F.3d at

11   529.  Because Freddie Mac's proof of claim in the bankruptcy court also "involve[d] Freddie

12   Mac's right to recovery under the [parties'] loan agreements," the court held that Siegel should

13   have objected to the proof of claim and raised his claims at that point.  *Id.* at 529, 531.  Ultimately,

14   the court concluded that "[Freddie Mac's] claims and [Siegel's] asserted defenses and

15   counterclaims," as reflected in the district court action, "were the heart and soul of the

16   bankruptcy."  *Id.* at 531.  As such, res judicata barred Siegel from raising those claims in the

17   district court because they could have been raised in the bankruptcy court.

18                        **c.  Discussion**

19         In its motion and in opposition to Ms. Sandigo's motion, Ocwen argues that both the

20   Amended Proof of Claim ("APOC") and, in the alternative, the Chapter 13 Plan in the Bankruptcy

21   Action preclude Ms. Sandigo from arguing in this action that she owed Ocwen any less than the

22   full escrow amount of $1,597.46 under the doctrine of res judicata.[4]  The Court discusses the

23   APOC and the Chapter 13 Plan arguments in turn.

24                        i.    Amended Proof of Claim

25   _____

26   [4] Ms. Sandigo briefly objects that Ocwen raised its res judicata argument too late in the case to
     assert it here.  Pl. Opp. at 9.  Ocwen did not plead res judicata as an affirmative defense.  *See* Ans.,
27   ECF 59.  Because Ms. Sandigo does not argue that she was prejudiced by Ocwen's delay in
     raising the defense, the Court holds that Ocwen can raise its defense here.  *See Garcia v. Salvation*
28   *Army*, 918 F.3d 997, 1008 (9th Cir. 2019) (requiring party arguing waiver of affirmative defense
     to demonstrate prejudice).

United States District Court
Northern District of California

United States District Court
Northern District of California

Ocwen argues that the APOC bars Ms. Sandigo's claims here because it satisfies each element of the res judicata test.  First, the APOC resolved the identical claim as Ms. Sandigo seeks to resolve here—namely, the monthly amount Ms. Sandigo owed to Ocwen—and Ms. Sandigo did not object to the APOC at the time.  Def. Mot. at 7–8 (citing *Siegel*, 143 F.3d at 529); Def. Opp. at 10.  Because Ocwen attached the escrow attachment and the loan modification in support of its APOC, and those two documents indicate that Ms. Sandigo owed the full escrow amount, the Bankruptcy Court has already decided that this amount is owed.  The same facts and rights were at issue there as here.  Second, the APOC is a final decision on the merits because it was not reversed or challenged by Ms. Sandigo and was "deemed allowed" under bankruptcy law (11 U.S.C. § 502(a)), such that it was legally adopted by the Bankruptcy Court.  Finally, Ms. Sandigo and Ocwen were indisputably parties to the earlier proceeding.

The Court disagrees that the Bankruptcy Court finally determined this issue.  Contrary to Ocwen's arguments, the Bankruptcy Court did not determine that Ms. Sandigo owed Ocwen the full escrow amount *ad infinitum* until some amending notice was posted in the Bankruptcy Action.

Ocwen bases its argument in part on the escrow attachment to the APOC, which states that Ms. Sandigo owed the full escrow amount.  But the escrow attachment does not bind Ms. Sandigo here.  Even assuming the escrow attachment to the APOC is part of Ocwen's "claim" in the Bankruptcy Action—a fact the parties dispute and the Court need not address to resolve the issue—the escrow attachment does not state that Ms. Sandigo would owe the full escrow amount in monthly payments unless the Bankruptcy Court said otherwise.  Instead, it contemplates that the "monthly payment amount *may change* due to an escrow requirement and/or interest rate adjustment," and it states that the full escrow amount is due only as the "*first* post-petition payment amount."  Def. Mot. RJN, Ex. 10 at 6 (emphases added).  This language indicates that the monthly payment obligation therein was not final and could be modified, or it is at least ambiguous as to whether it could be modified.  *Cf. In re Miller*, 284 B.R. 121, 124 (N.D. Cal. 2002), *aff'd sub nom. Miller v. United States*, 363 F.3d 999 (9th Cir. 2004) ("If the [Chapter 13] plan is ambiguous, then this Court cannot find that a claim is barred by res judicata until it unravels the ambiguity and determines how that claim was actually resolved.  The ambiguity may

1    also reflect the absence of any final decision on the merits of the particular issue at stake.").

2    Ocwen attempts to overcome this language in two ways, neither of which is availing.

3    Ocwen first argues that the language of the loan modification agreement, which the APOC

4    incorporates, refutes any argument that Ocwen could later de-escrow the loan because it states that

5    "[i]f the loan is currently escrowed, Ocwen will continue to collect the escrow amounts with [the]

6    monthly principal and interest payment."  Def. Opp. at 16 (quoting Def. Mot. RJN, Ex. 4, Ex. A).

7    The Court simply disagrees with Ocwen that the language of the loan modification contemplates

8    Ocwen collecting the same amount forever, even if it later wishes to modify that amount.  In fact,

9    Ocwen concedes on the very next page of its opposition that the APOC "contemplates the

10   possibility that the payment amount could change because of an escrow adjustment."  *Id.* at 17.

11   Indeed, the APOC language allowing for escrow adjustments in the escrow attachment directly

12   contradicts Ocwen's reading of the loan modification agreement, or at least creates an ambiguity

13   in the language, which should be construed against Ocwen as the drafter.  *Cf. In re Brawders*, 503

14   F.3d 856, 867 (9th Cir. 2007) (interpreting ambiguity in Chapter 13 plan against debtor as the

15   drafter).  Moreover, the loan modification agreement incorporates the rights and obligations

16   provided to each party under the Note and Deed of Trust.  *See* ECF 101-1 ¶ 8(b).  The Deed of

17   Trust allows Ocwen to waive the escrow requirement.  Sandigo Mot. Decl., Ex. 18, ECF 101-18 ¶

18   3.  Thus, the loan modification agreement, and in turn the APOC, contemplates that Ocwen can

19   waive or alter the escrow amounts.

20   Ocwen also argues that even if Ocwen could change the escrow amounts under the terms

21   of the APOC, the only way it could do so for purposes of modifying the "final" APOC order was

22   to comply with the bankruptcy rules and file a notice in the Bankruptcy Court under Bankruptcy

23   Rule 3002.1.  That rule states that "[t]he holder of the claim shall file and serve on the debtor,

24   debtor's counsel, and the trustee a notice of any change in the payment amount, including any

25   change that results from an interest-rate or escrow-account adjustment, no later than 21 days

26   before a payment in the new amount is due."  Fed. R. Bankr. P. 3002.1(b)(1).  Ocwen argues that

27   it could not have modified the escrow amounts due without filing a notice that complied with this

28   rule; because it did not file such a notice, it did not modify the final escrow amount set forth in the

United States District Court
Northern District of California

16

1  APOC.  Def. Opp. at 17.

2  To say that this argument is perverse is an understatement.  Punishing Ms. Sandigo for

3  Ocwen's failure to comply with its duties under the bankruptcy rules is not appropriate for

4  numerous reasons.  Most importantly, such a result is not contemplated under Rule 3002.1.  The

5  only express sanctions for a creditor's failure to comply with the rule is to preclude the *creditor*

6  from using the changed amounts as evidence in future proceedings or to impose certain fees and

7  expenses caused by the creditor's failure.  Rule 3002.1(i).  These sanctions do not apply to the

8  debtor, and the Court will not apply them against Ms. Sandigo here.

9  Moreover, Rule 3002.1 is meant to protect creditors from underpayment and debtors from

10  surprise about how much they owe at the close of the bankruptcy action.  *See In re Carr*, 468 B.R.

11  806, 808 (Bankr. E.D. Va. 2012) ("The rule . . . provides a procedure to draw a bright line at the

12  conclusion of a case as to any amounts that may *remain due* to a creditor relating to the cure

13  payments or payments due on a mortgage during the pendency of the chapter 13 case." (emphasis

14  added)); *In re Couvertier Lopez*, No. 17-03902 (ESL), 2019 WL 856302, at *3 (Bankr. D.P.R.

15  Feb. 20, 2019) (noting rule "prevent[s] 'unexpected deficiencies' prior to the closing of the case");

16  *In re Meyer*, No. 1-12-BK-04042-RNO, 2018 WL 1663292, at *7 (Bankr. M.D. Pa. Apr. 4, 2018)

17  ("The rule is meant to ensure a debtor is fully informed about amounts owed and is not surprised

18  after leaving Chapter 13.").  These purposes are chiefly served when the creditor notifies the

19  debtor of an *increase* in the amount owed, as opposed to a *decrease* in the amount owed, as

20  happened here.  That is not to say that the Rule does not cover decreases in amounts owed, but

21  rather that application of the Rule to preclude Ms. Sandigo from making her argument here makes

22  little sense.  Indeed, the Court has not found—and Ocwen does not cite—a case in which the rule

23  was applied to the detriment of the debtor.  Put simply, the law does not require that Ms. Sandigo

24  suffer for Ocwen's failure to comply with its duties.  *Cf. In re On*, No. BKR. 10-47541-EDJ, 2010

25  WL 5394804, at *3 (Bankr. N.D. Cal. Dec. 28, 2010) ("It is a maxim of equity adjudication that

26  'no one can take advantage of his own wrong;' and the Bankruptcy Court is a court of equity.  To

27  permit one to profit by his own wrongdoing is to extend an open invitation to wrongdoing.").

28  Because the APOC anticipates future modifications to the escrow amount and Rule 3002.1

United States District Court
Northern District of California

does not govern here, the APOC is not the final decision as to the amount owed.  This fact, and other key differences, distinguishes this case from the Ninth Circuit's decision in *Siegel*.  Because Ms. Sandigo could have rightly assumed that the APOC allowed Ocwen to change her escrow amount outside of the Bankruptcy Action, she would have no reason to object to the APOC on this point, and thus could not have asserted an attack on the APOC for that reason.  *See Siegel*, 143 F.3d at 530–31 (holding debtor "could have objected" at bankruptcy based on the same allegations asserted in his district court action).  Moreover, this case is easily distinguishable from *Siegel* for the additional reason that the Ms. Sandigo's monthly payment obligation, especially given the ambiguity surrounding it, was not the "heart and soul of the bankruptcy." *Id.* at 531.  Unlike in that case, where Siegel challenged Freddie Mac's right to foreclose on the properties altogether despite Freddie Mac's proof of claim allowing it do so, Ms. Sandigo does not challenge Ocwen's right to collect the total amount due to it; she challenges only how much she was required to pay monthly to satisfy that obligation.  *Cf. also Tadros v. Wilmington Tr., Nat'l Ass'n*, No. 3:17-CV-01623-AA, 2018 WL 2248453, at *4 (D. Or. May 15, 2018) (holding res judicata applies and comparing case to *Siegel* because both cases "center[ed] on the validity of assignment of the beneficial interest in the promissory note and deed of trust").

This latter point also speaks to another reason why res judicata should not bar Ms. Sandigo's arguments here:  Ocwen demands property tax escrow payments from Ms. Sandigo that she has paid (and continues to pay) to the County.  Since the alleged date of de-escrowing in April or May 2013, Ocwen has never paid Ms. Sandigo's property taxes to the County, and yet it demands the full escrow amount from Ms. Sandigo.  Such a result would not only be manifestly unjust, but also further indicates that new evidence and facts are at issue here that make res judicata inappropriate.  *See Siegel*, 143 F.3d at 529 (elements of res judicata include "whether substantially the same evidence is presented in the two actions" and "whether the two suits arise out of the same transactional nucleus of facts").

For all of these reasons, and because the relevant facts are undisputed, the Court holds as a matter of law that the APOC is not a final judgment on the merits, such that it does not bar Ms.

Sandigo from arguing that she owed the de-escrowed amount.[5]  *See CollegeSource, Inc. v. AcademyOne, Inc.*, 709 F. App'x 440, 443 (9th Cir. 2017) (holding judge decides res judicata issues where there are no questions of fact).

ii.    Chapter 13 Plan

Ocwen also argues that the Chapter 13 Plan, which set Ms. Sandigo's monthly payment obligation at $2,114.06, has res judicata effect here.  *See* Def. Mot. RJN, Exs. 2, 3.

"The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."  11 U.S.C.A. § 1327.  "An order confirming a Chapter 13 plan is res judicata as to all justifiable issues which were or could have been decided at the confirmation hearing."  *In re Evans*, 30 B.R. 530, 531 (B.A.P. 9th Cir. 1983).

Ocwen argues that the Bankruptcy Court's confirmation of Ms. Sandigo's Chapter 13 Plan set Ms. Sandigo's monthly payment obligation at $2,114.06, and Ms. Sandigo's failure to modify this provision or otherwise object to this amount bars her argument here that she owed less.  Def. Mot. at 10–11; Def. Opp. at 14–16.

The Court disagrees.  As an initial matter, Ocwen's argument here is inconsistent with its litigating position.  At the hearing on the motions, Ocwen disclaimed any right to the $2,114.06 amount and claimed only the full escrow amount of $1,597.56 from Ms. Sandigo, the amount set forth in the loan modification (which Ocwen does not claim has res judicata effect) and the APOC. How the Chapter 13 Plan, irrespective of the APOC, can have res judicata effect here while simultaneously allowing Ocwen to seek only the lower amount is a mystery.

But perhaps it's not such a mystery.  Rather, it may be a tacit acknowledgement by Ocwen of the weakness of its position.  The Chapter 13 Plan does not have res judicata effect here for numerous reasons.  First, and perhaps most importantly, Ms. Sandigo could not have challenged

United States District Court
Northern District of California

---

[5] To resolve the issue, the Court need not and does not address whether the APOC has retroactive effect back to the time the loan modification was filed or whether Ms. Sandigo's failure to object to documents filed after the APOC indicate a failure to object to any res judicata effect of the APOC.  *See* Pl. Mot. at 18–22; Def. Opp. at 13–14, 19–20.  The Court notes that Ocwen concedes that no documents filed after the APOC have res judicata effect.  Def. Opp. at 19.

the monthly amount "at the confirmation hearing," *In re Evans*, 30 B.R. at 531, because no attempt to reduce the monthly payment obligation (either through the loan modification or the APOC, or otherwise) had yet occurred.  She could not raise an issue that did not yet exist.  *Cf. In re MLC I, Inc.*, No. ADV. 06-00839, 2008 WL 8462951, at *7 (B.A.P. 9th Cir. Jan. 8, 2008) (dismissing claims under res judicata because the issues "could have or should have been raised before confirmation"); *In re Kelley*, 199 B.R. 698, 703 (B.A.P. 9th Cir. 1996) (same).  As such, this issue raises new evidence and does not involve the same nucleus of facts as was at issue at the time the Chapter 13 Plan was confirmed.  *See Siegel*, 143 F.3d at 531.

Second, after the Plan was confirmed, the Bankruptcy Court subsequently granted Ms. Sandigo's motion to modify the loan with Ocwen (and thus implement the loan modification agreement).  This had the same impact as if Sandigo had modified her Chapter 13 Plan to reflect the same information; the Bankruptcy Court order approving this change was sufficient to implement the change.  *See Ritts v. Grigsby*, 308 B.R. 231, 236 (D. Md. 2004) (holding bankruptcy court granting of motion to sell necessarily modified confirmed plan); *cf. In re Hanley*, 575 B.R. 207, 214 (Bankr. E.D.N.Y. 2017) ("The Court finds that although an agreement to modify a debtor's mortgage (thus curing the plan default) must be approved by the Court, it need not be memorialized in a modified chapter 13 plan.").  This result is evidenced by subsequent filings in the Bankruptcy Action and by Ocwen's own actions.  Not a single filing after the loan modification was accepted in March 2012 indicated that the amount due was $2,114.06 (as set forth in the Chapter 13 Plan); indeed, even the total amount due in the Notice of Final Cure Payment reflected a monthly payment obligation of only $1,597.56.  And since the loan modification was implemented, Ocwen has never claimed that Ms. Sandigo owed more than $1,597.56.  Ms. Sandigo's subsequent modifications of the Plan itself in October 16, 2013 and September 24, 2015 do not change this result because they did not modify the loan modification.

Third, as with the APOC attachment, the Bankruptcy Court's order approving the loan modification contemplated that the escrow amount could change, stating that Ms. Sandigo "will start making the *initial* monthly escrow payment in the amount of $271.77, which *may be adjusted periodically*."  Def. Mot. RJN, Ex. 5 (emphases added).  So even this order was not "final" with

respect to the amount due in escrow.

Ultimately, Ocwen recognizes that "Plaintiff obtained bankruptcy court approval of the modification agreement reducing monthly payments to $1,597.56," Def. Opp. at 15, and it has continuously acted in accordance with this understanding (and indeed perhaps with the understanding that Ms. Sandigo owed even *less*).  In light of these facts, applying res judicata is neither legally nor practically sound.

For these reasons, the Chapter 13 Plan, like the APOC, does not bar Ms. Sandigo from arguing that she owed the de-escrowed amount to Ocwen.

### 2.   The Amount Plaintiff Owed in Escrow Payments Is a Disputed Issue of Material Fact

Though the Court holds that res judicata does not bar Ms. Sandigo from arguing that she owed the de-escrowed amount, the question of how much she owed is a disputed issue of material fact.

To be sure, the evidence Ms. Sandigo marshals demonstrating that Ocwen de-escrowed the loan is overwhelming:  She presents billing statements, escrow statements, and transcripts of phone calls with Ocwen employees demonstrating that on the following dates, from May 2013 through April 2016, Ocwen told Ms. Sandigo that she owed the de-escrowed amount: 05/05/2013, 06/05/2013, 06/13/2013, 07/13/2013, 08/13/2013, 09/13/2013, 12/13/2013, 02/03/2014, 04/01/2014, 06/04/2015, 06/12/2015, 02/02/2016, and 04/06/2016.  She also presents evidence from Ocwen's 30(b)(6) witness that the loan was de-escrowed from April 2013 to the end of 2015 and that Ocwen's online system prompted her to pay the de-escrowed amount through 2016.  She submits internal Ocwen documents showing that her payments were current at least through October 2015.  She emphasized at the hearing that in the time period from May 2013 to October 2015, Ocwen never gave any indication that the amount she owed was any more than the de-escrowed amount.  She also notes that the Deed allows Ocwen to waive the right to escrow payments, and that Ocwen sent her written billing statements of the de-escrowed amount, indicating such a waiver.  And perhaps most persuasively, she notes that Ocwen stopped paying her property taxes and she started directly paying the County, which directly contradicts the idea

United States District Court
Northern District of California

that Ocwen was owed an escrow for such taxes.

But Ocwen rightly points chiefly to the Bankruptcy Court filings to support its position. Every document filed in the Bankruptcy Court supports Ocwen's argument that Ms. Sandigo owed the full escrow amount.  The loan modification (approved in March 2013), the APOC (filed in October 2015), and the Notice of Final Cure Payment (filed in May 2016) all indicated that Ms. Sandigo owed the full escrow amount throughout the course of her bankruptcy.  The loan modification demonstrates that she agreed to the escrow in 2012, and the APOC confirms that this amount was due in October 2015.  Though the APOC has no res judicata effect here, it is still an order of the Bankruptcy Court to which Ms. Sandigo did not object.  Indeed, Ms. Sandigo never objected in the Bankruptcy Court to any of these filings, despite the fact that they indicated she owed more than she believed she did.  Ocwen also told Ms. Sandigo on December 14, 2015 that she owed the higher amount.  And after April 6, 2016, Ocwen consistently told her the higher amount was due.  Finally, Ocwen argues that it did not tell Ms. Sandigo she was past due on her payments because it was barred from collecting debts from Ms. Sandigo by the automatic stay in effect during the duration of her bankruptcy.  Def. Opp. at 7 (citing 11 U.S.C. § 362).  Thus, the only notices Ocwen was arguably allowed to give (those to the Bankruptcy Court) listed the correct amount.

On these facts, based on the strict summary judgment standard, the Court cannot say with certainty that a reasonable jury would conclude that Ocwen de-escrowed the loan or waived its right to collect the full escrow amount.  As such, the amount Ms. Sandigo owed to Ocwen is a disputed issue of material fact.

Having so held, the Court now turns to Ms. Sandigo's claims.

### B.    Rosenthal Act

Both Ocwen and Ms. Sandigo move for summary judgment on the Rosenthal Act claim. The Court first sets forth additional relevant facts, and then turns to the arguments in each of the parties' briefs.

#### 1.  Facts

Many of the facts relevant to the escrow amount owed by Ms. Sandigo are also relevant

here, and the Court incorporates them fully here.

As mentioned, starting in June 2016, once Ocwen began demanding the full escrow amount, Ms. Sandigo disputed the amount.  On June 28, 2016, Ms. Sandigo spoke to an Ocwen employee who told her that her account was in default because she had missed payments in September 2015, March 2015, and November 2015.  Sandigo Mot. Decl. ¶ 29 & Ex. 25.  At Ocwen's request, Ms. Sandigo sent in proof that she had made those payments.  *Id.* ¶ 29 & Ex. 12, ECF 101-12.  On August 4, 2016, Ocwen confirmed that those payments had been applied to the loan.  *Id.*, Ex. 13, ECF 101-13.

However, on September 30, 2016, Ocwen told Ms. Sandigo again that certain payments were missing, for March 2012, May 2012, October 2013, September 2014, February 2015, and November 2015.  *Id.*, Ex. 26 at 6:20–9:9, ECF 101-26.  Ocwen's composite report shows that Ms. Sandigo had missed payments in October 2013, May 2014, September 2014, February 2015, and November 2015.  Kennedy Mot. Decl., Ex. 5, ECF 105-2.

Once the bankruptcy was discharged on October 14, 2016, Ocwen attempted to collect on the amount due, sending Ms. Sandigo several default notices and calling her asking her to pay the default.  Flannigan Opp. Decl. ¶ 18 & Ex. 6, ECF 114-2; Sandigo Mot. Decl. ¶ 27.

On December 1, 2016, Ms. Sandigo again spoke to an Ocwen representative who told her that Ocwen had not received payments for October 2013 and September 2015 and that Ms. Sandigo's loan delinquency was due to the missed payments, not to the increased monthly payment obligation due.  Sandigo Mot. Decl., Ex. 27 at 13:7–14:7, 21:16–22:21, 26:20–27:6, 33:3–35:20, ECF 101-27.  Following this call, on December 5, 2016, Ms. Sandigo sent to Ocwen her full bank statements from January 2013 through November 2016 showing she had made the payments.  *Id.* ¶ 35.  When she called Ocwen to check in, they said they were working on it.  *Id.*  On December 26, 2016, she sent a dispute letter to Ocwen again including her bank statements.  *Id.* ¶ 36 & Ex. 14, ECF 101-14.  She did not receive a written response to this letter.  *Id.* ¶ 36.  Again, on January 5, 2017, Ocwen said it was missing payments from April 2013, May 2014, September 2014, November 2015, December 2016, and January 2017. Sandigo Mot. Decl., Ex. 28 at 2:15–4:15, ECF 101-28.

United States District Court
Northern District of California

1    Despite Ocwen's representations, Ms. Sandigo had timely paid Ocwen the de-escrowed

2    amount every month except for her November 2015 payment, which she made up in December

3    2015, and her December 2016 and January 2017 payments because Ocwen would not accept them.

4    Kennedy Mot. Decl., Ex. 4 at 5–6; Sandigo Mot. Decl. ¶ 34 & Ex. 15.

5         Ocwen submits evidence that it rejected Ms. Sandigo's payments in December 2016 and

6    January 2017 because they did not cure the deficiencies in her loan, and Ocwen was not obligated

7    to accept a partial payment at that time, unlike during the Bankruptcy Action.  Flannigan Opp.

8    Decl. ¶ 19 & Exs. 8 & 9, ECF 114-2.

9         Ocwen also explains how Ms. Sandigo's serial alleged underpayment on her loan over the

10   course of many months (through payments of the de-escrowed amount instead of the full escrow

11   amount) led Ocwen's system to tabulate the underpayments as missed monthly payments every

12   few months.  *Id.* ¶ 21 & Exs. 3 & 6.  "As a consequence of the timing of Ms. Sandigo's payments

13   and the majority of those payments being short payments, Ocwen's records reflected some of the

14   payments as not having been received because payments *only* posted to the account when

15   additional funds were received and applied to suspense funds."  *Id.* ¶ 20.  Essentially, whenever

16   Ms. Sandigo had sufficient funds to cover the difference between her payment and the full escrow

17   amount, her payment posted.  But when her suspense funds could not cover the difference, her

18   payment was not posted and was instead deposited into her suspense account, and thus was

19   tabulated as a missed payment.  Then the cycle restarted.

20        Finally, on February 27, 2017, Ocwen told Ms. Sandigo she had made all of her payments

21   but that she was delinquent because she owed the full escrow amount but had only been paying the

22   de-escrowed amount.  Sandigo Mot. Decl., Ex. 29 at 2:12–14, 8:3–8, ECF 101-29.  On March 9,

23   2017, Ms. Sandigo sent Ocwen another dispute letter explaining that Ocwen had de-escrowed the

24   loan.  *Id.*, Ex. 16, ECF 101-16.

25        Ocwen recorded a Notice of Default on March 1, 2017.  Flannigan Opp. Decl., Ex. 10,

26   ECF 114-2.  On March 13, 2017, Ocwen sent fifty-four copies of a Notice of Default to Ms.

27   Sandigo's home, which indicated that it had begun the foreclosure process.  Sandigo Mot. Decl. ¶

28   40.  In April 2017, Ocwen cut off Ms. Sandigo's access to her online account and stopped sending

her monthly statements. *Id.*

On April 20, 2017, Ocwen responded to Ms. Sandigo's March 9 letter, stating, in relevant part, "on 4/12/2013, we have de-escrowed the loan for taxes. However, it was incorrectly escrowed for taxes again and the analysis was performed on 07/21/2016, due to which your monthly payments beginning with your payment due on 09/01/2016, was $1,636.30 . . . [A]s of this date, the issue has been resolved and the foreclosure proceedings would be reinitiated." *Id.*, Ex. 17, ECF 101-17.

In October 2018, some time after this lawsuit was filed, Ocwen allowed Ms. Sandigo to make up her payments from December 2015 at the de-escrowed price and began accepting payments of the de-escrowed amount. *Id.* ¶ 47; Kennedy Mot. Decl. ¶ 9. Ocwen states that it retroactively accepted Ms. Sandigo's de-escrowed payments for "various reasons, including customer courtesy, availability of funds in the escrow account, and being unhampered by bankruptcy proceedings." Flannigan Opp. Decl. ¶ 23.

### 2. Rosenthal Act Law

The Rosenthal Act is intended to "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts and to require debtors to act fairly in entering into and honoring such debts." Cal. Civ. Code § 1788.1 (legislative findings and purpose). In addition to setting forth its own standards governing debt-collection practices, the Rosenthal Act also provides that, with limited exceptions, "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of" the federal Fair Debt Collection Practices Act ("FDCPA"). Cal. Civ. Code § 1788.17. One of the FDCPA provisions that is incorporated into the Rosenthal Act is the bar prohibiting debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," found in Section 1692e of the federal FDCPA. *See* 15 U.S.C. § 1692e.

The Rosenthal Act requires Plaintiffs to prove four elements: "(1) the plaintiff is a 'debtor,' (2) the debt at issue is a 'consumer debt,' (3) the defendant is a 'debt collector,' and (4) that the defendant violated one of the liability provisions of the [Rosenthal Act]." *Long v. Nationwide Legal File & Serve, Inc.*, No. 12-cv-3578, 2013 WL 5219053, at *17 (N.D. Cal. Sept. 17, 2013).

1    A "debtor" under the Rosenthal Act is "a natural person from whom a debt collector seeks

2    to collect a consumer debt which is due and owing or alleged to be due and owing from such

3    person." Cal. Civ. Code § 1788.2(h).  The Rosenthal Act defines "consumer debt" as "money,

4    property or their equivalent, due or owing or alleged to be due or owing from a natural person by

5    reason of a consumer credit transaction." Cal. Civ. Code § 1788.2(f).  A mortgage on a single

6    family home, which is at issue in this case, is a consumer debt.

7    Although some courts have held that the mere allegation that a defendant foreclosed on a

8    deed of trust does not implicate the Rosenthal Act, *see Reyes v. Wells Fargo Bank, N.A.*, No. C-

9    10-01667, 2011 WL 30759, at *19 (N.D. Cal. Jan. 3, 2011) (collecting cases), where the claim

10   arises out of debt collection activities beyond the scope of the ordinary foreclosure process, a

11   remedy may be available under the Rosenthal Act.  *Id.* (finding that allegedly deceptive statements

12   in an offer letter related to a forbearance agreement were sufficient to state a claim under the

13   Rosenthal Act).

14   As to the third element, a "debt collector" is defined as "any person who, in the ordinary

15   course of business, regularly, on behalf of himself or herself or others, engages in debt collection."

16   Cal. Civ. Code § 1788.2(c).  The definition of "debt collector" is broader under the Rosenthal Act

17   than it is under the FDCPA, as the latter excludes creditors collecting on their own debts.  *See*

18   *Herrera v. LCS Fin. Servs. Corp.*, No. 09-cv-2843, 2009 WL 5062192, at *2 n.1 (N.D. Cal. Dec.

19   22, 2009); *Izenberg v. ETS Servs., LLC*, 589 F. Supp. 2d 1193, 1199 (C.D. Cal. 2008) ("The

20   definition of 'debt collector' in the state statute is broader than that contained in the FDCPA,

21   however.").

22                    **3.  Ms. Sandigo's Motion**

23   Ms. Sandigo contends that there is no triable issue of fact that Ocwen is liable for violating

24   the Rosenthal Act because Ms. Sandigo is covered by the Act as a debtor owing a consumer debt,

25   Ocwen is a debt collector, and Ocwen's conduct constitutes unfair debt collection practices.  Pl.

26   Mot. at 12–24.  As to the latter element, Ms. Sandigo asserts that Ocwen violated the Rosenthal

27   Act in at least three ways: (1) by demanding over $6,000 from Ms. Sandigo that was not due, Pl.

28   Mot. at 13–22; (2) by telling Ms. Sandigo for years that she owed the de-escrowed amount and

United States District Court
Northern District of California

26

then suddenly demanding over $6,000, representing missed payments for the full escrow amount, Pl. Mot. at 22–23; and (3) by misleading Ms. Sandigo as to the reasons for the default by telling her first that she was in default because she missed monthly payments and then telling her it was because of her underpayments of the escrow amount, Pl. Mot. at 23.  Ms. Sandigo also briefly asserts a fourth theory of liability with a citation only to 15. U.S.C. § 1692f:  Ocwen violated the law when it demanded that Ms. Sandigo pay more than $6,000 to make up for a property tax escrow for property taxes that Ocwen never actually paid.  Pl. Mot. at 23.

Ocwen responds with several arguments.  First, it argues that during the duration of the Bankruptcy Action (September 15, 2011 to October 14, 2016), it was not collecting debt and Ms. Sandigo was not a debtor under the terms of the Act.  Def. Opp. at 7–8.  Second, Ocwen argues that even if it were collecting debts during the pendency of the bankruptcy, Ms. Sandigo would be judicially estopped from raising that argument here because she would have had to raise it in the Bankruptcy Action.  And similarly, even if she were not judicially estopped, the Bankruptcy Code would preempt the Rosenthal Act as to Ocwen's acts during the Bankruptcy Action.  Third, it argues that res judicata bars Ms. Sandigo's argument that Ocwen collected the wrong amount from her.  Fourth, Ocwen argues that is did not mislead Ms. Sandigo as to the reason for her default because her underpayment of the escrow amount led her to miss monthly payments.  Fifth, Ocwen argues that the Rosenthal Act's one year statute of limitations bars any claim for acts occurring before April 11, 2016.[6]  Sixth, it argues that Ms. Sandigo does not provide adequate evidence that she is entitled to a remedy under the Act.  And finally, Ocwen argues that foreclosure proceedings are not collection under the Act.

In reply, Ms. Sandigo argues that Ocwen's arguments regarding its actions during the Bankruptcy Action and its statute of limitations defense are irrelevant because her theories of liability rely, at least in part, on actions Ocwen took *after* the Bankruptcy Action ended on October 14, 2016.  Pl. Reply at 2–3, 13.  She also argues that the Bankruptcy Code does not

---

[6] Ms. Sandigo raises in passing the fact the Ocwen did not plead this defense. Pl. Reply at 13.  But she does not argue she is prejudiced by its raising it now.  As such, the Court considers the argument. *See supra* note 4.

preempt the Rosenthal Act for actions Ocwen took during the Bankruptcy Action. *Id.* at 3. She then contests that res judicata bars her arguments here. *Id.* 3–11. She also argues that Ocwen waived the right to argue that Ms. Sandigo owed the full escrow amount. She next refutes Ocwen's contention that it did not mislead her about the reasons for her default. *Id.* at 12–13. Finally, she argues that she need not prove damages, but has in any event. *Id.* at 13–14. She does not contest Ocwen's claim that it is not liable for foreclosure proceedings. *Id.* at 14.

The Court need not address Ocwen's arguments with respect to its actions during the Bankruptcy Action because the Court need not address them in order to hold that none of Ms. Sandigo's theories of liability merits summary adjudication.

First, the Court reiterates that it has held that res judicata does not apply here, but that the amount Ms. Sandigo owed Ocwen is a disputed issue of material fact. These conclusions dispose of Ms. Sandigo's arguments in support of her first theory of liability premised on Ocwen's demanding $6,000 that was not due, including her argument in reply that Ocwen waived its right to the de-escrowed amount. Whether the full escrow amount was due is disputed. Likewise, they dispose of Ocwen's third argument for res judicata.

Second, the Court cannot summarily adjudicate Ms. Sandigo's second theory of liability, for Ocwen's alleged "bait and switch" strategy by which it told Ms. Sandigo that she owed only the de-escrowed amount for years and then all of a sudden told her she owed over $6,000 because of her underpayments. Pl. Mot. at 22–23. Specifically, she argues that this "bait and switch" constitutes a "false, deceptive, or misleading representation or means in connection with the collection of any debt," prohibited by 15 U.S.C. § 1692e, and a "false representation of–(A) the character, amount, or legal status of any debt" prohibited by 15 U.S.C. § 1692e(2). Pl. Mot. at 22. This theory assumes that Ocwen is correct that Ms. Sandigo actually owed the full escrow amount. Ms. Sandigo submits evidence showing that Ocwen made myriad misrepresentations beginning in June 2013 telling her she owed only the de-escrowed amount. However, the last of these misrepresentations occurred on April 6, 2016, more than one year before the filing of this case; Ocwen consistently told her the full escrow amount was due thereafter. She does not contest that the one year statute of limitations applies here. *See* Cal. Civ. Code § 1788.30(f). But she argues

that the "switch"—Ocwen's demanding the $6,000—happened within the limitations period.  Pl. Reply at 13.

Given the disputed facts presented by Ocwen, a reasonable jury could conclude that this claim is either barred by the statute of limitations or was not false, deceptive, or misleading.  The only representations Ocwen made to Ms. Sandigo that she owed the de-escrowed amount occurred outside of the limitations period.  So Ms. Sandigo must rely on the "switch" in order to win on this theory.  But Ocwen submits evidence showing that it was barred by the bankruptcy stay from informing Ms. Sandigo that she was underpaying.  Once the bankruptcy stay was lifted in October 2016, Ocwen promptly informed Ms. Sandigo about the entirety of the underpayment.  Though Ms. Sandigo persuasively argues that Ocwen was not required by the stay to affirmatively inform Ms. Sandigo that she owed only the de-escrowed amount, as Ocwen did on several occasions, a reasonable jury could conclude that Ocwen's representations were not deceptive.

Third, the Court can also dispose of Ms. Sandigo's arguments in support of her third theory of liability—that Ocwen misled her as to the reasons for her default.  Though Ms. Sandigo presents evidence showing that Ocwen gave her inconsistent justifications for her default, Ocwen presents evidence that its two justifications for the default—missed monthly payments and underpayment—are not actually inconsistent, but rather the underpayments led Ocwen's system to mark certain monthly payments as missed payments.  Likewise, Ocwen's employees who told Ms. Sandigo that she had missed payments were looking to the transaction history which said that payments had not "posted."  Eventually, after Ms. Sandigo sent in her bank statements multiple times, Ocwen was able to tell her more concretely why her underpayments were showing up as missed payments.  On these facts, drawing all inferences for Ocwen, the non-movant, a reasonable jury could conclude that Ocwen did not mislead Ms. Sandigo.

Fourth, and finally, the Court cannot resolve Ms. Sandigo's final theory of liability, that Ocwen used unfair or unconscionable means to collect or attempt to collect Ms. Sandigo's debt under 15 U.S.C. § 1692(f) because it asked her to repay property tax escrow payments even though Ocwen never paid her property taxes.  The Court agrees with Ms. Sandigo that Ocwen's actions are extremely troubling and that Ocwen's actions could potentially have given it a

United States District Court
Northern District of California

1    windfall.  But Ms. Sandigo has not demonstrated that Ocwen actually received such a windfall;

2    indeed, Ocwen represented at the hearing that it never retained the excess escrow payments for

3    itself, but instead applied them to Ms. Sandigo's loan payments.  Because it is disputed whether

4    those payments were actually due to Ocwen, the Court cannot say that Ocwen's attempt to secure

5    them, even though it had not paid the property taxes, is unfair or unconscionable without more.

6        Because Ms. Sandigo has not demonstrated that she is entitled to summary judgment on

7    any of her theories of liability her motion is DENIED.  To the extent Ocwen's arguments with

8    respect to its actions during the Bankruptcy Action or Ms. Sandigo's remedy are relevant to

9    resolving Ocwen's motion, the Court discusses them below.

10                    **4.  Ocwen's Motion**

11       In its motion, Ocwen identifies and attempts to discount four theories of liability under the

12   Rosenthal Act alleged in Ms. Sandigo's FAC: (1) that Ocwen called Ms. Sandigo so frequently it

13   amounted to harassment, Def. Mot. at 12 (citing FAC ¶¶ 89, 94); (2) that Ocwen demanded excess

14   payments, *id.* at 13 (citing FAC ¶ 90); (3) that Ocwen violated the Rosenthal Act by withholding

15   Ms. Sandigo's insurance checks (discussed below in the conversion section), *id.* at 13–14 (citing

16   FAC ¶¶ 90, 96); and (4) that Ocwen represented that Ms. Sandigo's loan could be increased by

17   fees and charges, which was not true, *id.* at 14 (citing FAC ¶ 91).  In reply, it also asserts (for the

18   first time) its arguments also made in opposition to Ms. Sandigo's motion that Ms. Sandigo's

19   claim is preempted and precluded by the Bankruptcy Code for Ocwen's acts taken during the

20   Bankruptcy Action, Def. Reply at 4–5.

21       Because the Court has determined that the escrow amount Ms. Sandigo owed is a disputed

22   issue of material fact, Ocwen cannot defeat theories two and four, which succeed if Ms. Sandigo

23   owed the de-escrowed amount.  Also, as Ms. Sandigo notes, Ocwen does not address her theory

24   that Ocwen violated the Rosenthal Act by "refusing to provide a coherent reason for its contention

25   that Ms. Sandigo was in default."  Pl. Opp. at 13 (citing FAC ¶ 90).  Again, the Court has found

26   disputed issues of material fact as to whether the justifications Ocwen provided to Ms. Sandigo

27   were misleading.

28       Because Ms. Sandigo has evidence to support viable theories of liability under the

1    Rosenthal Act, Ocwen's motion on this claim is DENIED.

2        **C.    Conversion**

3        Ocwen seeks summary adjudication of Ms. Sandigo's conversion claim.  In her FAC, Ms.

4    Sandigo alleges that Ocwen converted her property in two ways: (1) from July 2016–November

5    2016, by making her pay the full escrow amount, even though it was not owed; and (2) by refusing

6    to sign and return certain insurance checks Ms. Sandigo sent to Ocwen for endorsement.  FAC ¶¶

7    117–23.  The Court first describes the relevant facts, then applicable conversion law, and then the

8    parties' arguments.

9        **1.    Facts**

10       The facts relevant to Ocwen's alleged overcharging of Ms. Sandigo are recounted above.

11   To summarize, after the Notice of Final Cure Payment was filed in the Bankruptcy Court in May

12   2016, Ms. Sandigo unwillingly began paying the full escrow amount to Ocwen.  From July to

13   November 2016, she paid the full escrow amount, but in December 2016 Ocwen ceased accepting

14   her payments because they were insufficient to bring the loan out of default.

15       In 2017, during the time Ocwen believed Ms. Sandigo was in default on her loan, Ms.

16   Sandigo's home flooded, which left one bathroom unusable and one partially unusable.  FAC ¶ 67;

17   Sandigo Opp. Decl. ¶ 23.  Ms. Sandigo made a claim to her insurer and received two checks

18   totaling over $15,229.79 to pay for the damage.  Sandigo Opp. Decl. ¶ 23; Miller Decl. ISO Mot. ¶

19   7 & Ex. A, ECF 108.  The payee information on the checks included Ms. Sandigo, Ocwen, and a

20   second lender PNC Bank, who signed off on the checks promptly after Ms. Sandigo sent them.

21   Sandigo Opp. Decl. ¶ 23.

22       On August 7, 2017, Ms. Sandigo sent the checks to Ocwen for its signature.  In response,

23   Ocwen sent a letter to Ms. Sandigo asking her to submit certain documents necessary for Ocwen

24   to endorse the checks pursuant to its "Loss Draft Procedure."  *Id.* ¶ 23 & Ex. 15; Walker Decl. ISO

25   Mot., Ex. 2, ECF 106-2; Miller Mot. Decl. ¶¶ 9–12.  The Loss Draft Procedure allowed Ocwen to

26   draw 25% of the total claim if the debtor was delinquent; this process was also described in

27   Ocwen's letter to Ms. Sandigo.  Miller Mot. Decl. ¶¶ 9–12; Sandigo Opp. Decl., Ex. 15.

28   Moreover, Ms. Sandigo's Deed of Trust states that "[d]uring such repair and restoration period,

United States District Court
Northern District of California

31

Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.  Lender may disburse proceeds for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed."  Def. Mot. RJN, Ex. 14 ¶¶ 5, 11.  On November 7, 2017, Ms. Sandigo submitted all of the required documents.  Sandigo Opp. Decl., Ex. 16, 117-16.

On May 17, 2018, having received no response from Ocwen regarding her checks, Ms. Sandigo asked Ocwen to return her insurance checks to her.  On June 5, 2018, Ocwen returned 25% of the insurance funds, though it indicated it was returning "half."  However, the checks were made out to the incorrect contractor (someone Ms. Sandigo had previously hired, but for whom she had not submitted the full paperwork to Ocwen).  *Id.*, Ex. 32.  The letter enclosing the check told Ms. Sandigo that she needed to complete 50% of the repairs to receive the rest of the funds.  *Id.*

On July 9, 2018, Ms. Sandigo returned the check, noting the issue with the contractor and that the check was worth only 25% of the funds.  By that time, she had changed contractors, so she submitted full paperwork for a different contractor.  *Id.*, Ex. 33.  On July 22, 2018, in responding to Ms. Sandigo's May 17 letter, Ocwen's attorney noted that 25% of the funds had been given to Ms. Sandigo, pursuant to the Deed of Trust, but he did not mention Ms. Sandigo's return of the original check or the contractor issue.  *Id.*, Ex. 11 at 92–93.

On August 7, 2018, Ocwen sent a replacement check, again for 25% of the funds, noting in its letter that Ms. Sandigo must complete her repairs before she could receive the remainder of the funds.  *Id.*, Ex. 34.  This check was made out to Ms. Sandigo and the "Estate of Joseph Daniel Sandigo," which prohibited Ms. Sandigo from cashing the check.  *Id.* ¶ 27 & Ex. 35.  On September 26, 2018, Ms. Sandigo again wrote Ocwen about the issues with the check.  *Id.*, Ex. 36.  On January 11, 2019, Ocwen finally sent to Ms. Sandigo a check for the full insurance funds made out to Ms. Sandigo and the correct contractor.  *Id.* ¶ 29; Miller Mot. Decl. ¶ 17.

As of January 2019, Ocwen has reinstated the loan.  Flannigan Mot. Decl. ¶ 23.

### 2.  Conversion Law

1    "A claim for conversion requires a plaintiff to allege three things: (1) plaintiff's ownership

2   or right to possession of the property at the time of conversion, (2) defendant's conversion by

3   wrongful act or disposition of the property rights, and (3) damages." *Garcia v. City of King City*,

4   No. 14-CV-01126-BLF, 2015 WL 1737936, at *2 (N.D. Cal. Apr. 8, 2015); *see also G.S.*

5   *Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 906 (9th Cir. 1992);

6   *Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 45 (2010).

7    "Conversion is any act of dominion wrongfully exerted over another's personal property in

8   denial of or inconsistent with his rights therein." *Fischer v. Machado*, 50 Cal. App. 4th 1069,

9   1072 (1996). "Conversion is a strict liability tort. The foundation of the action rests neither in the

10   knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute

11   duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith,

12   lack of knowledge, and motive are ordinarily immaterial." *Welco Elecs., Inc. v. Mora*, 223 Cal.

13   App. 4th 202, 208 (2014) (internal quotation marks and citations omitted).

14        **3.  Discussion**

15    Ocwen argues that it did not convert either Ms. Sandigo's June to November payments or

16   her insurance checks.

17    1.  <u>Excess Payments</u>:  As to the payments, Ocwen first argues that it had a right to that

18   money (*i.e.*, that Ms. Sandigo owed the full escrow amount). Def. Mot. at 15. The Court has

19   already determined that the amount owed is a disputed issue of material fact, so Ocwen cannot win

20   on that argument.

21    Ocwen also states in its reply that it is "not in possession of any funds paid by Plaintiff,"

22   Def. Reply at 7, because, as stated in its accompanying declaration, it has "reverse[d] and

23   reappl[ied] payments made by Sandigo during the bankruptcy consistently with Sandigo's request

24   to be de-escrowed for taxes as of June 2013," Flannigan Reply Decl. ¶ 11 & Ex. 1, ECF 127-1. It

25   submits as an exhibit to the declaration a transaction history allegedly showing this reversal. *Id.*,

26   Ex. 1. But in the transaction history, the transactions on the date on which Ocwen claims to have

27   reapplied the funds (June 21, 2018) does not indicate that such funds were reinstated anytime after

28   July 1, 2016. Because the Court cannot, without more explicit guidance from Ocwen, interpret the

United States District Court
Northern District of California

1  evidence as showing that the funds were reapplied from July to November 2016, the Court must

2  infer in favor of Ms. Sandigo that those payments were not reimbursed.

3      Finally, and most substantively, Ocwen argues that even if Ms. Sandigo owed only the de-

4  escrowed amount, Ocwen cannot be liable for conversion because "an overcharge of money

5  cannot support a conversion claim." *Id.* (citing *McKell v. Washington Mutual, Inc.*, 142 Cal. App.

6  4th 1457 (2006)).  Ms. Sandigo counters that an overcharge *can* support such a claim where the

7  money is in a "specific, identifiable sum," as is the case here.  Pl. Opp. at 16 (citing *McKell*); *see*

8  FAC ¶ 118 (stating loss as $911.75).

9      The Court agrees with Ocwen.  In *McKell*, the plaintiff borrowers claimed that the lender

10  defendants had overcharged the borrowers for underwriting, tax services, and wire transfer fees in

11  conjunction with home loans.  142 Cal. App. 4th at 1465.  In rejecting the borrowers' conversion

12  claim, the court noted the longstanding rule that "[m]oney cannot be the subject of a cause of

13  action for conversion unless there is a specific, identifiable sum involved, such as where an agent

14  accepts a sum of money to be paid to another and fails to make the payment."  *Id.* at 1491.  In

15  contrast to the plaintiffs in cases in which agents had converted money, the plaintiffs in *McKell*

16  "did not allege that defendants were holding their payments on behalf of another, in essence in

17  trust for the third party vendors."  *Id.*  Because the plaintiffs "cite[d] no authority for the

18  proposition that a cause of action for conversion may be based on an overcharge," the court held

19  that plaintiffs had not stated a cause of action for conversion.

20      In *Kim v. Westmoore Partners, Inc.*, the plaintiff lender brought a conversion claim against

21  the defendant borrowers for their failure to pay back a loan.  201 Cal. App. 4th 267, 273–78

22  (2011).  The court held that the conversion claim failed because "the simple failure to pay money

23  owed does not constitute conversion."  *Id.* at 789.  The court cited the same rule set forth in

24  *McKell* and noted that "California cases permitting an action for conversion of money typically

25  involve those who have misappropriated, commingled, or misapplied specific funds held for the

26  benefit of others."  *Id.* (citing cases).  Distinguishing those cases, the *Kim* court found that the

27  plaintiff "did not allege he entrusted funds to defendants for a specific purpose" and that the case

28  "actually involve[d] a simple creditor-debtor relationship, in which defendants are alleged to have

34

violated their obligations to repay the subject debts." *Id.* Even though those debts were specifically enumerated, the court held that "[t]hose facts do not constitute a claim defendants interfered with [plaintiff's] possession of a specific, identifiable sum of money." *Id.*

By contrast, the court in *Welco* held the plaintiff had stated a claim for conversion where the defendant had "wrongfully caused a charge to plaintiff's credit card account by having a specific sum of money paid through the defendant's credit card terminal into defendant's bank account." 223 Cal. App. 4th at 211. The court held that the defendant's use of plaintiff's credit card and information constituted a taking of intangible property. *Id.* at 213–14. This taking distinguished the case from *Kim*, in which there was a "simple failure to pay money owed." *Id.* at 214.

These cases demonstrate that a claim for conversion of money cannot stand unless it is premised on the taking of some intangible property or on the misuse of specific funds held for the benefit of others. Neither occurred here. Instead, assuming the facts for Ms. Sandigo, Ocwen simply overcharged Ms. Sandigo, just as the defendants in *McKell* overcharged the plaintiffs there. And though the facts here are inverted from those in *Kim*—here, we have a creditor who owed a refund to a debtor—the same principle applies. The only "property" at issue is money owed. Indeed, at least one other district court has held exactly that in an analogous case. In *Utility Consumers' Action Network v. Sprint Solutions, Inc.*, the plaintiffs alleged that "as a result of misleading billing statements and demands for payment, plaintiffs transferred money to defendants when defendants were not entitled to that money." No. C07-CV-2231-W RJB, 2008 WL 1946859, at *8 (S.D. Cal. Apr. 25, 2008). Citing *McKell* and similar cases, the court held that the plaintiffs could not state a claim for conversion. So too here.[7]

Thus, Ms. Sandigo cannot prove that Ocwen converted her payments between July 2016 and November 2016, even assuming she overpaid.

    2. <u>Insurance Checks</u>: Turning to the insurance checks, Ocwen argues that under the Deed

---

[7] To the extent this holding conflicts with the ruling in *Turner v. Ocwen Loan Servicing, LLC*, No. 14-CV-659-L, 2014 U.S. Dist. LEXIS 172893, at *16 (S.D. Cal. Dec. 3, 2014), that decision is not binding on this Court.

United States District Court
Northern District of California

of Trust, it had the right to withhold some of the insurance funds until the repairs were finished. Def. Mot. at 15. It also argues that this claim is moot because it has returned all of the funds. *Id.* at 16 (citing *Mulhall v. Wells Fargo Bank, N.A.*, 241 F. Supp. 3d 1046, 1055–56 (N.D. Cal. 2017)). Ms. Sandigo counters that a conversion claim can still stand even if the property is later returned. Pl. Opp. at 16.

The Court agrees with Ocwen that no reasonable jury could conclude that Ocwen converted the checks, especially since they were eventually returned. Under the Deed of Trust, Ocwen had the express right to withhold the funds until the repairs were completed. It provided to Ms. Sandigo the 25% required by its Loss Draft Procedure and as indicated to her before she ever submitted full documentation. Though Ocwen delayed in sending Ms. Sandigo this check and ultimately made the check out to the wrong contractor and then to Ms. Sandigo's husband's trust, these actions are not sufficient to overcome the fact that Ocwen was entitled to withhold the check until the repairs were completed. And in any event, Ocwen eventually did endorse the checks and send them back to Ms. Sandigo. As such, Ms. Sandigo cannot prevail on this theory of conversion.

Because no reasonable jury could find for Ms. Sandigo on either of her conversion theories, Ocwen's motion is GRANTED on this claim.

### D. Credit Reporting Acts

Ocwen seeks summary judgment on the credit reporting act claims. Ms. Sandigo alleges that Ocwen violated the California Consumer Credit Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785.1 *et seq.*, and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b). FAC ¶¶ 126–150, 158–179. Her CCRAA claim is based on Ocwen's alleged reporting of inaccurate information to various consumer reporting agencies, and her FCRA claim is based on Ocwen's alleged failure to conduct a reasonable investigation of the disputes raised by the consumer reporting agencies ("CRAs") and its failure to report her account status as disputed to the CRAs.

#### 1. Facts

Monthly from January 2016 through July 2016, Ocwen furnished data to the CRAs

indicating that Ms. Sandigo's loan was past due.  Gollaher Decl. ¶¶ 6–12, ECF 109.  On October 14, 2016, the bankruptcy petition was discharged, and on November 23, 2016, the Bankruptcy Action was closed.  Def. Mot. RJN, Ex. 1.  After the discharge, Ocwen attempted on multiple occasions to collect the outstanding payment from Ms. Sandigo.  FAC ¶¶ 49–50; Flannigan Mot. Decl. ¶ 8 & Exs. 6, 7, ECF 110-2, 110-3.  In January 2017, Ocwen told the CRAs that Ms. Sandigo's balance on the account was $349,986.  Ocwen recorded a notice of default on March 1, 2017.  Flannigan Mot. Decl., Ex. 7.  Once it had notice of this action (in April 2017), Ocwen ceased including Ms. Sandigo's accounts in its monthly reporting to the CRAs.  Gollaher Mot. Decl. ¶ 14.  However, Ocwen did respond to several credit reporting disputes it received during this time, including on June 29, 2017, July 10, 2017, March 13, 2018, March 20, 2018, and May 8, 2018.  *Id.* ¶¶ 16–21.

### 2.  Claims

#### a.  California Consumer Credit Reporting Agencies Act Claim

The CCRAA bars a furnisher of information to consumer reporting agencies from furnishing such information if it knows or should know that the information is inaccurate.  *See* Cal. Civ. Code § 1785.25(a) ("A person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate.").  Ocwen does not dispute that it furnished information about Ms. Sandigo to certain CRAs.  *See* Gollaher Decl. ISO Def. Mot. ¶¶ 7–24, ECF 109 (describing Ocwen's communications with CRAs regarding Ms. Sandigo).  However, Ocwen argues that Ms. Sandigo cannot show that it furnished inaccurate information.  Def. Mot. at 16–19.

Because the Court has determined that the amount Ms. Sandigo owed is a disputed issue of material fact, summary judgment is not appropriate on the CCRAA claim.[8]

#### b.  Fair Credit Reporting Act Claim

The Court first describes the relevant FCRA law, and then turns to Ocwen's arguments.

---

[8] Ms. Sandigo does not refute Ocwen's argument that the FCRA preempts any claim she might have under Cal. Civ. Code § 1785.25(c) for Ocwen's failure to report the account as disputed.  *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1171 (9th Cir. 2009).

United States District Court
Northern District of California

### i.   FCRA Law

Ms. Sandigo brings her FCRA claim under 15 U.S.C. § 1681s-2(b).  The Ninth Circuit discussed liability under this provision in *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009):

> Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681x,6 in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 2205 (2007).  As an important means to this end, the Act sought to make "consumer reporting agencies exercise their grave responsibilities [in assembling and evaluating consumers' credit, and disseminating information about consumers' credit] with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).  In addition, to ensure that credit reports are accurate, the FCRA imposes some duties on the sources that provide credit information to CRAs, called "furnishers" in the statute.  Section 1681s–2 sets forth "[r]esponsibilities of furnishers of information to consumer reporting agencies," delineating two categories of responsibilities.  Subsection (a) details the duty "to provide accurate information," and includes the following duty:
>
> > (3) Duty to provide notice of dispute
> >
> > If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.
>
> § 1681s–2(a)(3).
>
> Section 1681s–2(b) imposes a second category of duties on furnishers of information.  These obligations are triggered "upon notice of dispute"—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information.  *See* § 1681i(a)(2) (requiring CRAs promptly to provide such notification containing all relevant information about the consumer's dispute).  Subsection 1681s–2(b) provides that, after receiving a notice of dispute, the furnisher shall:
>
> > (A) conduct an investigation with respect to the disputed information;
> >
> > (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) . . .;
> >
> > (C) report the results of the investigation to the [CRA];
> >
> > (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information . . .; and
> >
> > (E) if an item of information disputed by a consumer is found to be inaccurate

38

or incomplete or cannot be verified after any reinvestigation under paragraph (1) . . . (i) modify . . . (ii) delete[or] (iii) permanently block the reporting of that item of information [to the CRAs].

§ 1681s–2(b)(1).  These duties arise only after the furnisher receives notice of dispute from a CRA; notice of a dispute received directly from the consumer does not trigger furnishers' duties under subsection (b).  *See id.; Nelson v. Chase Manhattan Mortgage Corp.*, 282 F.3d 1057, 1059–60 (9th Cir. 2002).

The FCRA expressly creates a private right of action for willful or negligent noncompliance with its requirements.  §§ 1681n & o; *see also Nelson*, 282 F.3d at 1059.  However, § 1681s–2 limits this private right of action to claims arising under subsection (b), the duties triggered upon notice of a dispute from a CRA.  § 1681s–2(c) ("Except[for circumstances not relevant here], sections 1681n and 1681o of this title do not apply to any violation of . . . subsection (a) of this section, including any regulations issued thereunder.").  Duties imposed on furnishers under subsection (a) are enforceable only by federal or state agencies.  *See* § 1681s–2(d).

*Gorman*, 584 F.3d at 1153 (footnotes omitted) (alterations and omissions in original).

To summarize, a consumer (like Ms. Sandigo) cannot sue a furnisher of information (like Ocwen) under § 1681s–2(a), which requires the furnisher to furnish accurate information to CRAs in the first instance and to flag information as disputed if the consumer disputes its accuracy. Instead, a consumer only has a private right of action under § 1681s–2(b).  That section applies only when a consumer makes a dispute *to the CRA* and the CRA in turn notifies the furnisher of the dispute.  In response to this notice by the CRA, the furnisher is required to take the steps outlined in § 1681s–2(b).  As is relevant here, the furnisher must "(A) conduct an investigation with respect to the disputed information," and "(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information."

As to the need to investigate, the Ninth Circuit in *Gorman* held that the furnisher's investigation "may not be unreasonable."  584 F.3d at 1157.  That is, the investigation must make "an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute."  *Id.* at 1155.  To determine whether an investigation is reasonable, "[t]he pertinent question is . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."  *Id.* at 1157.  If the notice of dispute from the CRA is "scant," the necessary

United States District Court
Northern District of California

investigation will necessarily be more cursory.  However, the Ninth Circuit also noted that "[i]n deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken."  *Id.* at 1157 n.11.  Ultimately, the Court stated that "[w]hether a reinvestigation conducted by a furnisher in response to a consumer's notice of dispute is reasonable . . . depends in large part on . . . the allegations provided to the furnisher by the credit reporting agency."  *Id.* at 1160.  In that case, the plaintiff-consumer Gorman had not demonstrated that the defendant-furnisher's investigation was unreasonable.

The Ninth Circuit then turned to Gorman's argument that the defendant had violated its duties under § 1681s–2(b) by failing to inform the CRA that Gorman disputed the outcome of the defendant's § 1681s–2(b) investigation.  The court first described the nature of the claim, distinguishing it from a claim under § 1681s–2(a).  Because Gorman did not have a private right of action under § 1681s–2(a), he could not "proceed against [the defendant] for its *initial* failure to notify the CRAs that he disputed the [relevant] charges."  *Id.* at 1162 (emphasis added).  However, pursuant to his right to sue under § 1681s–2(b), Gorman could "challenge [the defendant's] *subsequent* failure to so notify the CRAs after receiving notice of Gorman's dispute" because of the defendant's responsibility to report "incomplete or inaccurate" information under § 1681s–2(b)(1)(C)&(D).  *Id.*  The Ninth Circuit held that "[a] disputed credit file that lacks a notation of dispute may well be 'incomplete or inaccurate' within the meaning of the FCRA, and the furnisher has a privately enforceable obligation to correct the information after notice."  *Id.* at 1164.  However, to hold the furnisher liable for its failure to report the disputed status of the information, the consumer's dispute must be "a bona fide dispute, a dispute that could materially alter how the reported debt is understood."  *Id.* at 1163.  That is, the consumer dispute cannot be "meritless."  *Id.*

### ii.  Discussion

In her FAC, Ms. Sandigo claims that Ocwen is liable under § 1681s–2(b) for its failure to investigate and its failure to inform the CRAs that Ms. Sandigo disputed the outcome of Ocwen's investigations pursuant to § 1681s–2(b).

United States District Court
Northern District of California

1    Ocwen's primary argument is that it reported complete and accurate information to the

2    CRAs at all times because Ms. Sandigo was delinquent on her loan.  As with the CCRAA claim,

3    this argument fails because the amount Ms. Sandigo owed is a disputed issue of material fact.

4    Ocwen's briefing obfuscates whether the entirety of its FCRA argument relies on the accuracy of

5    its submissions, but the Court will assume that Ocwen believes that it might still win on the claim

6    even if its submissions were inaccurate.

7    Ocwen does not expressly refute Ms. Sandigo's allegations that Ocwen failed to

8    reasonably investigate after receiving notices of dispute from the CRAs, as required under §

9    1681s–2(b)(1)(A).  *See* Def. Mot. at 16–19.  However, in its section discussing punitive damages,

10   Ocwen briefly argues that its actions after investigating the disputes were reasonable.  *See id.* at 25

11   (citing Gollaher Mot. Decl. ¶¶ 16–17, 19–21, ECF 109).  But the Gollaher declaration does not

12   describe what actions Ocwen took to investigate the CRAs' notices of dispute, instead stating only

13   that Ocwen "investigated the dispute" each time.  *See* Gollaher Mot. Decl. ¶¶ 16–17, 19–21.  This

14   evidence is insufficient under *Gorman* to show that the investigation Ocwen undertook was

15   reasonable.  This is especially true in light of the information included in some of the notices of

16   dispute.  For example, in Experian's March 13, 2018 notice of dispute, Experian included a note

17   from Ms. Sandigo stating that "in recent interrogatory responses Ocwen admitted that I was not in

18   default and that their credit reporting was wrong."  Kennedy Opp. Decl., Ex. 24, ECF 119-1.

19   Ocwen responded that the account was more than 180 days past due and increased the accounting

20   of the amount past due.  *Id.*, Ex. 9 (at OCW 4325, 4327).  Ocwen provides no evidence that it

21   investigated the discrepancies between its ultimate position that Ms. Sandigo was 180 days past

22   due and its previous interrogatory responses admitting she was not past due before it responded to

23   the notice.

24   Unlike in *Gorman*, where the notices did not "identif[y] the nature of Gorman's dispute as

25   centering on [the challenged] charge or indicate[] that the dispute concerned rejection of the goods

26   charged for," a reasonable jury could find that the notices from the CRAs in this case were specific

27   enough to require a more thorough investigation by Ocwen, and Ocwen has not submitted

28   sufficient evidence to demonstrate that it conducted such an investigation.  As the court in

41

United States District Court
Northern District of California

1    *Gorman* recognized, "summary judgment is generally an inappropriate way to decide questions of

2    reasonableness because the jury's unique competence in applying the 'reasonable man' standard is

3    thought ordinarily to preclude summary judgment." *Gorman*, 584 F.3d at 1157 (internal quotation

4    marks and citation omitted).  Thus, Ms. Sandigo's FCRA claim survives on this theory.

5          Ocwen also attempts to refute Ms. Sandigo's theory that under §§ 1681s–2(b)(1)(C)&(D)

6    Ocwen should have noted that Ms. Sandigo actively disputed the outcome of its investigations in

7    response to the CRA notices.  Ocwen first argues that it did not need to mark Ms. Sandigo's

8    account as disputed because *Gorman* requires it only to mark an account as disputed when the

9    CRA notice of dispute relays a dispute about a *previous* omission by Ocwen.  The Court believes

10    what Ocwen means is that Ocwen only needed to mark the account disputed if Ms. Sandigo told

11    the CRA that Ocwen had previously omitted key information from a response to a CRA notice of

12    dispute.  If that's Ocwen's argument, it is simply a misreading of *Gorman*'s holding.  Though

13    *Gorman* noted that a consumer cannot challenge a furnisher's furnishing inaccurate information in

14    the first instance (because there is no private right of action under § 1681s–2(a)), it expressly held

15    that the consumer can "challenge [the furnisher's] *subsequent* failure to so notify the CRAs after

16    receiving notice of [the consumer's] dispute." *Gorman*, 584 F.3d at 1162.  That is, the consumer

17    (Ms. Sandigo) can challenge the furnisher's (Ocwen's) failure to provide accurate information to

18    the CRA after Ocwen's investigation under § 1681s–2(b).  "[T]he omission of the disputed nature

19    of the debt could render the information sufficiently misleading" to warrant liability.  *Id.* at 1163.

20    *Gorman* did not require that the original CRA notice of dispute raise an omission issue or note that

21    the account had previously been disputed.  It simply requires that the consumer continue to dispute

22    the account information, even after the furnisher has completed its investigation in response to the

23    CRA's notice of dispute.

24          Ocwen raises two additional arguments as to why this notice-of-dispute theory fails.  It

25    argues that even if it were required to furnish a dispute code, it was not required to submit an

26    "XB" code as Ms. Sandigo suggests, and it argues that that Ms. Sandigo did not suffer any harm

27    from any failure by Ocwen to do so.  *See* Def. Mot. at 18–19; Def. Reply at 10–12.  Both of these

28    arguments rely on disputed issues of material fact.

United States District Court
Northern District of California

1     As to the XB code, while Ocwen's expert opines that Ocwen could not furnish an XB code

2     in response to a CRA notice of dispute, *see* Ulzheimer Mot. Decl. ¶ 8, ECF 107; Gollaher Mot.

3     Decl. ¶ 24; Ulzheimer Reply Decl. ¶¶ 3–6, 9–10, ECF 129, Ms. Sandigo's expert opines that

4     Ocwen should have used the XB code in responding to the CRAs' notices of dispute, *see*

5     Hendricks Opp. Decl. ¶¶ 16–18.  One source of this dispute is their disagreement over whether

6     Ocwen could, should, or would have relied on certain industry guidelines.  *Compare* Pl. Opp. at 19

7     (citing Hendricks Opp. Decl. ¶ 17), *with* Def. Reply at 11–12.  Similarly, they dispute whether

8     these guidelines bar Ms. Sandigo from arguing that Ocwen's alleged failure to furnish an XB code

9     harmed Ms. Sandigo.  While Ocwen's expert opines that Ms. Sandigo was not injured by any

10    failure to report an XB code, *see* Ulzheimer Mot. Decl. ¶¶ 8–9; Ulzheimer Reply Decl. ¶¶ 7, 11–

11    14, Ms. Sandigo's expert disagrees, documenting several occasions on which Ms. Sandigo's loan

12    applications were rejected to due to low credit, *see* Hendricks Opp. Decl. ¶¶ 15–16, 18–27.

13    Ocwen's sweeping challenges to Mr. Hendricks' report are not supported by any valid objection,

14    and its arguments that Mr. Hendricks is simply wrong are not appropriate at summary judgment.

15    *See* Def. Reply at 10–12.

16        Thus, these disputes prevent summary judgment here.

17    **E.    Real Estate Settlement Procedures Act**

18        Ocwen seeks summary judgment on Ms. Sandigo's Real Estate Settlement Procedures Act

19    ("RESPA") claim.  Ms. Sandigo alleges that Ocwen violated RESPA, 12 U.S.C. § 2605, based on

20    its failure to properly respond to five Notices of Error ("NOEs") Ms. Sandigo sent to Ocwen on

21    the following dates: July 26, 2016, November 2, 2016, December 26, 2016, August 21, 2017, and

22    November 18, 2017.  FAC ¶¶ 104.  In her opposition to Ocwen's motion for summary judgment,

23    she does not discuss the August 21, 2017 letter, but discusses two additional letters: one on March

24    9, 2017 and one on May 17, 2018.[9]  Ocwen does not raise the issue that Ms. Sandigo does not

25    include these letters in her FAC.

26        The Court discusses the relevant facts and then each parties' arguments.

27

28    _____

[9] Ms. Sandigo states that she sent the letter on May 7, but it is dated May 17.

### 1. Relevant Facts

The Court discusses each purported NOE in turn.

1. <u>July 26, 2016</u>:  To recap, in June 2016, Ocwen began demanding the full escrow payments from Ms. Sandigo.  Sandigo Opp. Decl. ¶ 17.  On June 28, 2016, Ms. Sandigo spoke to an Ocwen employee who told her that her account was in default because she had missed payments in September 2015, March 2015, and November 2015.  Sandigo Mot. Decl. ¶ 29 & Ex. 25.  The employee invited her to submit documentation to the contrary.  On July 26, 2016, Ms. Sandigo sent a letter to dispute the increased payments; she included bank statements to show she had not missed a payment.  Sandigo Opp. Decl., Ex. 11 at 1–4.

On August 4, 2016, Ocwen responded stating, in part, "[o]ur record indicates that the payments outlined in the correspondence have been received and applied to the loan accordingly" and that "the due date reflecting on the loan is valid."  *Id.*, Ex. 11 at 5–19; Flannigan Mot. Decl. ¶ 22 & Exs. 12, 13.  It did not mention the payment increase, but it included a full transaction history showing all credits and disbursements on her account.  Flannigan Mot. Decl. ¶ 22.

2. <u>November 2, 2016</u>:  On November 1, 2016, Ms. Sandigo spoke to an Ocwen employee who told her she could submit proof that she paid her own taxes.  Sandigo Opp. Decl., Ex. 30.  On November 2, 2016, Ms. Sandigo sent proof she paid her own taxes and again disputed the payment increase.  *Id.*, Ex. 11 at 22–28.  Ocwen responded on November 28, 2016 and agreed to de-escrow Ms. Sandigo's account, such that she would be responsible for "future payments toward the tax on the property" as of February 1, 2017.  It did not address Ocwen's retroactive requests for increased payments.

3. <u>December 26, 2016</u>:  On December 26, 2016, Ms. Sandigo sent Ocwen a letter disputing that she was in default and owed ~$7,000 in back payments, and also disputing Ocwen's reporting to Equifax that Ms. Sandigo was delinquent by ~$6,000.  *Id.*, Ex. 11 at 35–42.  Ms. Sandigo avers that she never received a response to this letter.  Sandigo Opp. Decl. ¶ 18.

4. <u>March 9, 2017</u>:  In February 2017, Ocwen told Ms. Sandigo that she had been underpaying each month since June 2013.  On March 9, 2017, Ms. Sandigo sent a dispute letter challenging Ocwen's claim that Ms. Sandigo was required to pay the full escrow amount since

June 2013, and attaching billing statements from Ocwen for the de-escrowed amount.  *Id.*, Ex. 11 at 43–54.  She specifically requested that Ocwen stop foreclosure proceedings; remove the escrow amount and show her loan as current; contact the consumer reporting agencies to remove this information from her account; and send her certain monthly statements.  *Id.*  On April 20, 2017, Ocwen responded detailing its accounting of the escrow payment option (though somewhat confusingly), and responding to the other information Ms. Sandigo noted.  *Id.*, Ex. 11 at 55–57.

5. November 18, 2017:  On November 18, 2017, Ms. Sandigo wrote a letter regarding the problems with her loan and the insurance funds.  *Id.*, Ex. 11 at 75–87. She noted that she had filed this lawsuit and Ocwen still had not fixed the problems with her loan and had not allowed her to make any payments on her account for over a year.  Likewise, she argued that Ocwen was wrongly trying to foreclose on her home.  On December 7, 2017, Ocwen's attorney acknowledged receipt of the letter but did not substantively respond.  *Id.*, Ex 17.

6. May 17, 2018:  On April 19, 2018, Ocwen rescinded its Notice of Default.  *Id.*, Ex. 18. On May 17, 2018, Ms. Sandigo wrote Ocwen asking Ocwen to send her monthly statements, allow her to make payments, give her access to her online account, remove negative information from her credit report, and send her an accounting of the current state of her account.  *Id.*, Ex. 11 at 89. On May 29, 2018, Ocwen's attorney acknowledged receipt.  *Id.*, Ex 11 at 90.  On July 22, 2018, Ocwen's attorney responded more substantively to each piece of Ms. Sandigo's request, though it did not indicate that Ocwen would take any action to fix the status of Ms. Sandigo's loan, which it still listed as "due for January 1, 2017."  *Id.*, Ex. 11 at 91–92.

## 2.  RESPA Law

RESPA outlines specific notice requirements for the servicing of mortgage loans and administration of escrow accounts.  *See* 12 U.S.C. § 2605.  Under the Act, if a borrower sends the servicer a "qualified written request" ("QWR") (sometimes referred to as a notice of error ("NOE")), the servicer must respond in accordance with the statute and accompanying regulations. A QWR is defined as "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the

belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." *Id.* § 2605(e)(1)(B).

A loan servicer must acknowledge receipt of an NOE from a borrower within five days (excluding weekends and legal public holidays). 12 C.F.R. § 1024.35(d). In the absence of several exceptions, the servicer must respond to the notice of error within 30 days by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i). Under section 1024.35(g), a servicer need not respond to a notice of error if "[t]he asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligation to respond . . ., unless the borrower provides new and material information to support the asserted error." *Id.* § 1024.35(g)(1)(i). If the servicer determines that it is not required to respond to the notice of error because it is "substantially the same" as an error previously reported, it must "notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination." *Id.* 1024.35(g)(2).

"To state a viable claim under § 2605(e), a plaintiff must allege: (1) facts giving rise to an inference that the servicer of a mortgage loan received a QWR, including the identity of the purported recipient; (2) facts showing that the QWR contained information enabling the servicer to identify the name and account of the borrower; (3) facts revealing that the QWR included a statement as to why plaintiff believed the account was in error or that provided sufficient detail regarding the other information he sought; (4) facts demonstrating that the QWR addressed the 'servicing' of plaintiffs' loan as that term is defined by statute, rather than the validity of the loan or other legal issues; and (5) facts indicating either that plaintiff suffered actual damage as a result

46

1    of defendant's failure to respond to his inquiries regarding the servicing of the loan or that a

2    pattern or practice of noncompliance exists entitling plaintiff to statutory damages." *Grigoryan v.*

3    *Bank of Am. Corp.*, 2012 U.S. Dist. LEXIS 189873, *10–*12 (citations omitted).

4              **3.  Discussion**

5         Ocwen argues that summary judgment is warranted on this claim for two reasons.  First, it

6    argues it "properly addressed the concern underlying Sandigo's letters on several occasions."  Def.

7    Mot. at 20.  And second, "there is no causal link between Ocwen's alleged failure to respond and

8    the damages [Ms. Sandigo] supposedly incurred."  *Id.* at 21.

9         In support of its first argument, Ocwen notes that it responded to Ms. Sandigo's July 2016

10   and November 2016 letters promptly with some substantive responses.  *See id.* at 20.  It also

11   argues that Ms. Sandigo's dispute letters were successive and "substantially similar" such that it

12   need not have responded to the duplicative requests.  *Id.* at 21.  And Ocwen argues that Ms.

13   Sandigo cannot demonstrate that Ocwen "has a pattern or practice of noncompliance with

14   RESPA" because of its prompt responses to those letters to which it responded.  *Id.* at 22.

15        Ms. Sandigo notes that Ocwen does not actually submit any of Ms. Sandigo's dispute

16   letters and discusses only two of its own responses to those letters, which Ms. Sandigo argues is

17   insufficient for Ocwen to meet its burden of showing that it responded adequately to those

18   disputes.  *See* Pl. Opp. at 16.  Indeed, Ocwen does not address the requirements of 12 C.F.R. §

19   124.35(g), which required Ocwen to inform Ms. Sandigo of the substantial similarity.  Finally,

20   Ms. Sandigo argues that her NOEs were not repetitive because they raised different issues, for

21   example the payment increase, the default status of the loan, the alleged missed payments, and the

22   failure to rescind the Notice of Default.  Pl. Opp. at 17.

23        The Court agrees with Ms. Sandigo that Ocwen's evidence is woefully deficient to win on

24   summary judgment.  It provides evidence that it responded to only two of Ms. Sandigo's NOEs,

25   and it does not even submit the other letters to demonstrate their "substantial similarity."  And Ms.

26   Sandigo is correct that Ocwen does not assert that it told her that her subsequent NOEs were

27   substantially similar.  Thus, Ocwen does not meet its moving burden to submit sufficient evidence

28   to demonstrate that it complied with RESPA's requirements.  But even reviewing the letters as

United States District Court
Northern District of California

47

submitted by Ms. Sandigo, the Court finds that a reasonable jury could determine that they were not substantially similar, as they raised disparate issues, including, for example, that Ms. Sandigo missed certain payments, that she owed past due payments (despite having paid her own taxes), and that she would owe such amounts in the future.  A reasonable jury could conclude that Ocwen's responses to Ms. Sandigo's July 2016 and November 2016 letters do not respond to all of these topics.  And assuming for Ms. Sandigo (the non-movant) that she only owed the lower de-escrowed amount, a reasonable jury could conclude that Ocwen had a pattern and practice of failing to comply with the requirements under the Act because it failed to fix the issues with her loan.

In support of its damages argument, Ocwen argues that Ms. Sandigo cannot demonstrate that its failure to respond to any NOEs caused Ms. Sandigo's alleged damages.  Def. Mot. at 21 (citing *Pasillas v. Deutsche Bank Nat'l Trust Co.*, 2014 U.S. Dist. LEXIS 33679, at *25–*26 (N.D. Cal. 2014)); *Hild v. Bank of Am., N.A.*, 2018 U.S. Dist. LEXIS 135623, at *16 (C.D. Cal. 2018)).  Ocwen argues that Ms. Sandigo admitted in her deposition that her emotional distress was related to Ocwen's demanding the full escrow payments.  In her deposition, in the context of discussing Ocwen's responses to her letters, Ms. Sandigo was asked "Would it have been less stressful for you if Ocwen had explained [] why you were delinquent?" and she responded "No." Walker-Probst Mot. Decl., Ex. 1 at 103:15–17.  When asked, "So really the heart of the frustration was that Ocwen was insisting you owed more than you thought you did?" she replied "Yes."  *Id.* at 104: 10–13.

In opposition, Ms. Sandigo interprets her response at the deposition differently.  In her declaration, she describes the emotional damages that Ocwen's failure to respond to her repeated inquiries about the issues with her loan caused.  She avers that all of Ocwen's actions cumulatively caused her "desperation, sadness, helplessness, exhaustion, and anger."  Sandigo Opp. Decl. ¶ 33.  Specifically, as to Ocwen's failure to respond to her disputes, she states that her deposition response meant that "it would have been equally stressful to be told that [her] default was caused by skipped payments, as by [her] making payments of $1415 when $1597 was due."  *Id.* ¶ 34.

48

1          Though Ocwen's interpretation of Ms. Sandigo's deposition testimony is reasonable, so

2   too is Ms. Sandigo's interpretation of her own response.  As such, there is a disputed issue of

3   material fact as to whether Ocwen's alleged failure to respond to Ms. Sandigo's NOEs caused her

4   additional emotional damages above and beyond those caused by Ocwen's alleged failure to

5   correct the issues with the loan.  A reasonable jury could find that getting the run around for

6   months on end without any meaningful response caused Ms. Sandigo additional stress.  Moreover,

7   the facts here differ dramatically from those in the cases Ocwen cites.  In *Pasillas*, 2014 U.S. Dist.

8   LEXIS 33679, at \*25–\*26, the plaintiffs sent their QWRs "three years and three months after the

9   Notice of Default" and "two years and eight months after the foreclosure sale."  *See also Hild*,

10  2018 U.S. Dist. LEXIS 135623, at \*16 (discounting emotional damages allegation because actions

11  preceding the QWRs likely caused the alleged damages).  Ms. Sandigo began sending her NOEs

12  promptly after Ocwen told her she owed more money and well before the Notice of Default—that

13  is, Ocwen's failure to respond occurred *contemporaneously* with the other actions that may have

14  caused Ms. Sandigo damage, making it more difficult to rule as a matter of law that Ocwen's

15  failure to respond did not cause such damages.

16          Because there are disputed issues of material fact as to whether Ocwen adequately

17  responded to Ms. Sandigo's NOEs and whether Ms. Sandigo suffered damages because of any

18  failure to respond, summary judgment is not appropriate, and Ocwen's motion is DENIED as to

19  this claim.

20      **F.    Unfair Competition Law**

21          Ocwen argues that Ms. Sandigo's UCL claim fails for two reasons: (1) because it is

22  derivative of her other substantive claims, which Ocwen seeks to dismiss; and (2) because she can

23  not show she is entitled to either injunctive relief or restitution.  Def. Mot. at 22–23.  Ms. Sandigo

24  counters that her claims are valid and that she is owed restitution of the excess amount she paid

25  Ocwen between June and November 2016.  Pl. Opp. at 17.

26          The Court agrees with Ms. Sandigo.  Most of her claims survive summary judgment, and

27  thus serve as a basis for liability under the UCL.  Also, as discussed above, Ocwen has not

28  provided concrete evidence that it repaid Ms. Sandigo the alleged excess payments she made

United States District Court
Northern District of California

between June and November 2016.

As such, Ms. Sandigo's UCL claim is still viable.

### G.    Punitive Damages

In her FAC, Ms. Sandigo seeks punitive damages (FAC, Prayer for Relief ¶¶ 4, 5, 6, 12), which she can recover on her CCRAA, FCRA, and conversion claims. *See* Cal. Civ. Code § 1785.31(a)(2)(B); 15 U.S.C. § 1681n(a)(2). Because the Court has dismissed Ms. Sandigo's conversion claim, it considers only her credit reporting claims. To show that Ocwen is liable for punitive damages under either credit reporting statute, Ms. Sandigo must show that Ocwen "willfully" failed to comply.

Ocwen argues Ms. Sandigo cannot demonstrate that it willfully violated either of these statutes because (1) it did not violate them (which the Court has already rejected at summary judgment); and (2) any mistake by Ocwen as to the amount Ms. Sandigo owed demonstrates a "good faith dispute between the parties." Def. Mot. at 25. As to the latter argument, Ocwen notes that it "sent numerous letters regarding the amount of her monthly payment and the balance owed"; that it had a good reason for furnishing the information it did because Ms. Sandigo did not object to the APOC in the Bankruptcy Action; that Ocwen stopped transmitting monthly information as soon as this suit was filed; and that Ocwen investigated each CRA notice of dispute and updated her account information consistent with its belief that the bankruptcy filings bound it. *See id.*

In response to these arguments, Ms. Sandigo dedicates four entire pages of her opposition brief to setting forth the evidence to refute these arguments. Pl. Opp. at 20–24. The Court has recounted much, but not nearly all, of this evidence above.

The Court has detailed the long and complicated history of Ms. Sandigo and Ocwen's interactions. As described in the section determining that the amount Ms. Sandigo owed is a disputed issue of material fact, the Court noted that the evidence Ms. Sandigo marshals to demonstrate that Ocwen agreed to and successfully did de-escrow the loan (at least for a few years) is overwhelming. Throughout that time, and for many months after it filed its APOC, Ocwen provided mixed messages to Ms. Sandigo about the amount she owed. At times it

50

1    admitted she owed only the lower amount and was not in default, at other times it indicated she

2    owed the lower amount but had missed monthly payments, and still at other times it indicated she

3    had not missed monthly payments but instead had been underpaying.  Ocwen has not provided any

4    evidence showing that at any time it believed it was ever paying Ms. Sandigo's property taxes (the

5    entire purpose of the higher escrow payment), and yet it demanded the full escrow payment both

6    retroactively and prospectively.  It also did not rely on any bankruptcy court orders to justify its

7    position until years after Ms. Sandigo began paying the de-escrowed amount.  A reasonable jury

8    could conclude from this evidence that Ocwen knew Ms. Sandigo only owed the lower amount,

9    and yet inaccurately reported to the credit agencies that she was deficient.  If these facts are true, it

10   indicates not simply that Ocwen "should have known" that it was violating the acts or that Ocwen

11   in good faith misinterpreted the bankruptcy law, *contra* Def. Reply at 13–14, but rather that

12   Ocwen knowingly and willfully violated the credit reporting acts.

13          Moreover, when Ms. Sandigo sent formal and informal disputes to Ocwen, drawing all

14   reasonable inferences for Ms. Sandigo, Ocwen continually provided non-substantive or vague

15   responses or simply failed to respond altogether.  Then when the CRAs sent Ocwen notices of

16   dispute with notes from Ms. Sandigo about Ocwen's failure to correct the default status, a jury

17   could conclude that Ocwen did not reasonably investigate.  Indeed, Ms. Sandigo presents copious

18   evidence from Ocwen's 30(b)(6) witness's deposition that Ocwen's investigation of these notices

19   was cursory, including no indication that the investigator reviewed any of Ms. Sandigo's prior

20   direct disputes.  *See, e.g.*, Kennedy Opp. Decl., Ex. 10 at 129:17–130:9, 230:3–233:5, 244:18–

21   246:7, 298:25–299:15, 299:25–301:7, 301:9–305:5, 314:25–316:25.  Thus, a reasonable jury could

22   also conclude that Ocwen willfully failed to conduct a reasonable investigation in response to the

23   notices of dispute.

24          Ocwen also again asserts its argument that Ms. Sandigo did not suffer any actual damages

25   as a result of its alleged willful violations of the acts.  Def. Reply at 13–14.  As discussed in the

26   FCRA section, Ocwen has failed to meet its moving burden to demonstrate that it reimbursed Ms.

27   Sandigo for the payments she made between July and November 2016.

28          As such, summary judgment is not appropriate on Ms. Sandigo's request for punitive

damages.

**V.     ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.   Ocwen's motion for summary judgment is GRANTED as to Ms. Sandigo's claim for conversion.

2.   Ocwen's motion for summary judgment is DENIED as to the remainder of Ms. Sandigo's claims and her request for punitive damages.

3.   Ms. Sandigo's motion for summary judgment is DENIED.

4.   Res judicata does not bar Ms. Sandigo from arguing that she owed only $1,415.21 per month to Ocwen.

**IT IS SO ORDERED.**

Dated: May 23, 2019

_____
BETH LABSON FREEMAN
United States District Judge